# Exhibit 1

AGREEMENT BETWEEN

# U.S. DEPARTMENT of COMMERCE/PATENT AND TRADEMARK OFFICE

AND

# THE PATENT OFFICE PROFESSIONAL ASSOCIATION

1986

AGREEMENT BETWEEN THE U. S .PATENT AND TRADEMARK OFFICE AND
THE PATENT OFFICE PROFESSIONAL ASSOCIATION

This document is bookmarked for ease of reference and use.

# PREAMBLE

The basic agreement and amendments thereto as may be executed hereafter from time to time together constitute a collective bargaining agreement by and between the U.S. Patent and Trademark Office, hereafter called the "Office", as represented by the Commissioner of Patents and Trademarks, and the Patent Office Professional Association, hereafter called the "Association", as represented by its President. The rights of the Commissioner and the President to delegate responses related to labor relations are not abridged unless specifically set forth in the articles of this Agreement.

It is the intent and purpose of the parties to promote and improve the morale, thereby improving employee performance and effectiveness, to promote and improve the effectiveness and efficiency of the Office in carrying out its mission, and to promote and improve the well-being of all employees in the Unit by establishing a mutual under-standing relative to personnel policies and practices and matters affecting the terms and working conditions of such employees.

The Office recognizes that participation of employees in collective bargaining through the Association and that collective bargaining by the Association with the Office furthers and carries out not only the principles set forth in the preceding paragraph, but also the purposes and principles set forth in 5 U.S.C. § 7101.

The parties realize that an orderly and constructive relationship will be best maintained between them by providing specific means for the amicable discussion and adjustment of employee grievances and that effective labor-management cooperation in the public service requires a clear statement of the respective rights and obligations of the parties.

Since the Association does not currently have the right to negotiate matters that are traditional topics for labor-management agreements such as salary and fringe benefits, the principal concerns of the parties include the policies and procedures used for initiating and/or justifying personnel actions, and methods of evaluating professional performance.

# ARTICLE 1
*Recognition & Unit Determination*

Section 1

In recognition of the fact that a majority of the professional employees of the Office have selected the Association as their exclusive representative and that a certification has been issued to this effect, the Commissioner hereby reaffirms his recognition of the Association as the exclusive representative of the employees in the following unit, hereinafter called the "Unit":

> All professional employees of the Office as determined in the unit arbitration decisions of Mr. Rocco C. Siciliano (81-Comm PATO-1 and PATO-2) dated July 31, 1964, and as modified by A/SLMR No. 856, excluding (1) any management officials or supervisors; (2) confidential employees; (3) employees engaged in personnel work in other than a purely clerical capacity; and (4) trademark professionals.

Section 2

A.   Not later than 4 calendar months after the effective date of this Agreement, and on the anniversary of effective date of this Agreement each year thereafter, the Office will provide the Association with a list, arranged by organizational unit and alphabetically therein, of all Office employees, showing the Office's view as to which employees are included in the Association's bargaining unit and which are not. This list shall set forth for each employee their name, tour of duty, position title, schedule code, series, grade level, tenure, competitive level, organization code and entrance on duty date.

B.   The Office shall notify the Association in writing of all new positions either simultaneous with the posting for such positions or, in the case of non-posted positions, simultaneous with the filling of such positions, and shall indicate the Office's view as to which of these positions are included in the Association's bargaining unit.

C.   Within one month after the transmission of a list as provided in Section 2A or Section 2B the parties will meet. At this meeting the Office shall present the factual basis for its view as to bargaining unit designations and the parties will discuss the reasons for such designations. The Association shall present, within a reasonable period of time, the factual basis for its view if upon investigation it has a disagreement. If the parties thereafter continue to disagree as to the appropriate bargaining unit status of any employee or position, the Office, within two months from receiving the factual basis for the Association view, will present the reasons for its position in writing and then the Association, within two months from receiving the written position of the Office, will respond in writing with the reasons for its view.

# ARTICLE 2
*Precedence of Law, Regulation & Other Matters*

Section 1

In the administration of this Agreement, officials and employees are governed by (1) existing or future statutes, (2) regulations issued by the Department of Commerce prior to the effective date of this Agreement and not inconsistent with this agreement, (3) government wide rules and regulations prescribed prior to the effective date of this Agreement or which are issued subsequently and are not inconsistent with this Agreement and are outside of the scope of bargaining. Except as otherwise provided, other than a rule or regulation implementing 5 USC 2302, no rule or regulation which is in conflict with this Agreement and which was prescribed after the effective date of this Agreement shall be enforced.

Section 2

The unwritten practices of the parties shall continue, absent written notification by either party of their intent to discontinue or modify a particular practice. Upon the request of either party, the parties shall bargain over the change to the extent consistent with law.

# ARTICLE 3
*Management Rights*

<u>Section 1</u>

Management officials of the Office shall retain the right:

    A. To determine the mission, budget, organization, number of employees, and the internal security practices of the agency;

    B. To hire, assign, direct, layoff and retain employees, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against employees;

    C. To assign work, to make determinations with respect to contracting out, and to determine the personnel by which operations shall be conducted;

    D. With respect to filling positions, to make selections for appointments from:

        1. Among properly ranked and certified candidates for promotions; or

        2. Any other appropriate source;

    E. To take whatever actions may be necessary to carry out the mission during emergencies;

<u>Section 2</u>

Management shall respond in writing to written requests from the Association. Where reasonably possible, the response shall be substantively responsive to the request and provided to the Association within two weeks from the date the request was received.

<u>Section 3</u>

The rights of the Office to take actions or to effectuate changes shall be limited to the provision of Article 14 on Mid-Term Bargaining.

<u>Section 4</u>

    A. In order that members of the bargaining unit and the officers of the Association may be better informed as to their rights, obligations and responsibilities, management will supply to the Association, as they are issued, a copy of all duly published Office policies, Patent Office

Administrative Instructions and Department of Commerce Administrative Orders.

B.    Any laws, regulations and policies relevant to an employee's performance, conduct or employment in the possession of the office shall be made available for inspection and study by the Association and individual members of the Unit, if such material is not otherwise reasonably available. Upon request, a copy of the relevant portion{s) of such material shall be provided to the Association or the requesting employee if the request is not unreasonable and the cost is not excessive.

C.    All cost center published policies directly applicable to an employee shall be available for his/her inspection and study at the Office of his/her second line supervisor.

D.    Each affected employee shall be given a copy of newly published Office policies.

E.    This section does not confer or sanction the use of nonproduction time by employees or Association officers or representatives unless, in the case of an employee, the inspection or study of the documents identified has been previously approved by his/her supervisor or, in the case of Association officers or representatives, the inspection or study is on official time.

Section 5

Disciplinary and adverse actions for misconduct will be taken for just and sufficient cause and will be in accordance with all applicable regulations and laws.

Section 6

Within the first quarter of each fiscal year, the head of an operating unit at the Group Director level or equivalent shall conduct a meeting to notify unit employees of all records maintained by the operating unit which identify the employee by name or other identifier. At this meeting, POPA shall have the opportunity to have a representative whom, if he or she attends, shall be limited to the role of observing or asking questions.

The Office, within the first quarter of each fiscal year, shall publish for the use of each unit employee and distribute to the Association a directory of each system of records maintained with respect to employees at management levels above the head of the operating unit, indicating the title and room location (e.g., Directors' offices) of such system of records and the categories of records (as exemplified by those specified in the Federal Register, vol. 49, No. 4, pp. 913-921) contained within the system of records. "Records" include both paper and

electronic records and shall refer only to that information which may be retrieved by the employees name or other identifier. Access to such system shall be governed by Article 4, Section(s) 6 and 11, but subject to the laws and regulations or higher authority.

# ARTICLE 4
*Employee Rights*

Section 1

Employees in the Unit shall have the right, freely and without fear of penalty or reprisal, to join or assist the Association or to refrain from any such activity, and each employee shall be protected in the exercise of such right.

Section 2

Nothing in the agreement shall require an employee to become or to remain a member of a labor organization, or to pay money to the organization except pursuant to a voluntary written authorization by a member for the payment of dues through payroll deductions.

Section 3

Nothing in this agreement shall preclude an employee from bringing matters of personal concern to the attention of appropriate management officials.

Section 4

This agreement shall not preclude an employee from exercising grievance or appellate rights established by law or regulations; or from choosing his/her own representative in a grievance or appellate action, except when presenting a grievance under the procedure provided in Article 11, the limitations set forth therein must be followed.

Section 5

The following rights shall apply to communications about an employee when the source, either oral or written, is not from within the employee's examining group or its equivalent.

A.    If the communication contains a complaint against an employee it shall not be later used against an employee unless:

   1. it has been reduced to writing, including notation of the date;

   2. any investigation with respect to it has been reduced to writing with specificity or there is adequate written justification for why no investigation was conducted;

   3. any oral response by the supervisor to the complaint has been later reduced to writing with the date and approximate length of the conversation noted;

   4. all written responses to the complaint have been retained;

5.  justification of why the complaint or relevant matters arising out of investigation or responding to the complaint were not disclosed to the employee, and opportunity given for comment by him/her; and

6.  the above has been provided to the employee at the time the communication is used as the basis for any action which is to the disadvantage of the employee. Such action cannot be based on a communication which was received more than 90 days prior to the action unless:

    a.  the complaint and/or relevant matters arising out of the investigation of, or the responses to, the complaint were disclosed to the employee and a reasonable opportunity given him/her to comment in writing within the 90 day period.

    b.  there is an ongoing investigation that specifically prohibits disclosure to the employee.

7.  When an employee has been afforded a reasonable opportunity to comment in writing within the 90-day period, any action which is to the disadvantage of the employee cannot be taken more than 12 months after the communication was received.

B.  If the communication compliments the employee, a copy shall be given to the employee or if the communication was oral, it shall be reduced to writing and given to the employee.

C.  Documents concerning admonishment, warning, caution or similar or like matters unrelated to performance are temporary and shall not be kept in any employee's record or file for longer than one year after their creation.


Section 6

A.  In all matters of or concerning personnel records the office shall abide by applicable laws and regulations of higher authority and this agreement.

B.  Each employee of the unit shall have the right to inspect his/her personnel records and have them amended upon a showing that they are inaccurate, untimely or incomplete. The request to inspect shall be made to the office in which such records are kept.

C.  Each employee of the unit shall be furnished a copy of any paper added to their Official Personnel Folder which relates to his/her performance, conduct, or potential provided such is not prohibited by the FPM or any Government-wide law or regulation, and such employee shall have an opportunity to submit and to have placed in

said OPF a brief written statement concerning such paper which is furnished to him/her.

Section 7

Employees will be treated equitably and fairly by management. Therefore, only employees who believe they have been personally subjected to disparate treatment or unreasonable acts by management shall have the right to contest such treatment by use of the negotiated grievance procedures set forth in Article 11.

Section 8

A.  When a representative of management wishes to meet with an employee for the purpose of obtaining information from him/her which management intends to be used with respect to determining whether disciplinary action shall be taken against the employee, the management representative shall notify the employee of the general nature of the meeting and of his/her right to have a union representative present prior to commencing the meeting.

B.  In addition to the provisions of 5 USC § 7114 (a) (2) (b) allowing an employee to have a union representative present at a meeting when he/she reasonably believes that an investigation, as part of that meeting, could lead to disciplinary action, the management representative conducting the meeting shall notify the employee of his/her right to a union representative to attend such a meeting, if the management representative reasonably recognizes that a disciplinary action may result.

C.  If the employee requests a union representative, management shall be obligated to wait a reasonable time to allow the employee the opportunity to secure representation, before proceeding with the meeting.

D.  None of the preceding subparagraphs shall apply to investigations, inquiries or counseling sessions which apply solely to performance-based actions.

Section 9

When it is necessary to reassign employees due to a staffing imbalance, the office will first ask for volunteers from among the qualified employees at the affected post of duty. If there are too many volunteers, the employees with the oldest PTO service computation date shall be given first consideration for the reassignment. If there are too few volunteers, employees with the most recent

PTO service computation date will be given first consideration for the reassignment.

Section 10

A.     The Office will notify the Association and the affected employees of a proposed substantial change in a position description, such as a significant addition or reduction of duties or a change in grade level. The employees and the Association will be provided with a reasonable period for comment on the proposed language which will not unduly delay issuance of the position description. The opportunity to comment by itself does not create or acknowledge a right to negotiate. Minor changes, such as clarifying language or a change in organization designation or position titles which are unassociated with other more important changes, will create the duty to notify the employee and the right of the employee to comment, but no such duty or right shall extend to the Association.

B.     The Office will provide the employee with the final amended position description upon its issuance. The Office will provide the Association with the final amended position description upon its issuance only when a substantial change is involved.

C.     The employee shall have the right to rely on the accuracy of his/her position description. An employee cannot be presumed to be aware of changes in a position description before the employee receives a final amended position description.

D.     The Office will provide the Association with a copy of all newly proposed position descriptions.

E.     When an employee requests a desk audit, the Office shall conduct the audit within a reasonable time under the circumstances.

Section 11

A.     The right of an employee, or his/her representative, to information provided in this Article, shall not be diminished, or otherwise adversely affected by such information being stored in machine systems, such as computers.

B.     Similarly, information made available to the Office by computer enhancements shall not be denied an employee where such denial will adversely affect an employee's right to information otherwise required by this Article.

C.   If there are alternate means of providing such information, the Office may choose the least costly or time consuming alternate, if to do so does not prejudice the employee's rights to prompt and meaningful information.

Section 12

A.   An employee covered by this Agreement may, without fear of penalty or reprisal, engage in the disclosure of information which the employee reasonably believes evidences:

(1)   violation of any law, rule or regulation; or,
(2)   Mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

B.   Such disclosure may be made if it is not specifically prohibited by law and if such information is not specifically required by executive order to be kept secret in the interest of national defense or the conduct of foreign affairs.

C.   The language of this section shall be interpreted in the same manner as similar language in 5 U.S.C. 2302 as interpreted by published decisions of the courts and those adjudicator agencies empowered by Congress to adjudicate "whistleblower" protections.

Section 13

A.   An employee may resign at any time. However, an employee should give reasonable notice of his/ her resignation. The employee's reasons for resigning should be entered in his/her official records.

B.   Normally, resignations should be in writing. Requests to withdraw resignations may be declined by the Office consistent with the provisions of 5 CFR, subpart b, § 715.

C.   The Office shall not secure any employee's resignation by coercive or deceptive means.

D.   When an employee resigns after receiving written notice of proposed disciplinary or adverse action, the pending action is to be listed in the employee's records, as set forth in the Federal Personnel Manual Supplement 296-33, unless the Office and the employee agree otherwise. When an employee resigns before receiving written notice of proposed disciplinary or adverse action, no record will be maintained regarding the possibility of such action, as set forth in the Federal Personnel Manual Supplement 296-33. All recorded information within

control of the Office specifically related to the incomplete action, except that which is retained in a confidential file maintained by the properly designated official in the Office of Personnel, shall be destroyed by the Office immediately after the employee's effective date of resignation.

Section 14

A.   The Office and the Association jointly encourage employees to participate in the Combined Federal Campaign and the United States Bond Drive.

B.   Financial participation in such programs and other charitable campaigns shall be on a strictly voluntary basis.

C.   First and second line supervisors shall not be provided any information as to the fact of, or the amount of, contribution by their subordinates; however, actual individual payroll stubs shall be exempt from this requirement.

D.   (1) Solicitors for contributions shall be volunteers; except, if there are no volunteers in a particular organizational area, the least senior employee shall be designated as the solicitor, unless there is a significant work-related reason requiring the designation of another employee. (2) The Office shall relieve an employee from duties as a solicitor; for cause directly related to solicitation activities. (3) No employee who reviews or directs the work of another shall solicit monies from the employees so reviewed or directed. (4) Solicitors shall be granted appropriate official time to engage in the solicitation program.

E.   Employees shall not be asked to disclose the fact of, or the amount of, their contributions or allotments to persons who review or direct those employees.

F.   All employees shall be given a non-transparent envelope for the purpose of making a confidential contribution or allotment. Solicitors shall explain the purpose of the envelopes and shall not open any returned envelopes that are sealed. Solicitors shall not divulge information regarding an individual's contribution or allotment to anyone other than a person designated by, and acting on behalf of, the Personnel Processing Division, other charitable campaigns, or the US Bond Drive.

Section 15

A.   The Office and the Association jointly encourage employees to donate blood. Participation shall be strictly voluntary.

B.   An employee's supervisor shall grant an employee four hours administrative time to make a blood donation, including recuperation and travel time. The administrative time shall be taken consecutively, beginning at the time the employee departs to make the blood donation.

C.   Employees will be released to donate blood unless the employee's absence will create a significant work detriment to the work load of the Office.

**ARTICLE 5**
*Employee Obligations*

Section 1

Each employee of the unit is presumed to know and is expected to comply with all laws, duly published regulations and policies which relate to his employment and conduct. The fact that a particular law, regulation or policy may not be called to his/her attention by the Office will not excuse any violation on his/her part. In such situations when a law, regulation or policy can be reasonably viewed as imposing a requirement or limitation which is not obvious or which does not involve a situation when a reasonable person should have inquired to ascertain whether there was a requirement or limitation, then an employee, who did not have actual notice or knowledge of the law, regulations, or policy, shall not be subject to a penalty more severe than an oral warning, unless the Office can show, with a high burden of proof, that the circumstances warrant a higher penalty.

Section 2

Whenever practical, prior to leaving their work area, all Unit employees shall inform their supervisor or designee of the nature of the activity to be transacted, the location of the area they intend to visit, and the approximate time they will be out of the work area.

Section 3

Notwithstanding the fact that there exists no legal requirement for employees to provide a current mailing address or home phone number to the Office, the parties nevertheless encourage employees to provide a current mailing address to the operations division and a home phone number to their immediate supervisor. Unless required by law, this information shall be kept in strict confidence. The immediate supervisor shall not use the employee's home phone number except in an emergency situation.

Section 4

Unit employees having contact with the public will maintain a neat and clean appearance, reasonably suitable for a contemporary business environment, during working hours.

**ARTICLE 6**
*Association Rights & Obligations*

Section 1

The Association shall have the right to act for and to negotiate agreements covering all employees of the Unit and also shall be responsible for representing the interests of any employee or group of employees within the Unit without discriminating and without regard to employee organization membership, except as provided for in 5 U.S.C. §7114(a) (5) and 5 U.S.C. §7121(b)(3)(B).

Section 2

Management shall furnish the Association with the name of every newly-hired Unit member and his/her initial Art Unit, or equivalent, assignment during the member's initial two weeks of employment.

Section 3

The Association shall have the right to speak to all new Unit employees at an orientation session. The Association will be given adequate notice of the schedule for its presentation. The Association's presentation will not exceed 15 minutes and shall not include any direct solicitation for membership. A reasonable time will be provided for answering questions. The Association will provide and distribute copies of the Agreement and amendments thereto at its presentation.

Section 4

In order to implement the Association's rights under 5 USC 7114 (a) (2) (A) to participate in formal meetings, the Office shall make every effort to provide the Association a minimum of four hours advance notice for such meetings. In any event, such advance notice shall be reasonable under the circumstances and sufficient to allow the Association time to arrange for representation at the formal meeting. If the Association is unable to be represented at a formal meeting or chooses not to be represented, the Office shall promptly prepare a written summary of the meeting at the Association's request. The Association shall have the right to one representative at such formal discussions.

Section 5

Advance notice under Section 4 shall include:

A.     the time and place of the meeting;

B.     the expected Unit employees and Office representatives at the meeting;

C.     the general nature and subject matter to be discussed, and a copy of any agenda prepared by the Office in advance.

Section 6

A.     Any communication to the Association from the Office which is subject to a response time period started by the serving of the communication, shall be delivered on the date of service and either 1) handed by a representative of the Office directly to (a) the Association President, (b) the Association Secretary, or (c) any person previously designated by the President to receive such communication; or 2) deposited by a representative of the Office into, and date and time stamped at, a communication box located in the clerical area of the Group, or its equivalent, of the Association President and dedicated solely for the use of the Association. When such a communication is deposited in the Association communication box, the Office will leave a message on the day of delivery notifying one of the POPA representatives listed in 1) of such. The Office will provide access to the communication box Monday-Friday, 8:30 a.m. -5:00 p.m. Any communication received in the box after 5:00 p.m. will be considered delivered on the following work day for the purpose of starting the period.

B.     The Office is exempt from the procedure set forth in subsection A when a neutral third party (e.g., arbitrator) specifically requires the communication be filed in a different manner.

Section 7

A.     No member of Management shall deliberately open and/or read mail directed to the Association.

B.     All external mail directed to the Association shall be removed during the initial mail sorting process. Such mail shall not be opened, but, date-stamped, bundled and delivered to the organizational unit of the Association President.

C.     Any Association mail mistakenly opened in the Mail Room shall be identified as mistakenly opened when the Mail Room perceives such a mistake before the mail in question leaves the Mail Room.

<u>Section 8</u>

The Association shall have the right to hold one meeting per year during duty hours to discuss working conditions and related subjects with its members. The internal affairs of the Association shall not be discussed at this meeting. The Office will grant one hour of administrative leave to all Unit members who attend.

## ARTICLE 7
*Career Development & Work Details*

Section 1

The Office shall designate certain recurring details as'' career development details." A listing of the career development details shall be posted and published annually, and copies made available to the Association and members of the Unit. Career development details are details that not only provide assistance in meeting work requirements, but also will provide employees an opportunity to develop their skills, interests, and improve efficiency in administrative and technical fields so that a reservoir of developed employees will be in existence for possible selection to higher level vacancies.

Section 2

Assignments to career development details shall be made and administered in a fair and equitable manner among every qualified employee who has expressed an interest in a detail. The Office and the Association encourage highly qualified individuals to participate in career development details. Two weeks advance notification of a career development detail shall be made by means of an announcement to all Unit employees. However, the Office may announce multiple details simultaneously and establish a roster of eligibles from the response to that announcement that is valid for a period of up to 12 months. Announcements shall include the location of the detail(s) , the duration, the nature of the work, the required application procedures and the minimum qualifications and requirements of an applicant. The Association shall be provided with a copy of each announcement.

Section 3

The term "career development detail" shall include the following, unless the creation of such a detail excessively interferes with management rights, details to:

A.     Office of Quality Review (Deputy Commissioner)

B.     Assistant Commissioner for Patents

C.     Assistant Commissioner of External Affairs

D.     Deputy Assistant Commissioner of Patents

E.     Solicitor's Office

F.      Enrollment and Discipline

G.      Any other detail:

      1.      for which credit (e.g., points) is given in merit promotion actions,

      2.      which is not normally assigned to the employee and is outside the employee's position description, and

      3.      which requires at least 450 hours work time over a period of four months.

<u>Section 4</u>

Before selection, the skill and ability of the employee and the specific needs of the Office will be considered. Selection preference shall be given to those qualified applicants who have the least amount of service on career development details. A career development detail which terminated more than four years prior to the announcement of a new detail will be ignored in assigning selection preference. Except in extraordinary circumstances an employee shall not serve on a career development detail a second time in the same area.

<u>Section 5</u>

Full allowance will be made for the time lost while said member is participating in a career development detail. The Office shall notify affected employees of the existence and expected duration of conditions in a Group Art Unit or equivalent area which would preclude their participation in a career development detail.

<u>Section 6</u>

The Office shall provide the Association with the name of the applicant selected to fill the detail.

<u>Section 7</u>

The Office may assign employees to work details without regard to the provisions of the article when workload requirements exist so as to make alternate assignments to details necessary to carry out the agency mission.

**ARTICLE 8**
*Professional Training & Development*

Section 1

A.      The Association and the Office agree that the professional training and development of Unit employees is a matter of great importance.

B.      The factors which shall be considered in determining which employees will be selected for training are:

1.      benefits to be derived by the Office
2.      resource limitations
3.      enhancement of the employee's performance
4.      number and type of training sessions previously attended by the employee
5.      length of employment in the office

C.      If management determines that it is in the best interest of the Office and the employee, the employee may be asked to repeat all or selected portions of training previously given or may be asked to take training. Management shall pay all costs of such training.

Section 2

The Office recognizes that the reading of technical and legal publications is necessary to keep professionals abreast of recent developments related to their work assignments, and to keep searches up to date. Absent a budgetary emergency, the Office will continue to supply professionals with articles, magazines and books written on legal and technical subjects pertinent to his/her assignments. In arts involving rapid technical advances, it is recognized that the reading, copying and classifying of technical publications may require a substantial amount of time. Accordingly, supervisors shall grant professionals a reasonable amount of non-production time, per bi-week, for this purpose.

Section 3

A.      The Office recognizes that attendance at certain conferences, seminars and meetings outside of the Office is necessary for full professional development of the members of the bargaining unit, and is both desirable and in the best interest of the mission of the Office. Therefore, the Office shall annually publish a list of such outside conferences, seminars and meetings at which attendance was approved in the previous calendar year. A copy of the list shall be maintained in each Group Art Unit or equivalent area for review by Unit members and made available to the

Association. This list shall not be read or used as a limitation on such outside symposiums and employees may request other appropriate outside conferences, seminars and meetings under this Section.

B.  A supervisor may authorize:

   1.  up to 16 hours annually of excused absence for attendance, and

   2.  40 hours of compensatory leave, to be earned in advance, in accordance with applicable law, rule and regulation.

This opportunity will be accorded to those members of the Unit who have demonstrated satisfactory job performance and would most probably benefit the Office mission by their attendance.

Section 4

The Office intends to maintain a "Professional Examiner Training Program," under appropriate laws, rules, regulations, and funding constraints. The current program includes the following types of training for selected professionals:

A.  The Patent Academy - Intensive in-house training program primarily for all newly hired examiners, or refresher training for others, to teach the basic legal and procedural skills of patent examining;

B.  Legal Training such as: in-house legal courses, law school tuition assistance program; and legal lecture

C.  Technical Training such as: in-house technical training; Technical Course Program (for example tuition assistance for job-related technical courses at local universities); and

D.  Specialty Training – This activity is for those professional employees lacking sufficient skill in areas such as communication skills.

Section  5

Once an employee has requested and been selected for training or personal development under this article, the office shall pay for all tuition and books which may be associated with the training.  However, if the employee fails such training, the employee shall reimburse the office.

Section  6

If the office assigns patent applications or classification work in the area of technology foreign to the member' s training and background, the office shall

afford the member appropriate classroom or on the job training in the foreign technological area during duty hours.  Time spent in training shall be accounted for separately from examining time or classifying time.

<u>Section   7</u>

The office shall make and administer assignments to training under this article in a fair and equitable fashion consistent with management rights, workload requirements and budgetary limitations.

<u>Section   8</u>

The parties here by adopt the guidelines set forth in Commissioner Donald J. Quigg's September 20, 1982 memorandum concerning the Examiner Education Program, with the following modifications:

1.      The report generated under Section IX. D.  4 shall include an accounting     of the number of field trips separately for Unit members and managers.

2.      Copies of the report, excluding the information provided in accordance with subsection D. 4 (c) shall be sent to the Association quarterly.

**ARTICLE 9**
*Overtime*

Section 1

When management deems there is a specific need for compensated overtime or that such is a proper and fit manner to expend funds, then overtime shall be authorized in accordance with the following criteria:

    A.     the amount of work to be done;

    B.     the funds available to do the work;

    C.     the ability of the member of the Unit to satisfy the specific need;

    D.     the ability of the member of the Unit to perform the work to be done in an independent manner during the period of overtime;

    E.     demonstrated effectiveness in producing the required quality and quantity of the work product involved.

Section 2

The above criteria shall be uniformly applied in any cost center for which overtime is authorized. Insofar as practicable, overtime will be on a voluntary basis. Justification for restricting or denying overtime shall be in writing if requested by the member of the Unit affected.

# ARTICLE 10
## *Promotions & Reassignments*

All career vacancies shall be filled from among the best qualified candidates available on the basis of merit, fitness and qualifications; and without regard to race, color, religion, national origin, personal favoritism, age, marital status, sex, physical handicap, political or employee organization status or affiliation, except as may be authorized or required by law.

Section 1

The Office shall confer, at least annually, with the Association regarding the general professional staffing goals and hiring plans. Subsequent anticipated staffing goal and hiring plan adjustments will be addressed in a labor-management committee meeting.

Section 2

The Office hereby expresses willingness to consider promptly requests for transfers or reassignments from all members of the Unit.  Any transfers or reassignments shall comport with sound personnel practices and the needs of the Office. Nothing derogatory shall be connoted in any request for transfer or reassignment and the individual so requesting shall be free of discrimination or reprisal therefore.

Section 3

A.    The Office shall consider candidates for extra credit ratings at least twice a year. Candidates will be submitted by appropriate supervisors or an individual may nominate himself. No cognizance will be taken of any type of nomination. Each candidate not awarded the requested rating shall be given the reasons for the denial in writing.

B.    Prior to any change in existing criteria for extra credit items, or in any changes in the procedures for the submission and consideration of candidates, the matter will be addressed in a labor-management committee meeting. The requirements for the granting of extra credit items will be in accordance with those set forth in the Position Classification Standards for Patent Examining Series, GS-1224, as interpreted by, the Department of Commerce. The Office recognizes the benefits of maintaining a consistent scope of the art for examiners. Therefore, to the extent consistent with the interests of the Office, every reasonable effort will be made to allow examiners in GS Grade 13 and above to maintain their assigned dockets.

Section 4

Requests for personnel action will be processed promptly.


Section 5

No member of the Unit shall be placed in a disadvantageous position with regard to promotions by virtue of officially initiated service on special detail or assignment. If such detail or assignment should preclude or otherwise render impracticable an accurate work performance evaluation for promotion purposes, said member shall be considered as working at this same level of work performance evidenced immediately preceding his/her entrance on such detail or assignment.


Section 6

In compliance with regulatory requirements, the Office shall grant temporary promotions to members of the bargaining unit who have served in a higher grade position for more than 45 days.

Section 7

The Office agrees that the promotion of an employee shall not be delayed only because the employee's supervisor has been newly appointed to that position and is unfamiliar with the employee's work.

Section 8

Every member of the Unit shall have the right to be considered for promotion to the next higher grade one month prior to completion of the minimum time in grade required by law and regulation, provided the member is working in a position identified as a career-ladder position and providing such higher grade position exists. However, the criteria of the Signatory Authority Program shall apply to GS-13 examiners who are on the Signatory Authority Program. Any member who is not promoted after completion of the minimum time in grade shall have the right to request and receive a written statement from his supervisor after personal discussion between them. The supervisor's statement shall list the reasons for withholding the promotion and explain how the member's performance can be improved to qualify for promotion. This statement may be maintained by the Office but shall not become a part of the member's OPF.

Section 9

Programs which are established to provide for orderly career or promotional advancement shall be announced by the Office. Criteria for evaluation of participants in such programs will be published by the Office and copies thereof will be made available to individual members of the Unit upon request. Criteria contained in existing programs, identified ;by the Association, will also be published and made available. The Association shall be furnished a copy of any such criteria.

Section 10

It is the purpose of this Section to provide a fair and equitable procedure for filling positions through competitive procedures based on merit principles. To that end, the following procedures shall be used to identify and select the best qualified candidates for career vacancies, grades GS-12 and above, which are not within an employee's established career ladder, whether by promotion, transfer or new appointment.

A.     Position Vacancy Announcements shall be promptly posted on all Office bulletin boards and in each art unit or its equivalent. A copy of each Announcement shall be provided to the Association: The Announcement shall contain:

   (1)     the area of consideration;

   (2)     the minimum qualifications required;

   (3)     the categories of evaluation criteria and the total points available in each category;

   (4)     the crediting plan for each category;

   (5)     closing date; and

   (6)     a statement of equal employment opportunity.

Interested candidates shall be required to apply no sooner than 10 workdays after the date the Announcement is posted. Open continuing vacancy announcements, *i.e.,* vacancy announcements without specific closing dates, may be used to advertise recurring vacancies for which recruitment is expected to be difficult or continuing. When a sufficient number of candidates apply for consideration, a promotion register or skill file will be established. The register

cannot be used for a period longer than *six* months. Candidates on the register will be considered for all applicable vacancies developing during the period.

B.    Applicants must meet all qualification requirements by the closing date of the vacancy announcement or the issuance date of a merit promotion certificate from an established register or skills file, to be eligible for consideration for that vacancy.

C.    Not part of collective bargaining agreement.

D.    All eligible candidates will be evaluated and ranked in a fair and objective fashion. At least 60 percent of the candidates' evaluation score shall be based upon objective criteria, such as, objective examinations, blind evaluation of written work, experience and relevant training, and sanitized performance evaluations.

E.    A crediting plan, how points will be awarded for work experience, performance evaluations, etc., shall be established and reduced to writing before the vacancy announcement is posted.

F.    Within 30 days after the vacancy announcement has closed, the panel shall evaluate and rank the candidates as "Qualified," "Well Qualified," or "Best Qualified." The panel shall maintain a record of what points are credited to each candidate by category and the factual basis for crediting those points. The records of each panel shall be available to the Association and to each candidate upon the filing of a grievance or other appropriate challenge to the promotion. These records shall be retained for two years or until any grievance or challenge regarding the selection is finally resolved, whichever is longer.

G.    When all eligible candidates have been evaluated and ranked, the Office will promptly issue form CD-262, "Merit Assignment Program Certificate," listing the names of the best qualified candidates in alphabetical order, to be considered by the selecting official.

(1)    A certificate will usually include the names of three to five best qualified candidates for the vacancy to be filled. Additional candidates may be certified where meaningful distinctions cannot be made. Ten is the maximum number of best qualified candidates that may be referred to the selecting official, except as stated in subsection G.3, but the number of candidates may be increased to the extent necessary to include all of the candidates available from other appropriate sources as "other appropriate sources" is used in 5 U.S.C. § 7106 (a) (2) *(C) (ii)*.

(2)     In cases where meaningful distinctions of qualifications cannot be made through the application of quality ranking factors and an excessive number of candidates are considered equally qualified, up to 10 candidates may be listed on a certificate based on seniority with the Office.

(3)     When there is more than one vacancy to be filled from a certificate, one additional candidate may be added to the certificate for each additional vacancy. In the event an additional vacancy occurs within one month after an announcement has closed, the old announcement may be used to fill the vacant position, with the consent of the Association.

(4)     A Merit Assignment Program Certificate is valid for 30 calendar days from the date of issuance. The certificate may be extended for 30 additional days upon a valid request by the selecting official, with the consent of the Association.

(5)     Interviews with the selecting official are optional. If one member of the "best qualified" group is interviewed, all must be interviewed.

(6)     If the candidate selected is a Unit employee, he/she shall be promoted within one pay period of the date of his/her selection Under unusual circumstances (e.g. to permit completion of essential assignments or to permit arrangements to be made for the completion of essential assignments) , this time period for promotions may be extended, but for no more than two additional pay periods.

H.     The Office shall notify all candidates as to whether they were selected or not.

I.     Not part of collective bargaining agreement.

J.     When requested by a competing applicant, the Office shall furnish the following information after the action has been completed:

(1)     The name of the individual(s) selected;

(2)     Whether the applicant was found to be qualified;

(3)     Whether the applicant was on the list from which selection to fill the position was made; and

(4)     Not part of collective bargaining agreement.

(5)     In what area, if any, an employee may improve his or her qualifications to enhance chances for future selection. (This information normally will be furnished by means of a counseling discussion with either a representative of the office of Personnel or a knowledgeable supervisor with feedback from the panel.)

**ARTICLE 11**
*Grievance Procedure*

Section 1

A.     The Office and the Association recognize and endorse the importance of considering and resolving complaints and grievances promptly and, whenever possible, informally. The parties agree that this grievance procedure will provide a mutually acceptable means of resolving complaints and grievances at the lowest level possible, and the Office and Association agree to work toward this end.

B.     The Office and the Association shall afford and assure all employees freedom from restraint, interference, coercion, discrimination or reprisal for filing or presenting a grievance or for otherwise participating in the grievance procedure including arbitration.

Section 2

The procedure described in these sections shall constitute the sole and exclusive procedure available to bargaining unit members or the Association for resolving grievances under this or any other negotiated agreement between the parties. Matters covered under this procedure and under certain statutory procedures may, at the discretion of the aggrieved employee, be raised under either procedure but not under both. The employee will be deemed to have exercised this option at such time as the employee timely initiates an action under the applicable statutory procedures or timely files a grievance in writing under this Article, whichever event occurs first. The matters for which this option exists are:

A.     discrimination based on race, color, religion, sex, national origin, age, physical or mental handicap, marital status or political affiliation under 5 USC 2303 (b) (1);

B.     removal or reduction in grade based on unacceptable performance under 5 USC 4303;

C.     other adverse actions under 5 USC 7121 *,i.e.,* removal, suspension for more than 14 days, reduction in grade, reduction in pay and furlough of 30 days or less) ; and

D.     matters which may be raised as unfair labor practices under 5 USC 7116.

Section 3

For purposes of this Grievance Procedure the term grievance means any complaint:

    A.    by an employee against the Office concerning any matter relating to the employment of the employee;

    B.    by the Association against the Office concerning any matter relating to the employment of any employee; or

    C.    by an employee or the Association against the Office concerning:

        (1) the effect or interpretation, or a claim of breach, of this Agreement; or

        (2) any claimed violation misinterpretation, or misapplication of any law or regulation affecting conditions of employment.

    D.    by the Office against the Association concerning any claimed breach of an obligation or responsibility owed to the Office as a result of this Agreement.


Section 4

The parties (i.e., grievant, Association, and Office) have the following rights in all grievances under this agreement:

A.    To be present during any grievance discussion conducted pursuant to this Article, including any settlement discussions. The right of the Association to be present, however, may not impair the right of the grievant independently to handle the grievance.

B.    To be furnished with a complete copy of any documents presented or generated in the grievance. This copy shall be furnished by the person presenting or generating the paper at the same time that it is furnished to any other concerned official or party.

C.    The Association shall have the right to state its position on a grievance orally and in writing which is prosecuted by a grievant pro se.

D.    The rights specified in subsections A, B, and C shall not apply during informal discussions at the examining group or equivalent level unless the employee states that a grievance is being presented.

E.    The grievant shall have the right to self representation at each level of the grievance procedure. However, grievant may be accompanied and

assisted by the Association or by no representative, if the grievant so desires.

F.    The Association may be chosen as the representative at any point in the grievance procedure. A grievant may only be represented by one Association representative. When necessary, another Association official (a trainee or a technical assistant) may attend the grievance meeting on bank time but, shall not participate in presenting the grievance. However, where two or more management representatives are going to hear a grievance, the grievant may be represented by the same number of Association representatives as there are management representatives hearing the grievance.

Section 5

The following matters are excluded from coverage under the provisions of this procedure:

A.    Those matters excluded from coverage under 5 USC 7121 (c) relating to:

(1)   any claimed violation of prohibited political activities;

(2)   retirement, life insurance, or health insurance;

(3)   suspension or removal in the interest of national security;

(4)   any examination, certification, or appointment; or

(5)   the classification of any position which does not result in the reduction in grade or pay of an employee.

B.    Nonselection for promotion from a group of properly ranked and certified candidates.

C.    Nonadoption of a suggestion, except when the grievance alleges that an employee's suggestion was adopted without appropriate recognition of the employee who made the suggestion.

D.    A preliminary oral warning or a written proposed notice of an action which, if effected, would be covered by this procedure or any statutory appeal procedure, provided that the written proposed notice of action is considered, after the employee is given an opportunity to reply to the proposed action, and a written decision issued at the earliest practical date, after the employee has made a reply or after the date for making a reply has passed.

E.      Actions to terminate trial or probationary employees serving probationary periods, or employees holding temporary appointments with definite time limits.

F.      Matters excluded by 5 USC 5366.  *(Termination of benefits after refusal to accept an equivalent job.)*

Section 6 – Informal Procedure

A.      Within 20 calendar days after receipt of an unfavorable administrative decision, or the date of the event or action prompting the grievance or the date the grievant becomes aware or should have become aware of such action, 'the employee, or his or her representative must personally present the grievance to the employee's immediate supervisor. In the event of Office or Association grievances, the grievant representative must personally present the grievance to the lowest official with authority to adjust the grievance or to effectively recommend its adjustment. At this time, the official receiving the grievance shall issue a brief written memorandum to the grievant stating merely that an informal grievance has been filed, identifying the date and party(ies) and then provide a copy to the Association, as appropriate.

B.      If the person receiving the grievance in subsection A does not have the authority to resolve the matter, he/she shall promptly refer the grievance to the official who does have such authority and notify the grievant and/or the Association, as appropriate, in writing of this referral. Any time limit on the informal response occasioned by this referral may be tolled, for a reasonable period, but not to exceed two (2) workdays.

C.      The 20 calendar day time period to file an informal grievance shall not bar an Office or Association grievance based on an alleged "continuing violation" (as that term has been construed by the courts in labor relations matters) or an alleged pattern of conduct provided that the grievance is filed within 20 calendar days after the date when awareness of the alleged pattern occurred.

D.      The official receiving the informal grievance shall inform the grievant, and/or the Association, as appropriate, of his/her decision within 20 calendar days after receipt of the grievance. If the decision does not resolve the grievance, the official shall immediately issue a written memorandum to the grievant stating that the parties were unable to resolve the matter informally. Copies of the memorandum shall be provided to the Association, as appropriate.

Section 7

A.    If the grievance is not resolved informally, the grievant may file a formal written grievance within 10 calendar days of receipt of the informal grievance decision.

B.    The formal grievance shall contain the following information:

    (1)    Identification of the grievant;

    (2)    Nature of the grievance;

    (3)    Corrective actions requested and reasons;

    (4)    The fact that the Association has been designated as representative, if the grievant has so designated.

Section 8 – Formal Procedure

A.    Not  part of the Collective Bargaining Agreement.

B.    The Commissioner or Association President, as applicable, shall appoint himself/herself or another official as the deciding official within two (2) workdays after receipt of grievant's exceptions.

C.    In any grievance against the Office, all papers submitted under this section shall be filed with the Commissioner. In any grievance against the Association, all papers under this section shall be filed with the Association President.

D.    Either party may request that a meeting be held to discuss the matter. If such a request is granted, the meeting shall take place within ten (10) calendar days after receipt of the grievant's exceptions. The meeting shall not be considered a hearing and the examination or cross examination or other presentation of witnesses by either party shall not be permitted.

E.    The deciding official may attempt to settle the grievance. However, if settlement is not possible, the deciding official shall render a written decision within fifteen (15) calendar days of his appointment or the close of the meeting.

F.    The deciding official's written grievance decision may be appealed to binding arbitration by the Association or Office, as appropriate.

Section 9 - Arbitration

A.    Arbitration may be invoked only by the Association or by the Office. An employee does not have the right to invoke arbitration. If the Association desires to invoke the binding arbitration provisions of this section, it must notify the Chief of the Employee and Labor Relations Division within ten (10) calendar days of its receipt of the deciding official's written grievance decision. Likewise, the Office must notify the Association President of its desire to invoke arbitration within ten (10) calendar days of its receipt of the Association President's written grievance decision.

B.    Within seven (7) calendar days from the date of receipt of the request for arbitration, the Association and the Office shall meet for the purpose of selecting a qualified arbitrator. If agreement cannot be reached at that meeting, the parties shall immediately request the Federal Mediation and Conciliation Service (FMCS) to provide a list of five persons qualified to act as arbitrator. Within seven calendar days after receipt of the list, the Office and the Association shall meet to select an arbitrator from the list. If they cannot mutually agree upon one of the listed arbitrators, then the Office and the Association will each strike one arbitrator's name from the list and repeat the procedure until one name remains on the list. The remaining person shall be the duly selected arbitrator. The party to make the first strike shall be determined by the toss of a coin.

C.    Where an arbitrator has not been selected within twenty (20) calendar days after the date of receipt of the FMCS list of arbitrators, due to either party refusing to participate in the selection of an arbitrator, the procedures of the American Arbitration Association (AAA) may be invoked by either party. once these procedures are properly invoked, the AAA shall have jurisdiction over the arbitration. However, the AAA procedures must be invoked within ninety (90) calendar days after the date of the receipt of the FMCS list of arbitrators. The parties shall not maintain their arbitration rights if the procedures are not invoked within the ninety (90) day period.

D.    Within three working days after the selection of the arbitrator, the parties shall notify, in writing, the source supplying the list of arbitrators of the arbitrator selected and the requirements of this Article. In addition, if the arbitrator is chosen under the FMCS procedures, the parties shall jointly notify the arbitrator of his/her selection and request the arbitrator's availability for purposes of scheduling a hearing.

E.    The arbitrator shall conduct the arbitration in accordance with the following procedures:

(1) The arbitration hearing shall not be open to the public or the press. In such hearings presented in the name of an individual or groups of individuals, attendance shall be limited to persons determined by the arbitrator to have a direct connection with the grievance. Parties to the grievance may be represented by an equal number of counsel, but not less than two.

(2) All witnesses except the grievant or counsel as the first witness shall be sequestered.

F.     The arbitrator shall be requested to render a decision to the Office and the Association as quickly as possible, but no later than 30 days after the conclusion of the hearing or the arbitrator's receipt of post-hearing briefs, if they are submitted.

G.     The arbitration proceedings shall be held on premises provided by the Office.

H.     Normally, there shall be verbatim transcript of the hearing. A copy of the transcript shall be provided to each party promptly after the hearing is closed.

I.     The arbitrator's fee and the expenses of arbitration, if any, will be shared equally by the parties, except that the expenses of any witness shall be borne by the party calling the witness.

The salary for a PTO employee, while participating in the presentation of testimony, shall be borne by the Office, if that employee would otherwise be in a duty status.

Section 10

A.     The grievant shall be granted a reasonable amount of official time, up to eight hours, for preparation of the grievance and a reasonable amount of official time, up to 8 hours, for preparation for arbitration.

B.     The grievant, the Association representative and all relevant employee witnesses shall be on official time for the presentation of any grievance matter or at any arbitration hearing.

## ARTICLE 12
*Disciplinary & Adverse Action Based on Conduct*

Section 1

The parties agree that primary emphasis should be placed on preventing situations which may result in disciplinary or adverse actions and that an employee may be more effectively helped through counseling than through a disciplinary or adverse action.

Section 2

A disciplinary action for the purpose of this Article is defined as an oral warning, a written warning, a letter of reprimand or a suspension of 14 days or less.

Section 3

An Adverse Action for the purpose of this Article is defined as a removal, a suspension for more than 14 days, a reduction-in-grade or pay for conduct, or a furlough of 30 days or less for non-conduct reasons. This Article does not apply to discharges during probationary, or trial periods or termination of temporary appointments.

Section 4

Not part of collective bargaining agreement.

Section 5

Not part of collective bargaining agreement

Section 6

Oral warnings, written warnings and letters of reprimand may be grieved pursuant to the terms of Article 11 of this Agreement.

Section 7

When the Office proposes to suspend an employee for 14 days or less the following procedures will apply:

A.     The Office will provide the employee with 15 days advance written notice of the proposed disciplinary action;

B.     The advanced written notice of proposed disciplinary action shall include all the reasons for the proposed action, a statement that the employee has a right to a representative, and the right to respond orally and/or in writing within 10 days from the date he/she received the notice. A request for an oral reply must be made in writing. A reasonable request for an extension will be granted.

C.     The documentary evidence on which the notice of proposed disciplinary action is based will be assembled, copied and given to the employee at the time the notice is delivered.

D.     Where an employee chooses to make an oral reply, the reply will be heard by a higher level management official than the official who issued the notice of proposed disciplinary action. The Office will record the oral reply, prepare a summary and provide a copy of the summary to the employee or his/her representative. The employee may make corrections to the summary. Any dispute over errors/corrections shall be verified by the recording of the oral reply.

E.     The oral reply affords the employee a forum to present an uninhibited oral defense, including denial of reasons for the proposed action, a presentation of any mitigating circumstances and a request for less severe action. It is not a hearing. Although questions may be asked for clarification, there is no cross examination or presentation of witnesses. In delivering an oral reply, the employee may make any representation he/she believes might influence the final decision. The oral/written reply shall be made a permanent part of the documentary evidence upon which the proposed action is based and shall be submitted to the deciding official.

F.     A letter of final decision containing the Office's detailed findings with respect to each reason upon which the proposed action was based, and the appropriate appeal rights, will be issued and delivered to the employee at the earliest date possible after the oral reply or the receipt of the written reply or the termination of the 15 day period. However, in no instance shall this time be greater than 60 days from the employee's response.

Section 8

A suspension of 14 days or less will be grieved at the level of the deciding official. Thereafter, all requirements associated with subsequent steps of the grievance procedure will apply.


<u>Section 9</u>

When the Office proposes an adverse action against an employee, the following procedures will apply:

A.  Not part of collective bargaining agreement;

B.  The advanced written notice of proposed adverse action shall include all the reasons for the proposed action, a statement that the employee has a right to a representative, and the right to respond orally and/or in writing within 15 days from the date he/she received the notice. A request for an oral reply must be made in writing. A reasonable request for an extension will be granted.

C.  The documentary evidence on which the notice of proposed adverse action is based will be assembled, copied and given to the employee at the time the notice is delivered.

D.  Where an employee chooses to make an oral reply, the reply will be heard by a higher level management official than the official who issued the notice of proposed adverse action. The Office will record the oral reply, prepare a summary and provide a copy of the summary to the employee or his/her representative. The employee may make corrections to the summary. Any dispute over errors/corrections shall be verified by the recording of the oral reply.


E.  The oral reply affords the employee a forum to present an uninhibited oral defense, including denial of reasons for the proposed action, a presentation of any mitigating circumstances and a request for less severe action. It is not a hearing. Although questions may be asked for clarification, there is no cross examination or presentation of witnesses. In delivering an oral reply, the employee may make any representation he/she believes might influence the final decision. The oral/written reply shall be made a permanent part of the documentary evidence upon which the proposed action is based and shall be submitted to the deciding official.

F.  A letter of final decision containing the Office's detailed findings with respect to each reason upon which the proposed action was based,

and the appropriate appeal right, will be issued and delivered to the employee at the earliest date possible after the oral reply or the receipt of the written reply or the termination of the 15 day period. However, in no instance shall this time be greater than 90 days from the employee's response.

Section 10

Adverse actions may be appealed either directly to the Merit Systems Protection Board (MSPB) or, with the consent of the Association, to arbitration under Article 11 of this Agreement, but not both. Employees shall be warned in writing that once an election to appeal is made, it is final and irrevocable.

Section 11

If an employee elects to appeal an adverse action to arbitration, the Association must give the Office notice of its decision within 15 days after the employee receives the Office's final decision.

**ARTICLE 13**
*Awards*

The present Incentive Awards Program in effect in the PTO is the Agreement on Awards negotiated between POPA and management. The PTO, nevertheless, has maintained, voluntarily the provisions with no change. Accordingly, while no change in the awards program is contemplated at present, the Office reserves the right, subject to the mid-term bargaining provisions of this Agreement, to change those portions of the awards program which are outside the Office's obligation to bargain. The Agreement on Awards is appended to this Agreement as Appendix A, and shall be deemed to be part of this Agreement to the extent that provisions thereof are within the mandatory scope of bargaining.

**ARTICLE 14**
*Mid-Term Bargaining*

Section 1

Not part of collective bargaining agreement.

Section 2

Mid-term changes in conditions of employment shall be proposed on a quarterly basis, beginning three months after the implementation of this Agreement.

Section 3

Unless the parties agree otherwise, the following procedure shall be used for preparing mid-term bargaining proposals:

A.    The party proposing a change in working conditions or personnel shall present its proposed action to the other party in writing shall include the reasons for the action and copies of relevant statutes, regulations and other relevant supporting background materials.

B.    Within one week thereafter, the parties shall meet to explain and clarify the proposals and answer questions regarding the proposals.

C.    For Office initiated changes, the Association will be granted the opportunity to meet with the affected employees to discuss the proposed action within one week after the completion of clarification. The Office shall provide adequate space for all such meetings. Participants shall be granted one hour of official time to attend such meetings.

D.    Within two weeks after the meeting with affected employees, the party not initiating the procedure shall present its counter-proposals and bargaining shall begin as soon as practical (normally within one week).

E.    For comprehensive negotiations involving performance appraisals, signatory authority or automation, the time limits in this section shall be extended one week or one hour accordingly.

Section 4

A. The Association shall have the right to the same number of representatives at mid-term bargaining as the Office, but not less than two representatives per party.

B. For comprehensive negotiations involving performance appraisals, signatory authority or automation, there shall be no less than three representatives per party.

Section 5

Unless the parties agree otherwise, the ground rules for mid-term negotiations shall be as follows:

A. Time of Negotiations -9:30 a.m. to 4:00 p.m.

B. Frequency at least 3 days a week.

C. Duration -up to 30 days or 6 weeks, whichever occurs first

D. Mediation -up to 10 days or 2 weeks, whichever occurs first

E. To meet the urgency of a Reduction in Force, the time limits in subsections C and D above may be reduced by one half.

F. For comprehensive negotiations involving performance appraisals, signatory authority or automation, the time limits for subsections C and D above shall be doubled.

Section 6

If agreement is not reached during mediation, the parties shall jointly petition the FSIP requesting interest arbitration ending in a Last-Best-Offer, issue-by-issue procedure, unless they agree to an alternative impasse resolution procedure or the FSIP deems other action to be appropriate.

Section 7

A. Management may not implement changes until the above procedures have been exhausted, except as provided in Section 1.

B. When the Office is required to implement pursuant to Section 1, it shall give written notification, including justification, to the Association as early

as possible. Any negotiated agreements concerning such action shall be given retroactive effect.

**ARTICLE 15**
*Official Time*

Section 1

A.    Association Officials and Representatives shall be authorized official time during duty hours not to exceed the established bank of hours per fiscal year described below for the following activities:

    (1)    to consult and counsel employees concerning personnel practices and policies, working conditions and employment related matters;

    (2)    to prepare and investigate grievances;

    (3)    to prepare and investigate matters other than grievances for the purpose of representing employees;

    (4)    to prepare for any meeting and/or consultations with management officials;

    (5)    to prepare for joint committee meetings;

    (6)    to prepare for all presentations before third parties;

    (7)    to review and respond to memoranda, letters and requests from the Office, as well as proposed new instructions, manuals, notices, etc., which affect personnel policies, practices or working conditions;

    (8)    to attend hearings or meetings in the capacity of an observer where an employee has elected to pursue a grievance without Union representation;

    (9)    to conduct any legitimate representational activity not precluded by statute and not set forth above.

B.    In any fiscal year the time used shall not exceed the following:
- 3 Association Officials                        3,800 hours
- 4 Association Officials                        3,200 hours
- All Other Association Officials          2,800 hours
- Association Sponsored LMR Training     160 hours

The Association Officials who draw from each bank must be identified annually, in writing, to the Employee and Labor Relations Division within two calendar weeks after the conclusion of the Association's annual election of officers.

C.     On a quarterly basis, starting with the first full quarter after the beginning of the fiscal year or the first quarter following the implementation of this agreement, the Association may transfer hours among the first three above described categories of bank time by written notification to the Office, detailing such transfers, within 10 workdays after the quarter commences.

## Section 2

In addition to the bank of hours set forth in Section 1, the Office shall grant to Association officials reasonable time for:

A.     presentations to any agent of the FLRA, FSIP, MSPB and/or arbitrators;

B.     presentations at any third party proceeding not included in subsection A above, and ex parte presentation to other federal agencies;

C.     grievance presentations;

D.     joint committee meetings and authorized activities therefore;

E.     meetings and/or consultations with management officials not included in part C and part D above;

F.     addressing new employees as provided in Article 6, Section 3;

G.     all activities for which official time is explicitly granted by statute, law, rule or regulation;

H.     preparation for mid-term bargaining.

## Section 3

Any activities performed by an employee relating to the internal business of the Association, shall be performed at a time when an employee is not on duty or is on approved leave. Such activities include (1) membership meetings; (2) soliciting union membership; (3) collecting union dues or assessments; (4) campaigning for union office; (5) distributing or posting union literature, notices or authorization cards; and (6) any activities pertaining to the internal management of the union, including executive board meetings.

Section 4

A.  Official time for the activities in Sections 1 and 2 above shall be accounted and reported to the Office on a bi-weekly basis. There shall be only one time code for each of the listed categories and not subproject codes. Travel time incident to a particular activity shall be included with that activity.

B.  The Office shall make available to the Association bi-weekly information on the time used by each Association official under each category. The information shall include 13 pay period and fiscal year to date totals.

Section 5

A.  No Association official shall be prejudiced or adversely affected by virtue of the fact that the official is authorized or required to spend time performing representational duties.

B.  Not part of collective bargaining agreement.

C.  Not part of collective bargaining agreement.

D.  The parties acknowledge that any examiner who starts without a docket will usually have a pipeline problem for more than six months. The Office will account for this problem in any evaluation given during the first 10 months after the official returns substantially full time to examining duties. An official returning substantially full time to examining duties will have the right to raise the pipeline problem as a defense to any action taken against him/her.

## ARTICLE 16
*Physical Facilities*

Section 1

A.    Each professional will be provided with a private, wall-enclosed (full ceiling height) office of approximately 150 square feet whenever possible.

B.    If there are situations where A. of this section is not possible, then professionals sharing office space with other professionals will be located in wall-enclosed (full ceiling height) offices with the smallest number of additional professionals feasible and provided with approximately 150 square feet, where possible, for their own working area.

C.    The PTO will attempt to lessen the adverse impact of increased noise on the production of professionals sharing offices by: (1) providing movable, acoustical wall partitions for each of these offices, unless the professionals sharing an office do not want partitions and (2) having the supervisor, after she/he is informed of a valid complaint (e.g., one affecting the professionals' productivity), temporarily reassign or allow reasonable non-production time to the affected professional (i.e., the professional making the complaint) , when one of the professionals sharing the office performs required work activities (e.g., examiner interview, classification project meetings, post classification disputes) creating disturbances which do not allow the affected professional, who shares this office, to maintain necessary concentration.

D.    Except for subsections 1E and 3E, the rights and obligations set forth in Sections 1-3 do not apply to temporary redistributions of space for less than 60 days.

E.    The Office is cognizant of its responsibilities to work towards the goal of removing architectural barriers to the physically handicapped.


Section 2

The arbitration decision of Jerome H. Ross in 83 FSIP 89, shall be incorporated into this agreement without change and is set forth in Appendix B.


Section 3

A.    The Office agrees that inadequate ventilation; heating, cooling and lighting in areas of the Office, in which members of the Unit work, contribute to inefficiency and further agrees to seek and request installation of adequate facilities to provide such ventilation, heating, cooling and lighting where it does not exist. In the event of failure of the

air conditioning system, heating or lighting facilities, the Office agrees that those employees present may be excused from duty with no loss of leave or salary. (Failure of the air conditioning system will be defined as any continuous period greater than four hours in which the employee's office temperature is greater than 87*F. Failure of the heating facilities will be defined as any continuous four hour period in which the employee's office temperature is below 60*F.)

B.     Each office will contain adequate controlled lighting, ventilation with proper dust filtration system, and heating, cooling and electrical outlets.

C.     Each patent search room will be provided with lighting at a level which allows the reading of the documents within their search area.

D.     Each examiner detailed to classification will be provided with a quiet, individual work space having adequate lighting, ventilation, heating and cooling.

E.     Not part of collective bargaining agreement.


Section 4

A.     Each professional's office or work area will be provided with a telephone whenever practical.

B.     Not part of Collective Bargaining Agreement

C.     As necessary, a reasonable amount of non-production time per bi-week will be granted to Post Classifiers, or such time will be accounted for separately, for travel between his/her work area and the Examining Corps to conduct official business when the Post Classifier and Examining Corps are housed in different buildings. Reasonable non-production time for travel may be granted, as necessary, to Project Classifiers and/or Detailed Examiners, at approximately the same rate of time per trip as that of Post Classifiers when needed for official business or such time maybe accounted for separately.

D.     The PTO agrees to normally deliver all written information or actions which affect either the production, rating, pay, promotions or services provided to professional personnel in a timely manner (i.e., approximately the same time now necessary for normal delivery in CP-2, 3 and 4).  Turn-around time periods shall start when the work is received by the professionals.


Section 5

A.     During a move, each affected professional will be allowed a reasonable amount of non-production time for the preparation, implementation and the reorganization of their office due to either a modification of, or a transfer to or from, his/her office area, subject to later review by the supervisor.

B.     No professional will be assigned or reassigned to office space until such time as that office space is substantially ready for occupancy in accordance with Sections 1, 2, 3 and 4 of this Article, except that the installation of phones may not be completed in the new offices at the time of the move.

Section 6     Not part of Collective Bargaining Agreement

Section 7

The agreement on parking, which will result from the currently recessed negotiations between the Office and the joint labor team (consisting of the Unions which represent Office employees), will become part of this Agreement.

Section 8

A.     The Office and the Association agree that clean, well maintained areas in which members of the Unit work contribute to the efficiency of the operation. In this regard, the Office agrees to diligently enforce the lease requirements regarding the painting and cleaning of such areas.

B.     Offices will be cleaned and painted as required during the off-duty hours of professionals, when practical.

Section 9

The Office will take appropriate steps to ensure that all members of the bargaining Unit will be provided with a comfortable chair in which to work.

Section 10

Professionals shall be permitted freedom of expression in decorating their office or work area. Only obscene or unsafe decorations will be prohibited.

Section 11

Six months after the completion of any move of at least one examining group or its equivalent, the parties will meet to consider any adverse effect(s) of the move and together make a bona fide attempt to solve such problem(s), if any.

# ARTICLE 17
## *Association Facilities*

Section 1

The Office will provide a furnished office and private line telephone for the Association, to provide a confidential place to discuss complaints and other Association matters. Unless the parties agree otherwise, the Office may not relocate such office or alter its size or configuration except where it is necessary to meet the Office's obligations under Article 16. However, the office shall not be reduced to a size less than 230 square feet. Use of the office is subject to the following conditions:

A.    The Office will not be responsible for Association property located within the office space provided to them;

B.    The Association will exercise due safety and security precautions when using such space, inspectable by the Office when accompanied by an Association official.

C.    The Association may use the telephone only to the extent permitted by law and regulation.


Section 2

The Association shall be granted use of Office designated bulletin boards and space for meetings unless (1) such use is prohibited by applicable laws, rules, regulations or Office policies, and/or (2) such space is not available. Notices posted by the Association on the bulletin boards designated for their use shall be reasonable in size and shall be identified as posted by the Association.


Section 3

The Office will provide "contractor or user passes" to Association staff (not employees of PTO) for use during duty hours only in accordance with Office security regulations. During non-duty hours Association staff, who are not employees of PTO, must be accompanied by a PTO employee.

**ARTICLE 18**
*Child Care Centers*

Section 1

The parties recognize that PTO employees need to have reliable and adequate day care services available to them so that they are free to devote their full energy and attention to their duties and responsibilities. Accordingly, the PTO shall establish a list of existing local day care facilities, including information on occupancy, , capacity, rates, location, hours of operation, local licensing status and the local agency responsible for licensing. The PTO agrees to make copies of this information available to new employees upon their entry into service and to others who express an interest.

Section 2

The parties recognize and acknowledge that the establishment of a child care center at the PTO can result in substantial benefits for the PTO and its employees.  These benefits include, but are not limited to, enhanced employee family life, improved employee morale and performance, reduced use of leave for family-related problems, lower employee turnover and reduced personnel costs for the PTO.  Because of anticipated improvements in the quality of work life and financial savings for the PTO, the parties agree to cooperate in seeking to establish a child care center in the Crystal City complex for PTO employees during the term of this Agreement.

# ARTICLE 19
## *Performance Appraisals*

Inasmuch as the parties have several proposals concerning performance appraisals currently pending a negotiability determination before the FLRA, negotiations concerning performance appraisal subjects affected by those proposals may be deferred until the FLRA renders its decisions on those proposals. However, the parties shall submit a letter to the FLRA requesting that it expeditiously pass on the negotiability of the proposals pending before it. The parties shall negotiate over those subjects which are not affected by the negotiability issues before the FLRA. Negotiation over such subjects shall commence 45 days after the effective date of this agreement pursuant to Article 14. To the extent not inconsistent with law, government-wide regulations or the necessary functioning of the agency, the Office shall maintain the status quo in those performance appraisal matters affected by the proposals pending before the FLRA; until the FLRA issues its decision. Within 45 days after the FLRA renders its decisions, the parties shall negotiate over the appropriate affected performance appraisal subjects. The Arbitrator shall exercise continuing jurisdiction over this subject.

**ARTICLE 20**
*Leave*

<u>Section 1</u>

A.    Requests for and approval of sick leave shall be made as far in advance as possible and shall be made directly to the employee's immediate supervisor or supervisor's designees in the absence of the supervisor.

B.    When the need for sick leave is not known in advance, the employee shall request sick leave directly from his/her immediate supervisor or the supervisor's designees by 9,30 a.m. or as soon as practical thereafter. After two attempts to request such leave, the employee shall leave a message for the supervisor or the supervisor's designees.

C.    Employees are required to request additional sick leave on each day they are absent unless leave for a continued sickness has been previously approved. Sick leave requests shall be granted for purposes approved by law and government-wide regulations.

D.    Not part of collective bargaining agreement.

E.    Employees shall not be required to furnish an acceptable medical certificate to substantiate requests for approval of sick leave unless:

    (1)    the employee has not complied with this Section; or

    (2)    the employee is on leave restriction; or

    (3)    the employee is a chronic user of short periods of sick leave and there is evidence as to the invalidity of his/her claim to such leave.

F.    Where the nature of the illness was such that an employee did not or could not see a medical practitioner, the Office may waive the requirement for a medical certificate.

G.    An acceptable medical certificate is a written statement signed by a registered practicing physician or health professional certifying to the incapacitation, examination, treatment, or the period of disability of an employee while he/she was undergoing professional treatment.

H.    A person shall be placed on sick leave restriction only if there is evidence of sick leave abuse and the restriction is justified in writing. The mere amount of leave used for illness does not constitute abuse.

I.    Sick leave restrictions} shall be administered as follows:

(1)     In individual cases, if there is evidence showing that an employee is abusing sick leave privileges, the employee shall first be counseled. If there is no improvement, the employee will be notified in writing that an acceptable medical certificate will be required for each subsequent absence for sick leave purposes.

(2)     Cases requiring an acceptable medical certificate for each sick leave absence shall be reviewed by supervision, for the purpose of determining whether there is a need to continue the restriction. Such review shall take place at the end of six (6) months from the date of the notice to the employee requiring an acceptable medical certificate. When it has been determined that there is a need to continue the restriction, the employee shall be notified in writing. If there is no such notice, the previous notice shall be removed from the records.

(3)     If a grievance is filed, placing an employee on sick leave restriction shall be stayed for 45 days or until the final Agency decision is rendered, whichever occurs first.

<u>Section 2</u>

The earning of annual leave, as provided by applicable law, is a right; however, the use of annual leave is granted subject to the needs of the Office.

A.     Consistent with the needs of the Office, employees and supervisors will schedule annual leave as far in advance as is necessary and reasonable.

B.     The employee shall request annual leave of his/her immediate supervisor. So as to provide a prompt decision on leave requests, the supervisor shall designate other employees in the Art Unit or Group (or similar administrative area) who shall have the authority to grant an annual leave request when the supervisor is not available to grant the request. After two attempts to request such leave, the employee shall leave a message for the supervisor or the supervisor's designees).

C.     Consistent with the needs of the Office, annual leave will be granted if, at the time of the request, the employee (1) has no interviews or meetings scheduled for the leave period, (2) is under no duty to respond during the leave period to an individual who is under a running statutory time constraint, or (3) makes appropriate arrangements for such interviews, meetings and/or communications.

## Section 3

A. Pregnancy shall be treated like any other medically certified temporary illness. Maternity leave may be any combination of sick leave, annual leave, leave without pay, and compensatory time as appropriate. Advanced sick and annual leave, for maternity purposes, may be granted in accordance with applicable law and government-wide regulations. Available sick leave may be used for the time required for physical examinations and any incapacitation due to pregnancy and childbirth. Length of absences for maternity reasons will be determined by the employee and her physician in coordination with her supervisor. Absent an emergency situation, the employee must coordinate such leave with her supervisor, prior to her absence for maternity reasons.

B. Upon reasonable advance notice and a showing of need, a male employee shall be granted any combination of annual leave, leave without pay or compensatory time, as appropriate, for a reasonable period of time to assist or care for his child(ren} or the mother of his child(ren) due to her confinement for maternity reasons, unless his absence causes a substantial work interruption.

## Section 4

An employee will be granted annual leave, compensatory time, or leave without pay to attend a funeral.

## Section 5

A. Consistent with the needs of the Office and in accordance with relevant law and regulations, no request for earning compensatory time shall be unreasonably denied.

B. Compensatory time must be used within six pay periods after it is earned. However, where an employee is denied use of compensatory time during the six pay periods after it was earned, the Office will either pay the employee for the time at his/her overtime rate or the time shall be carried over for use during the next six pay periods. If an employee is denied use of the compensatory time during the second six pay periods, he/she will be paid for the time at his/her overtime rate.

C. Consistent with the needs of the Office and in accordance with relevant law and regulations, an employee will be advanced compensatory time when his/her personal religious beliefs require abstention from work for certain periods of the workday or workweek.

D. Consistent with the needs of the Office and in accordance with relevant law and regulations, no request for using compensatory time shall be denied if, at the time of the request, the employee:

 (1) has no interviews or meetings scheduled for the leave period,

 (2) is under no duty to respond during the leave period to an individual who is under a running statutory time constraint, or

 (3) makes appropriate arrangements for such interviews, meetings, and/or communications.

E. Consistent with the needs of the Office, every reasonable attempt will be made by employees and supervisors to schedule compensatory time as far in advance as is necessary and reasonable.

F. Compensatory time off will be deducted from a bargaining unit member's production time for the bi-weekly period in which the time off was taken. The compensatory time worked will be added to the member's production time for the bi-weekly period in which the time was worked.

<u>Section 6</u>

When it is necessary to close the Office because of inclement weather or an emergency situation (e.g., heavy snow, severe icing conditions, flood, earthquake, hurricane, major fire, bomb threats or massive power failures) employees **will be** granted administrative leave.

**ARTICLE 21**
*Retirement Counseling*

Section 1

The Office will arrange for at least one retirement seminar each year. The seminar shall include specific information on the trial retirement program and shall relate prior experience under it.

Section 2

All bargaining unit members currently eligible or within two years of retirement eligibility may attend. Attendance of any person will be limited to a maximum of once every two years.

Section 3

Attendance at this seminar will be considered training.

Section 4

The Office shall provide information assistance necessary for employees considering retirement.

## ARTICLE 22
*Signatory Authority*

Inasmuch as there is a grievance concerning the subject of signatory authority pending before Arbitrator Jerome H. Ross, negotiations concerning signatory authority shall not commence under Article 14, until 45 days after Arbitrator Ross renders his arbitration award, unless exceptions to the award are filed with the FLRA. Where exceptions are filed with the FLRA or where a negotiability dispute arises, the parties shall only negotiate over those subjects of signatory authority that are not affected by the appeal or the pending negotiability determination. Within 45 days after the FLRA issues its decisions, the parties shall negotiate over the appropriate affected subjects of signatory authority in accordance with Article 14. The parties shall maintain the status quo in those areas of signatory authority affected by the issues before Arbitrator Ross, unless and until it is supplanted by his decision or a decision by the FLRA. The Arbitrator of this Agreement shall exercise continuing jurisdiction over this subject.

# ARTICLE 23
## *Work Schedules*

Section 1

    A.    Normal Tour of Duty -Monday thru Friday from 8,30 a.m. to 5:00 p.m. is the normal tour of duty for Office employees.

    B.    Flexitime Plan -Under the flexitime plan, an employee works Monday through Friday but may report to work at any appropriate time (not earlier than 6:30 a.m.) during the morning flexitime band, be present during core hours and leave after the employee has accumulated eight hours of work, plus one half hour for lunch.

    C.    Four Day Week (4/10 Plan) -Under the four day week schedule, an employee will work four days each week, 10 hours daily, thus satisfying the requirement for 40 hours per week.

    D.    5-4/9 Plan -This plan permits an employee to have one "extra" day off each pay period. To satisfy the 80 hour pay period work requirement, the employee will work 8 nine-hour days and I eight-hour day. On the eight-hour day, the employee may not report to work before 6:30 a.m. To simplify implementation of Time and Attendance record keeping for the 54/9 Plan, employees will be required to work the eight-hour day on the last scheduled work day of each pay period. Therefore, the eight-hour work day will always be the last Friday of the pay period, unless the last Friday is a scheduled non-work day in which case the last Thursday will be an eight-hour day.

Section 2

Each employee is required to arrange his/her work schedule Plan with their supervisor one quarter of the fiscal year in advance, identifying the day of the week which will be the employee's nonwork day in the case of the 4/10 Plan, and the day of the bi-week which will be the non-work day in case of the 5-4/9 Plan. Employees are required to elect a single day which will be the non-work day for the entire quarter. Subject to supervisory approval, the employee may select any day as a non-work day except for Tuesday and Thursday which, during all work weeks, will be considered. core" work days. However, when a holiday falls on a employee's scheduled non-work day, Tuesday and Thursday may be used "in lieu of" holidays if required by the chart in Section 11B.

Section 3

All full-time employees represented by the Association are required to elect one of the work schedule plans in Section 1. An employee's election to participate in a work schedule plan other than the normal tour of duty must be approved by his/her supervisor. If either the 4/10 Plan or the 5-4/9 Plan is selected, an election must also be made of a specific schedule.

Section 4

Employees participating in a work schedule plan other than the normal tour of duty may withdraw from the program at any time, by giving the supervisor two weeks advance notice. Employees who withdraw from such plans shall revert to the normal tour of duty. After withdrawal, employees will be permitted to elect another work schedule plan only in accordance with Section 7.

Section 5

New employees may begin participation in a work schedule other than the normal tour of duty at the beginning of any pay period subject to the restrictions in Section 13.

Section 6

Employees transferring from one division to another will be required to obtain approval, from the new supervisor, of their previous election or make a new election at the time of the transfer. Upon supervisory approval the employee can begin participation in a work schedule other than the normal tour of duty at the beginning of the next pay period. It is recognized that it is possible that the new position may be such that the employee must be denied the opportunity to participate or have his/her participation restricted.

Section 7

Employees who wish to change work schedule plans or who wish to change their non-work day selection will be permitted to submit such a request only during the months of February, May, August and November. Upon supervisory approval of the request, the employee will begin participation in another work schedule plan or effect the desired change at the beginning of the first pay period in the following quarter of the fiscal year.

Section 8

Only full-time employees will be eligible for participation in the 5-4/9 and 4/10 Plans.

Section 9

A.    An employee participating in a work schedule plan other than the normal tour of duty and is in travel status or on Office business outside the Crystal City area will revert to the normal tour of duty for the period involved unless an alternative arrangement can be agreed upon between the employee and appropriate supervisory authority. The alternative arrangement must not increase the cost of the ,travel, training or other Office business to the Office or violate any rule, regulation or statute.

B.    For employees on the 4/10 and 5-4/9 Plans, when an employee is on Office business away from the Office but in the Crystal City area, and the duration of the business is less than the duration of the employee's normally scheduled work day, the employee must report to the Office and work for a period of time equal to the difference less reasonable travel time from the place of the other Office business to the Office.

C.    For employees on Flexitime or Normal Tour of Duty Plans, when an employee is on Office business away from the Office but in the Crystal City area, and the duration of the business is less than eight (8) hours, the employee must report to the Office and work for at least a period of time equal to the difference less reasonable travel time from the place of the other Office business to the Office.


Section 10

An employee's elected work schedule plan will remain in effect until the participant withdraws under Section 4 or until the opportunity to change the plan occurs as set forth in Section 7.

When circumstances arise which are both unusual and extenuating an individual employee upon written request may, after obtaining appropriate supervisory approval, be permitted to amend his/her choice of a non-work day to another day in the same bi-week, provided that such amendment will not prevent the unit to which the employee is assigned from providing its normal service to the public, the Office and other agencies of the government. Under no circumstances will such an amendment be permitted in two consecutive pay periods.

Section 11

A.   General Leave -When an employee is absent from the job other than for a holiday, he or she will be charged with leave equal in hours to the scheduled length of the work day. Employees working for a four-day week will, therefore, be charged with 10 hours of leave (Annual, Sick, LWOP, AWOL, Administrative, etc.) whenever absent during a regularly scheduled work day. Employees working under the 5-4/9 Plan will be charged with nine or eight hours, depending upon the employee's schedule. Employees working under the normal tour of duty and the Flexitime Plans will be charged with eight hours.

B.   Holiday Leave -A full time employee who is relieved or prevented from working on a day designated as a holiday is entitled to pay with respect to that day for the number of work hours scheduled (i.e., 4/10 Plan -10 hours, 5-4/9 Plan -9 or 8 hours depending upon the schedule, normal tour of duty and Flexitime Plans -8 hours) . The following rules apply when a holiday falls on a scheduled non-work day:

(1)   When the holiday falls on the employee's first or second consecutive scheduled non-work day, the preceding work day shall be designated as the day off in lieu of the holiday, in accordance with the following chart.

(2)   When the holiday falls on the third consecutive scheduled non-work day, the next work day shall be designated as the day off in lieu of the holiday, in accordance with the following chart.

| | | | Holiday or Day Off in Lieu of a Holiday | |
|---|---|---|---|---|
| Employee's Non-Work Days | | | | Day Off |
| Fri., | Sat., | Sun. | Friday | Thursday |
| Sat., | Sun. , | Mon. | Monday | Tuesday |
| Sat. , | Sun., | Wed. | Wednesday | Tuesday |

Section 12

Authorized work performed outside an employee's work schedule (i.e., in excess of 10 hours, 9 hours or 8 hours, depending upon the schedule) or in excess of 80 hours per pay period or on any non-work day, is overtime work. Employees are entitled to overtime compensation or compensatory leave as appropriate for overtime work in accordance with applicable provisions of law.

Section 13

A.    Consistent with the provisions set forth below, all employees shall be authorized the unrestricted use of any Work Schedule.

B.    Restrictions or denials on the use of a Work Schedule by employees shall be based on one of the following:

(1)    Consistent with the provisions set forth below, all employees shall be authorized the unrestricted use of any Work Schedule.

(2)    Abuse of the particular Work Schedule, meaning misconduct of a serious nature during the scheduled work days that would be alleviated by the presence of a supervisor;

(3)    Supervisors may temporarily suspend employee participation in a particular Work Schedule program for formal training;

(4)    Requirement for close supervision for the initial training required to understand and perform the duties of the position;

(5)    The requirement for close supervision for employees with serious deficiencies in the performance of their primary tasks over a period of at least one per quarter to the extent that the level of their performance would constitute grounds for an unsatisfactory performance rating. The intent here is that employees operating at this level would have the attention, to the extent practical, of their regular or acting supervisors during times that would not be available if the employee were participating in that particular Work Schedule Plan.

C.    Justification for restricting or denying a Work Schedule must be neither punitive in nature nor otherwise related to conduct or job performance except as discussed above.

D.    All disapprovals or restrictions shall be in writing and they shall clearly describe the basis used to justify the decision to deny or restrict participation in the work schedule elected. Copies of the justification shall be furnished to each employee affected at least two weeks prior to the time when the denial or restriction is to take effect, unless the denial or restriction is caused by an emergency situation or affects a new employee. In such cases, supervisors may reschedule the day(s) off.

E.     Justification for restrictions or denials shall be reviewed at the request of the employee upon a change in condition.


Section 14

A.     Operational, flexible, core and public hours, and core days from Monday through Friday will be:

| | | | | |
|---|---|---|---|---|
| Operational Hours | 6:30 | AM | to | 6:00 | PM |
| **5:00 AM to 10:00 PM  - IFP ???** | | | | |
| Morning Flexible Band | 6:30 | AM | to | 9:30 | AM |
| Afternoon Flexible Band | 3:00 | PM | to | 6:00 | PM |
| Core Hours | 9:30 | AM | to | 3:00 | PM |
| Core Days | Tuesday and Thursday | | | |
| Public Hours | 8:30 | AM | to | 5:00 | PM |

B.     Employees on a Work Schedule other than the normal tour of duty may report at any appropriate time during the morning flexible band consistent with being able to work the approved 8, 9, or 10 hour day with operational hours. From the time of reporting they must remain at work for 81/2, 91/2 or 101/2 hours in order to be credited with the respective hours of work and to cover a 1/2 hour period for lunch.


Section 15

A.     Employees on a Work Schedule other than the normal tour of duty shall personally sign in and sign out on a daily basis in alphabetical order. The two daily signatures constitute certifications that the employee arrived no later than and left no earlier than the times indicated. The T and A Sheets (Time, Cost and Attendance Report, CD-238) shall continue to be used and shall be the official form for recording, certifying and reporting time and attendance. The sign in and sign out sheet(s) will be located in the same place every day, preferably immediately adjacent to the office or desk of the immediate supervisor, insofar as is practicable.

B.     Employees on the normal tour of duty shall not be required to sign in and sign out each day for normal working hours.


Section 16

Nothing in this article shall affect the authority of the Office to take whatever actions may be necessary to carry out the functions of the agency.

**ARTICLE 24**
*Labor-Management Committees*

Section 1

The parties, recognizing the need for improved communication and a better understanding of each other's concerns, agree that a cooperative involvement must exist at all levels of the Office and the Association in order to enhance labor-management relations. To this end, the parties agree to jointly commit their efforts to establish and support a Quality Joint Labor-Management Committee System. The objectives of the Quality Labor-Management Committee System are to enhance the quality of work life in the Office and to improve the effectiveness of the Office by providing for the discussion of each other's concerns, the open exchange of information, and the opportunity for joint problem-solving of issues and concerns that have an adverse impact on the work environment. It is understood that the establishment of the Quality Joint Labor-Management Committee System is not intended to replace the collective bargaining process or the grievance procedure, but to provide a foundation from which to build and promote the cooperative attitude the parties acknowledge must exist at all levels of the organization.

Section 2

A.   Within 60 days after effective date of this agreement, the Office and the Association will appoint 3 persons from their organizations to serve as members of the following Quality Discussion Groups (each person must work in the area the Discussion Group represents):

   (1)   Chemical Quality Discussion Group
   (2)   Documentation/Other Quality Discussion Group
   (3)   Electrical Quality Discussion Group
   (4)   Mechanical Quality Discussion Group

B.   The Office shall not appoint managers above the level of first line supervisor or managers who were participants in the arbitration leading to this agreement to serve as members of the Quality Discussion Groups.

C.   The Association shall not appoint Association Official/Representatives to serve as members of Quality Discussion Groups.

Section 3

A.   Quality Discussion Group meetings shall be held every two months, and shall be limited to two hours, unless the Group mutually decides to meet more frequently. At the first meeting, a specific day and time shall be selected for future meetings.

B.   The Chair of the Discussion Groups shall alternate every six months between Association and Office Discussion Group members, unless the Group mutually decides to have another arrangement.

C.   The Chairperson is responsible for calling meetings, maintaining orderly meetings, obtaining agenda items from the members and preparing the meeting agenda.

D.   Except for an agenda, Discussion Group meetings shall be informal.

E.   Except for grievances, Unfair Labor Practices and the like, Discussion Groups may discuss any topic related to the Office work environment, despite the fact that such topic(s) may be outside of the scope of bargaining. However, the Discussion Groups have no authority to amend or delete any term of this Agreement or to compel action on any subject.

F.   The Discussion Groups shall make recommendations and/or reports to the Joint Labor-Management Committee.

G.   Unless the Discussion Group members mutually decide otherwise, the two alternating Chairpersons shall attend Joint Labor-Management Committee meetings as ex officio members and shall report on the recommendations of the Discussion Group or on whatever the Group deems appropriate.

H.   Discussion Group members shall be authorized official time to attend Group meetings.


Section 4

The Association may periodically send an Association official to a Discussion Group meeting as an observer. However, the Association official shall not participate in the Group meeting. The official's time at the meeting shall be charged to the Association's bank time.

Section 5

When requested by a Discussion Group, arrangements shall be made for key people from the Office, the Association and elsewhere to address the Group.

Section 6

A.    Within 90 days after the effective date of this agreement, the Association and the Office shall appoint 5 representatives from their respective organizations to serve on the parties' Joint Labor-Management Committee.

B.    The two ex officio representatives of the Discussion Groups shall serve as non-voting members of the Joint Labor Management Committee.

Section 7

A.    Joint Labor-Management Committee meetings shall be held quarterly and shall be limited to four hours, unless the Committee mutually agrees otherwise. At the first meeting, a specific day and time shall be selected for future meetings. At the same meeting, a Standing Joint Sub-Committee on Automation, and a Health and Safety Committee in accordance with Article 31 shall be established. The Committee may subsequently establish any standing or special subcommittee it deems appropriate.

(1)    The Health and Safety Committee and each Standing Joint subcommittee shall be composed of six members, three representatives appointed by the Office and three appointed by the Association. At least two members of each sub-committee (one appointed by the Office and one appointed by the Association) shall also be members of the Joint Labor-Management Committee.

(2)    Each Standing or Special Joint Sub-Committee shall operate in accordance with Section 3 above, excluding subsection G. The Joint Labor-Management Committee member who is also a Standing or Special Joint Sub-Committee member shall report recommendations to the Joint Labor-Management Committee.

B.    The Joint Labor-Management Committee Chair shall be held jointly by a representative of the Office and a representative of the Association. Each party will determine whether it will have a permanent or a rotating co-chairperson.

C.     Joint Labor-Management Committee meetings shall discuss, explore and study the recommendations and reports of the discussion groups and the Standing and Special Joint Sub-Committees. By mutual agreement, the committee shall make a recommendation or report to the Office concerning those issues discussed, explored and/or studied. However, the Committee has no authority to compel or preclude the Office from action or implementing proposed actions.

D.     The Chairpersons shall cause an agenda to be prepared and distributed to all Committee members at least two workdays prior to the meeting. The agenda shall include a brief description of each item to be discussed. Agendas should not be limited to Discussion Group and/or Standing or Special Joint Subcommittee recommendations and/or reports, although such items shall have priority along with previously scheduled agenda topics. The Joint Labor-Management Committee may agenda any topic of interest to the Association, the employees or the Office, /despite the fact that such topic(s) may be outside the scope of bargaining. Topics not on the agenda shall not be discussed but rather shall be placed on the agenda for the next meeting. Emergency items may be added to the agenda by mutual consent.

Section 8

Only full-time employees will be eligible for participation in the 5-4/9 and 4/10 Plans.

Section 9

A.     An employee participating in a work schedule plan other than the normal tour of duty and is in travel status or on Office business outside the Crystal City area will revert to the normal tour of duty for the period involved unless an alternative arrangement can be agreed upon between the employee and appropriate supervisory authority. The alternative arrangement must not increase the cost of the ,travel, training or other Office business to the Office or violate any rule, regulation or statute.

B.     For employees on the 4/10 and 5-4/9 Plans, when an employee is on Office business away from the Office but in the Crystal City area, and the duration of the business is less than the duration of the employee's normally scheduled work day, the employee must report to the Office and work for a period of time equal to the difference less reasonable travel time from the place of the other Office business to the Office.

C.     For employees on Flexitime or Normal Tour of Duty Plans, when an employee is on Office business away from the Office but in the Crystal City area, and the duration of the business is less than eight (8) hours, the employee must report to the Office and work for at least a period of time equal to the difference less reasonable travel time from the place of the other Office business to the Office.

Section 10

An employee's elected work schedule plan will remain in effect until the participant withdraws under Section 4 or until the opportunity to change the plan occurs as set forth in Section 7.

When circumstances arise which are both unusual and extenuating an individual employee upon written request may, after obtaining appropriate supervisory approval, be permitted to amend his/her choice of a non-work day to another day in the same bi-week, provided that such amendment will not prevent the unit to which the employee is assigned from providing its normal service to the public, the Office and other agencies of the government. Under no circumstances will such an amendment be permitted in two consecutive pay periods.

Section 11

A.   General Leave -When an employee is absent from the job other than for a holiday, he or she will be charged with leave equal in hours to the scheduled length of the work day. Employees working for a four-day week will, therefore, be charged with 10 hours of leave (Annual, Sick, LWOP, AWOL, Administrative, etc.) whenever absent during a regularly scheduled work day. Employees working under the 5-4/9 Plan will be charged with nine or eight hours, depending upon the employee's schedule. Employees working under the normal tour of duty and the Flexitime Plans will be charged with eight hours.

B.   Holiday Leave -A full time employee who is relieved or prevented from working on a day designated as a holiday is entitled to pay with respect to that day for the number of work hours scheduled (i.e., 4/10 Plan -10 hours, 5-4/9 Plan -9 or 8 hours depending upon the schedule, normal tour of duty and Flexitime Plans -8 hours) . The following rules apply when a holiday falls on a scheduled non-work day:

(1)   When the holiday falls on the employee's first or second consecutive scheduled non-work day, the preceding work day shall be designated as the day off in lieu of the holiday, in accordance with the following chart.

(2)     When the holiday falls on the third consecutive scheduled non-work day, the next work day shall be designated as the day off in lieu of the holiday, in accordance with the following chart.

| Employee's Non-Work Days | | | Holiday or Day Off in Lieu of a Holiday | Day Off |
|---|---|---|---|---|
| Fri., | Sat., | Sun. | Friday | Thursday |
| Sat., | Sun. , | Mon. | Monday | Tuesday |
| Sat. , | Sun., | Wed. | Wednesday | Tuesday |

Section 12

Authorized work performed outside an employee's work schedule (i.e., in excess of 10 hours, 9 hours or 8 hours, depending upon the schedule) or in excess of 80 hours per pay period or on any non-work day, is overtime work. Employees are entitled to overtime compensation or compensatory leave as appropriate for overtime work in accordance with applicable provisions of law.

Section 13

A.      Consistent with the provisions set forth below, all employees shall be authorized the unrestricted use of any Work Schedule.

B.      Restrictions or denials on the use of a Work Schedule by employees shall be based on one of the following:

(1)     Consistent with the provisions set forth below, all employees shall be authorized the unrestricted use of any Work Schedule.

(2)     Abuse of the particular Work Schedule, meaning misconduct of a serious nature during the scheduled work days that would be alleviated by the presence of a supervisor;

(3)     Supervisors may temporarily suspend employee participation in a particular Work Schedule program for formal training;

(4)      Requirement for close supervision for the initial training required to understand and perform the duties of the position;

(5)      The requirement for close supervision for employees with serious deficiencies in the performance of their primary tasks over a period of at least one per quarter to the extent that the level of their performance would constitute grounds for an unsatisfactory performance rating. The intent here is that employees operating at this level would have the attention, to the extent practical, of their regular or acting supervisors during times that would not be available if the employee were participating in that particular Work Schedule Plan.

C.      Justification for restricting or denying a Work Schedule must be neither punitive in nature nor otherwise related to conduct or job performance except as discussed above.

D.      All disapprovals or restrictions shall be in writing and they shall clearly describe the basis used to justify the decision to deny or restrict participation in the work schedule elected. Copies of the justification shall be furnished to each employee affected at least two weeks prior to the time when the denial or restriction is to take effect, unless the denial or restriction is caused by an emergency situation or affects a new employee. In such cases, supervisors may reschedule the day(s) off.

E.      Justification for restrictions or denials shall be reviewed at the request of the employee upon a change in condition.

Section 14

A.      Operational, flexible, core and public hours, and core days from Monday through Friday will be:

| | | | | | |
|---|---|---|---|---|---|
| Operational Hours | | 6:30 | AM | to | 6:00 | PM |
| | | **5:00 AM to 10:00 PM  - IFP ???** | | | |
| Morning Flexible Band | | 6:30 | AM | to | 9:30 | AM |
| Afternoon Flexible Band | | 3:00 | PM | to | 6:00 | PM |
| Core Hours | | 9:30 | AM | to | 3:00 | PM |
| Core Days | | Tuesday and Thursday | | | |
| Public Hours | 8:30 | AM | to | 5:00 | PM |

B.      Employees on a Work Schedule other than the normal tour of duty may report at any appropriate time during the morning flexible band consistent with being able to work the approved 8, 9, or 10 hour day with operational

hours. From the time of reporting they must remain at work for 8 1/2, 9 1/2 or 10 1/2 hours in order to be credited with the respective hours of work and to cover a 1/2 hour period for lunch.

Section 15

A.  Employees on a Work Schedule other than the normal tour of duty shall personally sign in and sign out on a daily basis in alphabetical order. The two daily signatures constitute certifications that the employee arrived no later than and left no earlier than the times indicated. The T and A Sheets (Time, Cost and Attendance Report, CD-238) shall continue to be used and shall be the official form for recording, certifying and reporting time and attendance. The sign in and sign out sheet(s) will be located in the same place every day, preferably immediately adjacent to the office or desk of the immediate supervisor, insofar as is practicable.

B.  Employees on the normal tour of duty shall not be required to sign in and sign out each day for normal working hours.

Section 16

Nothing in this article shall affect the authority of the Office to take whatever actions may be necessary to carry out the functions of the agency.

**ARTICLE 25**
*Contracting Out*

Section 1

For the purposes of this agreement, contracting out is defined as the transfer of any bargaining unit job or job function which adversely affects bargaining unit employees from the Office to the private sector.

Section 2

    A.    Simultaneous with the publication of a request for bids or proposals, the Office will provide the Association with a copy of the request for bids or proposals.

    B.    The Association may provide comments to the Office concerning the contracting out within the time frame provided to contractors.

Section 3

Within 10 workdays after the contract has been awarded, the Union will be notified of the name of the awardee, the date of contract implementation and of any impact(s) on bargaining unit employees.

Section 4

When appropriate, the Office agrees to assist and counsel affected employees in obtaining employment with the contractor and/or other employers. The name and address of the awardee will be provided to all affected employees.

Section 5

When appropriate, the Office will explain any programs for early retirement to affected employees.

Section 6

Nothing in this Article shall preclude the parties' obligations under Article 14 of this Agreement.

Section 7

If a Reduction-In-Force becomes necessary due to contracting out, the parties will follow the RIF procedures set forth in Article 29 of this Agreement.

# ARTICLE 26
*Delayed Benefits*

Section 1

The Processing and Records Division when notified by an employee that his/her paycheck was lost, missing or not received, will expeditiously investigate the facts and circumstances and instruct the proper authorities to issue a replacement check, if appropriate. If a replacement check is not received within 72 hours, the Office shall issue emergency supplemental funds to the employee.

Section 2

The Processing and Records Division will correct payroll related errors (i.e., in allotments, tax deductions, annual leave, sick leave, compensatory time, overtime compensation, etc.) normally within two pay periods after notification. The Association will be given written notice of those errors that are not corrected within the two pay periods with the reason(s) why they were not corrected and a proposed date within which they will be corrected.

# ARTICLE 27
*Automation*

Section 1

A.   The Office shall promptly furnish to the Association detailed advance information about the development and implementation of automated operations through the application of computer technology. The providing of information shall include preliminary (or tentative) and revised documentation and periodic briefings.

B.   The Office shall provide the Association with the results of system evaluations performed by the Office to determine whether functional requirements are being met.

Section 2

A.   Employees working with computers and video display equipment shall have a work environment that is based upon high standards of health, safety and ergonomics.

B.   The Office will inspect each machine in use on a regular basis and will maintain all equipment in proper repair, state of cleanliness and working order. Each machine will be checked regularly for noise, flicker, clarity of image, contrast, brightness and adjustability.

C.   The Office will make available published health and safety specifications and the maintenance log for each machine used by a member of the bargaining unit.

Section 3

Upon request from a pregnant employee and subject to the needs of the Office, the PTO will reassign the employee to work that does not require the use of video display equipment. If such reassignment is not made, the employee may request leave for the duration of the pregnancy, in accordance with applicable rules, provisions and policies applicable to maternity leave. This Section does not preclude the Office from accommodating the employee in other ways that are acceptable to the employee and approved by the Association.

<u>Section 4</u>

In accordance with Article 24 of this agreement, a joint committee shall be established to study the Automated Patent System and the special needs of employees with regard to it.  Two members of the committee (one appointed by the Office and one appointed by the Association) shall also be members of the Health and Safety Committee.  Recommendations concerning issues of health and safety will be promptly referred to the Health and Safety Committee for comment and submission to the Office.

<u>Section 5</u>

Nothing in this Article shall preclude the parties' obligations under Article 14 of this Agreement.

**ARTICLE 28**
*Equal Employment Opportunity*

Section 1

The Office and the Association agree to fully support the concept of Equal Employment Opportunity, the Federal Equal Employment Opportunity Program and the terms of this Article.

Section 2

The Office shall not discriminate against any employee on the basis of race, color, religion, age, national origin, sex, handicap condition, marital status, social or political activities or affiliation, or sexual preference.

Section 3

Any meeting conducted for the purpose of reaching a final settlement of a discrimination complaint involving a bargaining unit member shall be treated as a formal meeting and, therefore, shall be subject to the statutory and contractual provisions applicable to formal meetings.

Section 4

The Office and the Association agree to encourage those employees having an underrepresentation in the above mentioned groups to qualify for and apply for higher level positions. The Office agrees to make reasonable accommodations in the work schedules of employees to permit them to obtain training or education to so qualify for such positions.

Section 5

The Office shall provide the Association with a copy of the current Office Affirmative Action Plan (AAP) and a copy of the Equal Employment Opportunity (EEO) complaint procedure.

    A.    The Office agrees, at such times as the AAP is revised, to provide the Association with a draft copy of the revised plan, prior to the proposed implementation. The Association shall review the revised plan and provide appropriate comments thereto and/or provide negotiation proposals. Written reasons will be given to the Association regarding any rejected suggestions.

      B.      The Association agrees that negotiation proposals relative to a revised AAP are governed by the procedures set forth in the Article on mid-term bargaining.

## Section 6

The Office agrees that a copy of the EEO complaint procedure shall be posted on each floor occupied by Association members.

## Section 7

The Office shall annually provide the Association with the following information:

      A.      workforce composition by race, sex and grade level;

      B.      composition of each major occupation (job series) by race, sex and grade level;

      C.      upward mobility positions filled by race, sex; and

      D.      numbers and types of discrimination complaints filed;

## Section 8

The PTO will establish an EEO counselor system to provide counseling to any aggrieved person who believes that he/she has been discriminated against because of race, color, religion, sex, national origin, age or handicap condition. The EEO counselor system is not available to an aggrieved person who believes that he/she has been discriminated against for other reasons.

## Section 9

The Office will select and train all EEO counselors.

## Section 10

In an attempt to resolve discrimination charges as early as possible, EEO counseling will be provided to an aggrieved employee on an informal basis, before a formal EEO complaint is filed.

Section 11

The name, picture, telephone number and work site location of each EEO counselor will be posted in a conspicuous location in an enclosed or protected bulletin board on each floor where unit employees work.


Section 12

Each quarter the Office will publish/distribute information to unit employees that will include the name, telephone number and the work site location of each EEO counselor.


Section 13

An aggrieved employee shall have the sole right to select anyone of the designated counselors to handle his/her complaint, as long as the selected counselor is available.


Section 14

An aggrieved employee, if in a duty status, shall be granted a reasonable amount of time to contact and explain his/her complaint to an EEO counselor.


Section 15

The PTO agrees to provide adequate facilities wherein an aggrieved employee and the EEO counselor can discuss the matter forming the basis of the complaint in a confidential setting/forum that is excluded from other persons.


Section 16

The purpose and subject matter of an EEO counselor's visit to an aggrieved employee's work site shall be kept confidential unless authorized to be released by the aggrieved employee.


Section 17

The counselor selected by an aggrieved employee shall attempt to resolve the complaints or matter(s) raised by said employee on an informal basis and to the satisfaction of said employee before the complaint is filed under 29 CFR 1613.214.

## Section 18

Any resolution of a complaint that is proposed by an EEO counselor shall be fair, equitable and where feasible designed to prevent similar complaints from arising in the future. No counselor will coerce or pressure an aggrieved employee to accept a proposed resolution.

## Section 19

The PTO will, upon request, promptly provide any EEO/counselor with pertinent data and information necessary to assist the counselor to fairly and equitably resolve a complaint. The aggrieved employee will be provided with a copy of the counselor's report.

## Section 20

When contact is made with the aggrieved employee, the counselor shall inform said employee of information concerning the availability of applicable EEO Statutes, Regulations, Departmental Orders and Agency (PTO) Orders and Guidelines. Upon request, copies of information may be provided to employees.

## Section 21

An EEO counselor shall not use pressure or coercion of any form to prevent an aggrieved person from filing a formal complaint.

## Section 22

The EEO counselor shall provide the aggrieved employee with a written summary of the resolution of any complaint at least ten (10) working days prior to submitting it to the Personnel Office.

## Section 23

Notice of EEO counselor vacancies shall be posted on all bulletin boards. Interested unit employees may apply.

## Section 24

The parties agree to meet at least twice per year to discuss EEO matters of mutual interest. Reasonable time will be granted for such meetings.

<u>Section 25</u>

To the extent permitted by law and government-wide regulation, the Office shall make whole any unit member who has been subjected to unlawful discrimination.

**ARTICLE 29**
*Reductions-In-Force*

<u>Section 1</u>

Reduction-In-Force (RIF) shall be governed by 5 C.F.R. provisions of this Article.

<u>Section 2</u>

Not part of collective bargaining agreement.

<u>Section 3</u>

A.   The Office will counsel and assist employees, for whom no acceptable position can be provided, regarding early retirement and/or preparing resumes, holding job interviews, and other techniques of gaining acceptable employment.

B.   Counseling and assistance shall be conducted on official time.

C.   When more than fifteen (15) employees are to be released over a two-month period, the Office will invite suitable employers for a job fair.

<u>Section 4</u>

A.   To facilitate impact and implementation negotiation, the Office will inform the Association of any pending RIF, as soon as possible, but not less than 30 days prior to official notification of the employees.

B.   The Office shall inform the Association by written notice, which shall include the reasons for the RIF, the number and types of positions affected, and the approximate date of the action. A copy of the retention register shall be made available for inspection by the Association.

C.   The Office will meet with the Association to explain the RIF procedure and answer any questions.

<u>Section 5</u>

A.      After receiving written notice of the RIF, the Association shall have the right to negotiate on the impact and implementation of the impending RIF.

B.      Negotiations will be conducted in accordance with this Agreement's provisions for mid-term negotiations and shall be limited to proposals not inconsistent with this Article.

Section 6

The Office shall not institute a RIF as a disciplinary measure against an employee or group of employees.

Section 7

A.      Upon notification to the Association of an impending RIF, the Office will impose a hiring freeze on positions within the competitive level of the affected employees.

B.      The hiring freeze will stay in effect until all affected employees have retired and/or are placed in positions having the same representative rate as their current positions but, in no event shall it stay in effect for more than one year.

Section 8

A.      The Office shall maintain the records needed to accurately determine the retention standing of employees.

B.      Upon request, the Office will timely provide the Association with copies of records relevant to a proposed separation or assignment to a lower grade level position.

Section 9

For all members of the Unit, the minimum competitive area is the entire Patent and Trademark Office.

Section 10

A.   A competitive level shall be consistent with the regulatory definition of competitive level.

B.   If the Association provides, in writing, reasons for including additional positions within a particular competitive level, the Office shall either include these positions or provide substantive written justification for excluding them.

Section 11

A.   When an employee is to be released from a competitive level, the Office will provide the employee with a list of all positions within the bargaining unit for which the employee is at least minimally qualified.

B.   The employee will be given thirty (30) days to accept or refuse the first offered assignment and ten (10) days to accept or refuse any subsequent offered assignment which is less severe than the first assignment.

Section 12

Specific notice of release from a competitive level, as defined in 5 C.F.R. 351.802, shall be given to the employee at least 30 days before the effective date of release.

Section 13

Not part of collective bargaining agreement.

**ARTICLE 30**
*Health Services*

Section 1

In compliance with Section VIII.A of Appendix B, the Office will compile a list of employees with determined emergency health problems from information voluntarily submitted by employees. The purpose of the list is to facilitate advice or services obtained in the event of an emergency. The Office shall maintain the information submitted and the list in a strictly confidential fashion.

Section 2

The Office shall continue to provide existing health services through the health unit in Crystal Plaza.

Section 3

Upon request, the Office shall supply an employee with the results of any test or examination given him/her.

**ARTICLE 31**
*Health & Safety*

Section 1

The Office and the Association shall encourage unit employees to participate in the Occupational Health and Safety Program.

Section 2

In accordance with Executive Order 12196, the Office and the Association shall establish an on-going Joint Health and Safety Committee to perform the following functions:

A.   consult and advise the Office concerning the health and safety conditions, practices (existing and proposed), programs and regulations within the Office;

B.   promote employee health and safety education, which will consist of, but not be limited to, training for emergency evacuation of the buildings, training in first aid and training in the use of fire extinguishers for an appropriate number of employees for each floor;

C.   provide a means for presentation and evaluation of employees' comments;

D.   conduct semi-annual safety inspections of facilities and recommend measures for the elimination or control of conditions hazardous to the health and safety of the employees, especially handicapped employees.

Section 3

The Health and Safety Committee shall be furnished with copies of all reports furnished to the Department of Labor under terms of the Occupational Safety and Health Act.

Section 4

Fifteen (15) days after the Office determines which Committee recommendations will not be adopted, the Association shall be notified of such in writing, including the reasons therefore.

Section 5

If the unions which represent Office employees agree to establish a Joint Labor-Management Health and Safety Committee, such Joint Committee shall be established in lieu of the Health and Safety Committee established under this Article.

Section 6

When an employee is injured in the performance of his/her duty, the employee will promptly be referred to the Office of Personnel for counseling as to his/her right to file for compensation benefits and benefits payable when it is known that the absence will be for more than three (3) workdays.

**ARTICLE 32**
*Dues Withholding*

Section 1

Any employee of the Office may authorize an allotment of pay for the payment of dues for membership, provided:

A.      The employee is included in the Unit;

B.      The employee has voluntarily completed a request for such allotment of pay on the existing SF-1187;

C.      The employee receives an amount of pay on regularly scheduled paydays which is sufficient, after other legally required deductions, to cover the full amount of the allotment; and

D.      The employee is serving under an appointment not limited to six (6) months or less.

Section 2

The procedures and effective date of authorization shall be as follows:

A.      The Association agrees to acquire existing authorization form SF-1187, distribute the form to its members, ask its members to read the form and to receive completed forms from members who request allotment. The Office agrees to direct employees who have questions concerning the form to the union;

B.      The Treasurer or his/her designee is designated to process completed existing authorization forms SF-1187, by completing Section A thereof. The Treasurer or his/ her designee will submit, not later than the second Tuesday of the pay period, the completed existing authorization forms to the Employee Relations Division, Office of Personnel, who will forward them promptly to the Processing and Records Division, Office of Personnel, after checking for and establishing eligibility. The Association will be notified promptly of any employees found not to be eligible for dues deduction; and

C.      The deduction will begin with the next pay period after the authorization form is received by the Employee Relations Division.

Section 3

Allotted dues will be withheld each pay period. The amount to be withheld shall be the amount of the regular bi-weekly dues of the member, exclusive of initiation fees and fines.

If the amount of regular dues is changed by the Association, the Processing and Records Division will be notified in writing by the President of the Association. This notice will certify that the dues structure of the organization has been changed in accordance with the Constitution and By-Laws of the Association, and will give the effective date of the change. The notice must be forwarded to the Processing and Records Division three (3) pay periods before the effective date, to allow time to change computer programs. Only one such change in the computer program may be made in any period of twelve (12) consecutive months.

Section 4

The allotment will be terminated by the Processing and Records Division at the end of the pay period in which loss of eligibility occurs from any of the following events:

A.     When the Association is finally adjudicated as having lost its recognition;

B.     When a Unit employee dies, retires, is separated from the Office, or is promoted or reassigned to a non-Unit position;

C.     Upon receipt of notice from the Association that the employee is no longer a member; or

D.     After an employee submits a written request for revocation of an allotment, SF-1188, "Revocation of Voluntary Authorization of Allotment of Compensation for Payment of Employee Organization Dues." However, as provided in 5 USC 7115(a) , an initial allotment may not be revoked for a period of one year. A revocation received on or before the first anniversary of the date the employee authorized withholding will be effective the first pay period which begins on or after the anniversary date. Thereafter, a revocation will be effective the first pay period which begins on or after March 1st, if the revocation is received on or before March 1st.

<u>Section 5</u>

The amount due the Association shall be remitted to the Treasurer of the Association or designee, approximately 10 days following the end of the pay period. Each remittance will be accompanied by a statement giving the following information:

A.      Identification of Association;

B.      Names of members for whom deductions were made, and the amount of each deduction;

C.      Names of employees who did not earn enough salary to permit a deduction;

D.      Total number of members for whom dues are withheld;

E.      Total amount withheld from payroll and remitted;

F.      Names of employees removed from dues withholding during the relevant pay period; and

G.      Identification of employees added in each new list.


<u>Section 6</u>

The Association and the Personnel Division agree to issue the following written notices:

A.      The Association will send by interoffice mail to the Processing and Records Division within ten (10) workdays any written revocation of allotment received by the Association;

B.      The Processing and Records Division will send to the Association within ten (10) workdays a copy of each written revocation received by the Office;

C.      When the Association becomes aware of an overpayment, the Processing and Records Division will be notified. The overpayment will be deducted from the remittance check normally sent to the Association. This deduction will occur within two (2) pay periods after the notice of overpayment.

D.      When the Association receives a remittance check which is less than that due to the Association, the Association will notify the Processing and Records Division. Within two (2) pay periods after such notice the appropriate adjustment shall occur in the next remittance check.

## ARTICLE 33
*Printing & Distribution*

<u>Section 1</u>

The Chief Negotiators shall arrange for printing at a mutually agreeable cost. The cost shall be shared equally by the Office and the Association. The printing will be done as expeditiously as possible.

<u>Section 2</u>

The Office will distribute copies to all unit supervisors and management officials.

<u>Section 3</u>

The Association will distribute copies to all unit employees.

**ARTICLE 34**
*Duration & Amendment*

<u>Section 1</u>

A.     Except as provided in this Article, this Agreement shall remain in full force and effect for a three year period commencing July 1, 1986, and thereafter for additional one year periods, unless written notice of intent to terminate is given to the other party in accordance with Section l(b) below.

B.     Such notice of intent to terminate shall be given not sooner than 180 days before the termination date and not less than 120 days before the termination date. Once such notice is given, the moving party must submit its proposals to the other party not less than 120 calendar days before the termination date. The party receiving the proposals may submit counterproposals and/or proposals to the other party during the next 45 day period. The parties shall begin negotiations no later than 70 days prior to the termination date. This Agreement will remain in full force and effect until the implementation of a new basic agreement.

<u>Section 2</u>

Except as provided in Article 2, Section 2, this Agreement may be reopened for amendment at any time by mutual consent of the parties. Any request for amendment shall be in writing and must be accompanied by proposed amendments or modifications(s) .Within 30 days after a request has been received, the party receiving the request will indicate either willingness or refusal to negotiate. If the consent is obtained or if a request has been made under Article 2, Section 2, negotiations will commence in accordance with Article 14, Section 3B. Only those changes accompanying the request shall be considered unless the parties agree otherwise.

<u>Section 3</u>

Amendment to this Agreement may be required because of changes in applicable laws, rules, regulations or policies issued by higher authority after the effective date of this Agreement. In this event, the parties will meet for the purpose of negotiating new language that will meet the requirements of such higher authority. No changes shall be considered except those bearing directly on and falling within the scope of such laws or regulations.

Section 4

Except for those specific provisions which have been identified to the arbitrator and submitted to the FLRA for a negotiability determination, all provisions of this Agreement shall be in effect immediately upon approval by the Department of Commerce or within 30 days after the agreement has been submitted to the parties by the arbitrator. If the FLRA decides that any provision of this Agreement is outside the Office's duty to bargain, then negotiations shall be reopened to consider alternatives to the affected provision. If the FLRA decides that a provision is negotiable, then the specific provision shall have the effective date it would have had if it had not been submitted for the negotiability determination.

Section 5

For all matters arising prior to the effective date of the appropriate provisions of this Agreement, the provisions governing the resolution of the matter shall be those of the parties' prior Agreement.

**ARTICLE 35**
*Definitions*

<u>Section 1</u>

In the interpretation and application of the Contract, the following words or terms, whenever used in the Contract, shall have the following definitions, except when otherwise clearly and specifically provided:

A.    Not part of collective bargaining agreement.

B.    Time periods as set forth in this Contract are determined to be calendar days, unless specifically identified otherwise. In computing any period of time prescribed or allowed in the Contract, the day of the act, event, or occurrence from which the designated period of time begins to run shall not be included. When the day or the last day fixed by any time period for taking action falls on a Saturday, Sunday or a holiday, the action may be taken on the next succeeding day which is not a Saturday, Sunday, or Federal holiday.

C.    Any "justification" or reasons given in writing, as required in this Agreement, shall mean that a management response justifying a particular action shall contain the reasons and arguments that the Office shall rely upon if the action is contested. Any reasons or arguments that are not presented in the writing shall not be presented in an arbitration, unless the arbitrator permits it after hearing management's justification for not previously providing the information.

D.    "Presentation" means an oral or physical appearance to state a position on a particular issue. Presentation does not include the writing of documents, such as briefs, etc. However, such documents may be submitted during a presentation.

E.    An "unwritten practice" in Article 2, Section 2, is a term or condition of employment if, prior to this Agreement, (a) the practice had been consistently exercised for an extended period of time by the parties to this Agreement of (b) the practice had been followed over a substantially long duration by one of the parties and not challenged by the other. The party asserting the practice must establish the elements of the practice by a preponderance of evidence. A party may establish that the practice was consistently exercised over the requisite period of time by demonstrating that the practice occurred with such frequency over such a period of time that a reasonable person would expect it to continue. A party may demonstrate that the practice was followed by both parties, or by one party with the acquiescence of the other, by showing that a substantial number of individuals engaged in the course of conduct establishing the practice, and that the other party "knew" of

the conduct and consented to its continuance." A party's knowledge may be implied where circumstances are shown which should have led that party to be aware of the conduct. Likewise, a party's consent may be implied where it is demonstrated that the party did not reasonably exercise its prerogative to communicate its lack of consent to a specific ongoing practice of which it was aware.

F.      Not part of collective bargaining agreement..

G.      "Work areas" in Article 5, Section 2, shall mean any area in which a Unit Member performs duties pursuant to his/her Performance Appraisal Plan. For example, the Board of Appeals and the Solicitor's Office shall not be considered work areas for examiners.

H.      "Contemporary business environment" in Article 5, Section 4, includes those private, public and federal professional business offices which interact with the public.

I.      "Announcement" in Article 7, Section 2, shall mean that copies of the notification are posted on bulletin boards and sent to Art Unit Supervisors who shall display them in a conspicuous location.

J.      "Provided" in Article 7, Section 2, shall mean that a copy of the notification shall be sent through interoffice mail to the President of the Association.

K.      "Necessary" in Article 7, Section 7, shall mean that there are relatively few employees who can successfully perform the essential elements of the detail upon entry into it., without a reasonable loss of the quality or quantity of the work needed to be performed.

L.      "Foreign to the member's training and background" in Article 8, Section 6, means that the unit member has no formal education or work experience in a certain technology.

M.      "Trainee" as set forth in Article 11, Section 4f, means an individual who has very little or no experience in handling a grievance.  The trainee shall not participate in the presentation.

N.      "Technical Assistant" as set forth in Article 11, Section 4f, means an individual who is knowledgeable in the specific technology involved in a grievance to serve as an advisor to the POPA representative who lacks sufficient technological knowledge in a grievance where such knowledge is necessary.

O.      A "preliminary oral warning" in Article 11, Section 5, is a verbal warning which does not include "specific" findings of fact with respect to a wrongdoing on the part of an employee.  A preliminary oral warning

Appendix A
# Agreement on Awards

The Commissioner of Patents and Trademarks and POPA hereby agree to amend their agreement of December 13, 1972, as amended, by adding thereto the following article:

## Article XV - Awards
## Section 1. Quality Step Increases

A.   An employee is eligible for a quality step increase if, in accordance with this Article and the employee's performance appraisal plan, the employee performs at an outstanding level in all critical performance elements and achieves at least a satisfactory level in all other performance elements over a period of four consecutive quarters. Because a quality increase will indefinitely raise the employee's salary, the employee's performance must give promise of continuing at the same high level in the same grade and type of position.

B.   Where a standard which measures the quantity of accomplishment for a critical element is included in the performance appraisal plan, an achievement of 110% of an assigned goal shall be the award goal on the factor of quantity to warrant the grant of a QSI. An achievement of 117.5% of an assigned goal shall be prima facie evidence of sufficiently exceptional performance on the factor of quantity to warrant the grant of an additional QSI to an employee having one effective QSI. Achievements of 123%, 128% and 133% are the award goals for employees having two, three and four effective QSIs, respectively. With respect to all performance standards other than quantity, the achievement required for second and subsequent QSIs shall be the same as for the first QSI.

C.   An "effective" QSI is a QSI that raises the salary of an employee above the salary level the employee would be at had the employee received each within-grade increase in the employee's current grade in the minimum time provided by law and regulation. No QSI earned prior to a grade promotion or a change in rank that increases the employee's assigned goal shall be considered an effective QSI. When a salary increase due to a QSI is blocked by a pay cap, that QSI is not an effective QSI.

D.   To be eligible for a quality step increase, an employee must have spent a minimum of 1400 hours during the four quarter award period performing the functions of the employee's job. The functions of a patent examiner's job are patent examining and examining related activities.

## Section 2. Special Achievement Awards for Superior Performance

A.   An employee is entitled to a special achievement award if, in accordance with the employee's performance appraisal plan, the employee performs at the following level over a period of four consecutive quarters:

1 (a).   For patent examiners and classifiers: 110% of an assigned goal for employees having no effective QSIs or 10 percentage points above the minimum quantitative achievement necessary to qualify for the employee's most recent effective QSI. A satisfactory level of performance in each other performance element is also required.

1 (b).   For bargaining unit members other than patent examiners and classifiers: performance at the outstanding level for at least 50% of the critical elements and a satisfactory level of performance in each other performance element.

B.   The basic amount of a special achievement award shall be 3% of the employee's current base per annum salary as of the end of the award period. An employee who has spent at least 1400 hours during the award period performing the functions of the employee's job shall receive the basic amount. An employee who has spent at least 700 hours but less than 1400 hours during the four quarter award period performing the functions of the employee's job shall receive a proportionate amount. The proportionate amount shall be 3% of the employee's base per annum salary times the number of hours spent performing the job functions divided by the 1400 hour base. The functions of a patent examiner's job are patent examining and examining related activities.

C. If the award period for a special achievement award encompasses the date when an employee has received a promotion or a permanent increase in signatory authority, the quantitative achievement required to earn a special achievement award shall be the sum of:

1.   110% of the minimum quantitative achievement necessary to qualify for the promotion or permanent increase in signatory authority for the 13 pay periods prior to said date; and

2.   The achievement that would be otherwise necessary for an award during the periods outside said 13 pay periods.

# Section 3. Implementation Procedures

A.   A written explanation of the reasons for denial of an award shall be given to the employee upon his request.

B.   No employee may, except as provided in Section 4.13. of this Article, receive more than one award for the period used to justify the award. An employee whose performance merits either a quality step increase or a special achievement award shall have the option to refuse either award or both awards.

C.   In determining whether an employee has sufficient quantity to earn an award and in determining the number of hours spent performing the functions of the employee's job, some or all of the hours the employee has worked overtime may, at the employee's option, be subtracted from the total number of hours spent performing the functions of the employee's job during the award period. When a patent examiner has overtime hours subtracted, a number of BDs equal to the number of subtracted overtime hours divided by the examiner's H/BD goal will be subtracted from the total BDs achieved during the award period. When a classifier has overtime hours subtracted, an analogous computation will be made.

D.   Awards will be submitted and forwarded to payroll within two months of the end of the award period or within two months after the employee exercises the option described in Section 3.C. of this Article, whichever occurs later.

# Section 4. Transition Procedures

A.   A special achievement award period under this article shall not begin prior to October 1, 1982.

B.   An employee who is granted a special achievement award under this Article for a four-quarter period which overlaps the award period of a previously received special achievement award shall have the four-quarter award amount reduced by the following: the previously received award amount times the ratio of the number of pay periods of overlap to the total number of pay periods in the award period of the previously received award.

C.   No six-month award period (provided for in the paragraph labeled 2 in the "meaning and effect of a goal" section of the Agreement on Goals executed on July 9, 1976) shall terminate later than the end of the 3rd quarter of FY'83. All employees who qualify for a six-month award by that time shall be granted such award.

D.   To the extent that paragraphs labeled I and 2 in the "meaning and effect of a goal" section of the Agreement on Goals executed on July 9, 1976 conflict with specific language within this Article, this Article shall govern. In addition, the minimum time provisions of Section ID and Section 2B of this Article shall supersede the minimum time provisions set forth in the penultimate sentence of the 1976 Agreement on Goals.

# Section 5. Duration of Effectiveness

A.   This Article shall be effective October 1, 1982, subject to the transition provisions of Section 4 of this Arficle.

B.   This Article shall expire on the fourth anniversary of this Article, i.e., September 30, 1986, except when both parties have agreed otherwise.

C.   Upon the third anniversary of this Article, or any time thereafter, either party may request reopening of this Article. Once a party has submitted in writing its proposals, the opposite party within three calendar weeks shall submit its proposals and/or counterproposals. Negotiations upon a successor or modified article shall commence no later than two weeks thereafter. The article, as produced or modified by such negotiations, shall be incorporated into the basic agreement between the parties and shall be subject to its terms.

For POPA                              For PTO
*/s/Ronald J. Stern*                     */s/Donald 1. Quigg for*
Ronald J. Stern                       Gerald J. Mossinghoff
President, POPA                        Commissioner of Patents and Trademarks
Date: June 27, 1983                   Date: June 27, 1983

In the Matter of the Arbitration        Appendix B
       between

PATENT AND TRADEMARK OFFICE      Case No. 83 FSIP 89
       and

PATENT OFFICE PROFESSIONAL
ASSOCIATION

In accordance with a directive of the Federal Service Impasses Panel, dated September 2, 1983, the parties selected the undersigned as mediator/arbitrato*r in the above styled case. Conferences were held on October 31, November 1, 2, 3 and 4, 1983 in the offices of the Patent and Trademark Office in Arlington, Virginia.

## AWARD

This Award shall be an article in the parties'existing Agreement and shall be incorporated into the parties' next basic Agreement. This Award is not intended to construe the parties' Memorandum of Understanding-of December 2, 1982 and is not intended to rule upon any claim of either party with respect to that Memorandum of Understanding.

The following provisions shall constitute the Addenda to the Memorandum of Understanding on Impact and Implementation of Relocation of Professional Employees to or within Crystal Square 4, Crystal Plaza 2, Crystal Plaza 3 or Crystal Plaza 4:

I.    The following item is agreed to by the above parties with respect to Patent Examiners, or those acting in that capacity, in the bargaining unit who are not located in Crystal Square 4: When a patent application is ready for allowance except for a classification issue, and a post classifier is not readily available in the Examiner's group to resolve said issue and failure to promptly resolve said issue will result in the application being held beyond an office required "turnaround" time, the Examiner will have the application counted. After this application is counted, the application will be mailed to the appropriate Documentation Division for resolution of the issue.

II.    Non-production time for work related travel shall be granted as follows to any examiner who, because of relative office and search room relocations during this move, travels to a different building than the one in which his/her office is located to search a class outside of his/her assigned docket: Ten minutes for each round trip between Crystal Plaza 2 and either Crystal Plaza 3 or Crystal Plaza 4. A round trip only encompasses multiple searches in the same building when done during the same trip.

This travel time will be permitted to accumulate over one or more pay periods and will be granted in one hour increments of accumulated time. The examiner will supply the serial number of each application for which at least one of the above type trips is claimed on the Form 690-E for the pay period during which an increment(s) accumulates.

III.   The goal of the Office shall be to provide equivalent offices to examiners of equal grade and signatory authority. The following provisions shall be implemented no later than May 1, 1984:

A.    Within each art unit, priority of office selection shall be determined first by the grade of the examiner, then by the degree of signatory authority, and finally by the amount of time served in the employee's current and previous higher grades (as in the case of down-graded employees) while an employee of the PTO.

B. Selection of employees to share offices shall be made in the reverse order of the priority.

C. Except as provided below, when exa miners agree among themselves to" trade" rooms, their choice shall be honored.

D. If a group director desires to assign a room out of the agreed upon sequence of priority, the director may do so only if the variance is due either to: (a) the physical requirements of the examiner, as in the case of a handicapped person, or (b) special requirements of the work. Conduct or work performance shall not be a basis for room assignments. The director shall have the burden of justifying the variance in writing to the affected employee.

E. All examiners and classifiers, grades 13, 14 and 15, shall be provided with private offices of approxi-mately 150 square feet; however, chemical classifiers shall be provided with separate offices based on the reconstruction of walls within existing space allocations of the Chemical Classification Division.

F. All non-exarniners and non-classifiers, grades 13, 14 and 15, will be maintained at at least their existing level except for offices presently under the Administrator for Automation for whom every reasonable effort will be made to provide private offices of approximately 150 square feet to the extent the nature of those professionals' work requires privacy.

G.   All examiners and classifiers, GS-12 and below, shall be provided with at least 75 square feet if in an outside office, and at least 100 square feet if in an inside office, except that reasonable variations from these standards shall be allowed where it would be necessary to tear down walls to be in compliance. Neither examiners nor classifiers sheill be placed more than three to an outside, corne- room and no more than two in any other room.

H.   Each non-exa miner and non-classifi er, GS-1 2 and below, presently employed by the PTO who now have office space of at least 75 square feet in an outside office or at least 100 square feet in an inside office shall not be reduced in office space below 75 square feet or 100 square feet respectively. In the event new space is acquired, the first priority of management shall be to provide 75 square feet of outside office space and 100 square feet of inside office space for non-examiners and non-classifiers, GS-12 and below, if the new space or other space can be reasonably used for this purpose. In no case shall non-examiners and non-classifiers, GS-12 and below, have less than 66 square feet of office space.

I.   Within the lowest level organizational unit, office selection for other members of the POPA bargaining unit involved in this reallocation of office space shall be based on analogous criteria to that applied to examiners (e.g., unit, grade, time served).

J.   Prior to any final assignment of offices, the PTO will provide POPA with a listing of office assignments which is such that a determination can be made that the requirements of this section have been met.

IV. For moves subsequent to the execution date of this document, the Office shall send a memorandum to each affected-professional assuring the employee of his/her entitlement to all non-production time agreed to in these negotiations.

V. At the conclusion of each major relocation of examiner offices (e.g., plural art units or a group), the Office shall provide each Art Unit and Classification Group with information sheets containing both (a) the final locations of the examiners and their new telephone numbers, and (b) the final location of each Class (when in a single search room) or major subclass grouping thereof (when the class is located in plural search rooms).

VI. The Office agrees to maintain clerical support for all examiners located on a floor other than the one on which the clerical operation for their group is located. No examiner shall be more than one floor from his/her normal clerical staff. A central pick-up and delivery station shall be provided on floors without clerical support staff. In addition, a photocopier and a PALM terminal will be provided at or near each of these central stations. If the Office fails to maintain an equivalent level (e.g. twice daily pick-ups) of central station clerical service for more than five working days within a bi-week, then any affected examiners shall be provided one hour of non-'production time for travel during that bi-week.

VII. The following items are agreed to by the above parties with respect to the members of the bargainini~, --Init located in buildings other than Crystal Gateway 2:

A. Any member of the bargaining unit who goes to the Crystal Gateway 2 location shall be granted reasonable and adequate time for work related travel.

B. Each examiner shall be provided, at the conclusion of the relocation of personnel into Crystal Gateway 2, with an information sheet containing the room and telephone number for each person located at Crystal Gateway 2.

VIII. The following items have been agreed to by the above parties with respect to the unit members located in Crystal Gateway 2:

A. *Health Services*

The Office will provide the same health services that are provided for PTO employees in all of the other buildings occupied by PTO employees. PTO will endeavor to persuade government agency health services, closer to such employees than the health service in CP-3, to provide emergency medical services to such employees. Management will furnish such health facility with a list of employees with determined emergency health problems.

B. *Parking*

The PTO will make a bona fide effort to get parking spaces within the existing facilities when requested for professionals near their office location in Crystal Gateway 2 at employees' expense. In addition, every bona fide effort will be made to make available one parking space for each disabled personnel where mobility is impaired (e.g., confined to wheelchair, etc.).

Jerome H. Ross
Arbitrator

Appendix C
# Agreement On Trial Gainsharing Program
## Between
## The Patent And Trademark Office
## And
## The Patent Office Professional Association

*The PTO and POPA hereby agree to establish a trial gainsharing program, effective October 1, 1988, as follows:*

### SECTION 1
### PRODUCTIVITY GAINSHARING AWARDS

A. *Productivity Award*
An employee is entitled to a Productivity Gainsharing Award in an amount based upon the percentages listed below of the employee's current base per annurn salary as of the end of the award period if an employee performs at the following levels over a complete fiscal year beginning October 1, 1988, or any portion of a subsequent fiscal year as provided for under Section 4A.

1. For patent examiners and patentability review examiners:

| Achievement of Goal* | Performance Rated Quality Elements | Amount of Current Base Salary |
|---|---|---|
| 110% | At least all Fully Successful | 1% |
| 110% | At least all Commendable | 2% |
| 120% | At least all Fully Successful | 3% |
| 120% | At least all Commendable | 4% |
| 130% | At least all Fully Successful | 5% |
| 130% | At least all Commendable | 6% |

At least a Fully Successful level of performance in Workflow Managernent is also required.

2. For classifiers:

| Performance Achievement of Goal* | Amount of Rated Quality Elements | Current Base Salary |
|---|---|---|
| 110% | At least Fully Successful | 1% |
| 120% | At least Fully Successful | 3% |
| 130% | At least Fully Successful | 5% |

The classifier's production shall be reduced to a single percentage achievement by creating a weighted average of the percent achievement for all production tasks with the weighting factor being the time spent on each task.

Employees in part 1 and 2 above who have spent at least 1400 hours in a fiscal year performing the functions of the employee's assigned job shall receive the full amount designated above within the appropriate award category. An employee who has spent at least 700 hours in a fiscal year perforn-dng the functions of the employee's assigned job shall receive a proportionate amount within the appropriate award category. The proportionate amount shall be the full amount of the appropriate award times the number of hours spent performing the job functions divided by the 1400 hour base. The functions of patent examiner's assigned job are patent examining and examining related activities.

3. For all other members of the bargaining unit:

| Total Score Critical and Non-Critical Elements | Amount of Current Base Salary |
|---|---|
| 460-474 | 1% |
| 475-489 | 3% |
| 490-500 | 5% |

For the 3%, and 5% awards under 3, the immediate supervisor Must document that the contributions fat exceed the minimurn requirements for outstanding p(,t-formance in those areas which affect the Office Pendenc~ and Quality Reinforcement Programs.

An employee in part 3 who has spent at least 1400 hours in a fiscal year performing the functions of the employee's assigned job which directly contribute to the Pendency Reduction and Quality Reinforcement Programs shall receive the full amount designated above

_____
*The percentages set forth above are applicable for employee.,, having no effective QSIs. For employees with effective QSIs, the performance necessary for award consideration are 10, 20 or 30 percentage points above the minimum quantitive achievement necessary to qualify for the employee's most recent effective QSI.

within the appropriate award category. An employee who has spent at least 700 hours in a fiscal year performing the functions of the employee's assigned job which directly contribute to the Pendency Reduction and Quality Reinforcement Programs shall receive a proportionate amount within the appropriate award category. The proportionate amount shall be the full amount of the appropriate award times the number of hours spent performing the job functions divided by the 1400 hour base.

No Productivity Award shall include the hours of an employee's first year in the Patent and Trademark Office.

4. If the award period for a Productivity Award encompasses the date when an employee has received a promotion or a permanent increase in signatory authority, the quantitative achievement required to earn that award shall be the sum of:

1) 110%, 120%, or 130% as appropriate, of the minimum quantitative achievement necessary to qualify for the promotion or permanent increase in signatory authority for the number of pay periods, up to 13, that are both within the award period and prior to that date; and

2) the achievement that would be otherwise necessary for the award during the pay periods that are both outside the 13 pay periods prior to that date and within the award period.

B. *Pendency Redtiction Award*

In addition to and independent of any Productivity Gainsharing Award under (A) above, patent examiners ~vill be entitled to a Pendency Reduction Award in an amount based upon the percentages listed below of the employee's current base per annum salary as of the end of the award period. In addition to the criteria below, the examiner must perform at a level of at least Fully Successful in the Production Goal Achievement and Quality elements over a period of two consecutive quarters beginning October 1, 1988. In the Workflow Management element, in addition to the criteria set forth below, no more than nine (9) subtraction points may be lost during the two consecutive quarter period.

1. For the Ist and 2nd Quarters of FY 1989:

| Pendency Reduction Award | Amount of Current Base Salary |
|---|---|
| All examiner's answers and responses to amendments replying to non-final Office actions are completed and submitted for credit within one month of their receipit by the examiner. | 1% |

All typed Office communications are mailed within 15 calendar days from the submission for credit by the examiner.

The new case having the oldest actual filing date is completed and submitted for credit each pay period.

2. For the 2nd and 3rd Quarters of FY 1989:

| Pendency Reduction Award | Amount of Current Base Salary |
|---|---|
| Same as above | 0.75% |

3. Each subsequent two consecutive quarters beginning with the 3rd Quarter of FY 1989:

| Pendency Reduction Award | Amount of Current Base Salary |
|---|---|
| Same as above | 0.5% |

However, no Quarter may be used to justify more than one of the above Pendency Reduction awards.

A patent examiner who has spent at least 700 hours during two consecutive quarters performing the functions of the examiner's assigned job shall receive the full amount designated above within the appropriate award category. A patent examiner who has spent at least 350 hours during two consecutive quarters performing the functions of the examiner's assigned job shall receive a proportionate amount within the appropriate award category. The proportionate amount shall be the full amount of the appropriate award times the number of hours spent performing the job functions divided by the 700 hour base. The functions of a patent examiner's job are patent examining and examining related activities.

No Pendency Award shall include the hours of the employee's first year in the Patent and Trademark Office or the first quarter after the completion of a four month or longer detail.

## SECTION 2
## IMPLEMENTATION PROCEDURES

A. Awards granted pursuant to this Agreement shall be in addition to and independent of any benefit conferred by the parties' June 27, 1983 Agreement on Awards, which has been incorporated into the parties 1986 Basic Agreement.

B. A written explanation of the reasons for denial of any award and/or any recognition level required for an award under this Program shall be given to the employee upon histher request.

C. In determining whether an employee has sufficient quantity to earn a Productivity Award and in determining the number of hours spent performing the functions of the employee's job, some or all of the hours the employee worked overtime may be subtracted from the total number of hours spent performing the functions of the employee's job during the award period. When a patent examiner has overtime hours subtracted, a number of BDs equal to the number of subtracted overtime hours divided by the examiner's H/BD goal will be subtracted from the total BDs achieved during the award period. When a classifier has overtime hours subtracted, an analogous computation will be made. The overtime subtraction provision contained herein is not applicable to the Pendency Award.

D. Awards will be submitted and forwarded to payroll within two months of the end of the award period.

E. For the purpose of this Agreement, productivity, quality and workflow performance elements and standards are those defined in the October 30, 1986 PAP, regardless of the outcome of the litigation pending before Arbitrator Bloch. The use of the 1986 PAP in this Agreement shall not be used as evidence of the fairness, reasonableness or desirability of using the 1986 PAP for other performance determinations. Accordingly, the PTO shall be barred from introducing this Agreement or any information regarding this Agreement in the pending litigation before Arbitrator Bloch, any litigation arising out of Mr. Bloch's award (including enforcement proceedings), any FSIP proceedings or interest arbitration arising from or replacing the current performance appraisal negotiations and any future litigation arising therefrom or the outcome therefrom, unless explicit written permission is granted by POPA.

## SECTION 3
## DURATION

The Program shall remain in effect for a period of three years from its creation, SUbject to the availability of funds and a determination after October 1, 1989 or at anytime thereafter, by the Office with approval by the Department of Commerce, of the continuing exigencies and the effectiveness of the Program in dealing with the exigencies. If the Office determines that the exigent cirCUrnstances no longer exist, or that the Awards Program is not effective in combating the exigencies, or that funding is not available, the Program may be terminated on or after October 1, 1989 subject to the provisions of Section 4.

## SECTION 4
## TERMINATION PROCEDURES

A. Upon providing notice of termination to the members of the bargaining unit, the Trial Gainsharing Program shall terminate at the end of the fiscal quarter in which notice is given. Eligibility standards and award amounts shall be prorated relative to a yearly basis depending on the quarter in which termination is effective.

B. When PTO terminates the Program, it will provide notice to POPA. POPA will be given an opportunity to bargain over the impact resulting from termination of the Program. This will not affect PTO's right to terminate the Program as of October 1, 1989 or at the end of any quarter thereafter. The right to notice and to negotiate over impact will not preclude the PTO from terminating the Program at the end of any quarter after September 30, 1989.

C. If a decision is made to terminate, PTO will provide POPA with available Program cost information and available productivity and pendency data for the period in which the Program was in effect.

FOR: Patent Office Professional Association

*/s/ Ronald J. Stern*
Ronald J. Stern, President
*October 6, 1988*
Date

FOR: Patent and Trademark Office

*/s/ James E. Denny for*
Donald J. Quigg, Assistant Secretary and Commissioner of Patents and Trademarks
*Octobcr 6, 1988*
Date

Appendix D

# Memorandum of Understanding
# Between
# Patent and Trademark Office
# And
# Patent Office Professional Association

The PTO and POPA agree as follows:

1. Learning curves, pipeline adjustments and any other adjustments to assigned goals based upon circumstances known in advance shall be communicated up front. If no learning curve, pipeline or other adjustment is warranted, it shall not be granted.

2. The phrase "up front" shall mean that the employee is informed of the adjustment to be granted as soon as practicable, but in no event later than the bi-week after the work to which the adjustment is applicable is assigned.

3. Adjustments when given will be effectuated at the time at which the work to which the adjustment applies is actually completed.

4. Management shall reconsider goal adjustments, upon request by an employee, at later times, up to and including the time at which the employee's performance of the assigned work to which the adjustment is applicable is evaluated.

5. This Memorandum of Understanding shall remain in force until the parties implement a new Memorandum of Understanding on this subject.


FOR: Patent Office Professional Association     FOR: Patent and Trademark Office

*/s/Ronald J. Stern*                            */s/ James E.Denny for*
Ronald J. Stern, President                      Donald J. Quigg, Assistant Secretary and
                                                and Commissioner of Patents and Trademarks


*October 6, 1988*                               *October 6, 1988*
Date                                            Date

# Exhibit 2



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

Date:          December 1, 1992

To:            All Patent Examiners

From:          Edward E. Kubasiewicz
               Assistant Commissioner For Patents

Subject:       Signatory Authority Program

This memorandum explains what the Signatory Authority Program is,
how long it will take to complete it, and what the examiner must
do to successfully complete it.  You should review this document
and seek guidance with respect to any questions you have about
the Program.

To achieve the position of Primary Examiner, an examiner must
complete the Signatory Authority Program. Under this Program, the
examiner's work will be evaluated during four separate periods of
time to determine if the examiner should be permanently delegated
the authority to represent the Commissioner and sign all actions
including allowances.

<u>Policy</u>

It should be recognized that the signing of an office Action
represents the position of the Agency at that point in time.
This is particularly significant when a Primary Examiner signs a
final action in a case.  These types of actions are ordinarily
only reviewable by the Board of Patent Appeals and Interferences
and/or the Federal Courts.  Accordingly, the permanent grant of
Signatory Authority should only be given to those examiners whose
performance clearly demonstrates that they are competent to
exercise this authority.  This is determined by reviewing and
evaluating the cases credited to the examiner during a trial
period in which the examiner exercises Signatory Authority on a
temporary basis. The number and mixture of cases reviewed and
evaluated should be such that the quality, quantity, and
timeliness of the examiner's work clearly demonstrates the
examiner's ability to exercise a permanent grant of Signatory
Authority.  The examiner's work is evaluated based upon the
standards in the Performance Appraisal Plan (PAP) for that
permanent grant of Signatory Authority.  An examiner has clearly
demonstrated the necessary competency when the examiner has
achieved the Fully Successful level of performance under the
Performance Appraisal Plan (PAP) for the particular permanent
authority (partial or full) involved.

Obviously, the exercise of Agency authority, even on a temporary
basis, is not a learning program. On the contrary, the evidence

reviewed on evaluation of the examiner's work product under this Program must clearly indicate that the examiner has demonstrated the competence and judgement to act on patent applications in a proper and approved manner utilizing approved Agency procedures before any permanent grant is authorized. This level of competency and judgement is achieved by attaining the Fully Successful level of performance under the PAP.

<u>Eligibility and Trial Periods</u>

The Signatory Authority Program is a four step process. In the first step, after an examiner becomes a GS-13, the examiner's performance at that grade will be evaluated for a period of time called the "eligibility period." The eligibility period will be the most recent ten (10) consecutive pay periods after the examiner becomes a GS-13. Unless an examiner's Supervisor is notified that the examiner declines to accept the temporary grant of Signatory Authority, the grant of temporary authority shall be automatic (that is requiring no action on the part of the examiner) if the examiner has performed at least at the Fully Successful level in all the elements of the examiner's PAP during the eligibility period.

The examiner's decision not to accept the temporary grant of Signatory Authority may be oral but must be confirmed in writing to the Supervisor.

Examiners who have previously declined the grant of temporary Partial Signatory Authority shall receive the temporary grant of authority with a week's prior written notice to the examiner's Supervisor of the examiner's desire to receive the temporary grant. However, the examiner may chose his/her starting time for and receive the temporary grant of authority only if the examiner's performance is Fully Successful for the most recent ten (10) consecutive pay periods immediately preceding the start of that temporary grant.

An examiner granted temporary Partial Signatory Authority enters the second step that comprises what is called the "trial period." At the beginning of the trial period, the examiner will receive a copy of the PAP which will set out what is required to be Fully Successful (including the quality, quantity and timeliness requirements). Under this temporary grant the examiner is authorized to sign most non-final actions except those specified in MPEP 1005. The length of the trial period will be at least thirteen (13) consecutive pay periods.

To pass the trial period, the examiner must perform at least at the Fully Successful level in each element in the PAP for an examiner having permanent Partial Signatory Authority. Additionally, the examiner must perform at least 700 hours of

actual examining time in paid status as defined in the "Evaluation" section below.

If the examiner passes, the examiner will be so notified and granted permanent Partial Signatory Authority by the Director/Deputy Director. Where-potential-clear errors which could lead to an adverse decision are found, the examiner will have the option to respond, as detailed in the "Decision" section below. This ends step two.

Grants of any temporary or permanent authority shall begin only at the start of a pay period.

Steps three and four are identical to steps one and two, except that steps one and two relate to Partial Signatory Authority whereas steps three and four relate to Full Signatory Authority. If an examiner, having permanent Partial Signatory Authority, performs at least at the Fully Successful level for ten (10) consecutive pay periods, the examiner is automatically granted temporary Full Signatory Authority. If an examiner wishes to decline the grant of temporary Full Signatory Authority, the same rules apply as noted above. During the trial period, the examiner's performance will be evaluated based upon the standards in the Performance Appraisal Plan (PAP) for an examiner having a permanent grant of Full Signatory Authority. If, at the end of this trial-period, the examiner passes, the examiner will be so notified and granted permanent Full Signatory Authority by the Director/Deputy Director. Where potential errors which could lead to an adverse decision are found, the examiner will have the option to respond as in step two above. Upon successful completion of step four, the examiner is granted the status of Primary Examiner.

With either type of temporary grant, at the end of the trial period, the temporary grant is terminated until a decision is made by the Director/Deputy Director whether to grant the permanent authority.

Any examiner who is on an approved part-time schedule with a regular tour of duty of at least forty (40) and less than eighty (80) hours per pay period, and has met the eligibility requirements for a grant of either temporary Partial or Full Signatory Authority, may elect to enter a trial period of twenty (20) consecutive pay periods. If the examiner elects to enter the twenty (20) pay period trial period, the examiner must still perform at least 700 hours of actual examining time in paid status during the trial period. Any election to participate in the twenty (20) pay period trial period must be made prior to the issuance of the temporary grant and shall not be changed during the trial period. The election of the examiner to participate in the twenty (20) pay period trial period shall be in writing and

-4-

signed by the examiner and presented to the examiner's immediate
Supervisor or Group Director or the Group Director's designee.

The Office will consider a request by an examiner, under a part-
time schedule, which has previously been approved by the Office,
who meets the requirements for the eligibility period and desires
to enter the trial period under a temporary grant of Signatory
Authority to modify the examiner's part-time schedule during the
trial period in order to meet the minimum hour requirement.
Although normally the request to modify a part-time schedule
should be submitted before the trial period begins, the Office
will consider such a request at any time during the trial period.

Review Procedures

Once an examiner begins a trial-period, any or all of the cases
for which the examiner has received credit during the trial
period and had the authority to independently sign are subject to
review and evaluation. At a minimum, the performance review will
include at least 17 cases. The Director/Deputy Director shall
direct the mix of cases to be selected and the support staff
shall retrieve the actual cases. Selection of cases shall follow
the traditional methods for selection of cases. For an examiner
who has temporary Full Signatory Authority, the emphasis will be
on finals, allowances, and other actions relating to the exercise
of Full Signatory Authority. For an examiner having temporary
Partial Signatory Authority, the accent will be on those first
actions on the merits which the examiner had the authority to
independently sign. In all instances, the actions reviewed and
evaluated must have been credited to the examiner during the
trial period.

Evaluation

The evaluation involves a thorough and complete check of the
reviewed cases to see whether there were any clear errors as
defined by the applicable PAP elements, i.e. Patentability
Determination, Action Taking (A/T), and Patent Examining
Functions (PEF). At the end of the trial period, an error rate
will be calculated for the applicable performance elements. The
examiner's performance in each case will be evaluated by the
Director/Deputy Director, who will make Management's
determination whether there were any clear errors. At the end of
the trial period, the examiner must also be performing at least
at the Fully Successful quantitative level for an examiner having
such Signatory Authority, and at least at the Fully Successful
level in Workflow Management. If the examiner has not performed
at least at the Fully Successful level in any PAP element during
the trial period, the permanent grant will be denied.

−5−

For those examiners on the temporary Full Signatory Authority
Program, the error rate for Patentability Determination is
calculated by counting the number of allowed cases having a clear
error and dividing by the number of cases allowed by and credited
to the examiner during the trial period. The error rates for
Action Taking and Patent Examining Functions are calculated by
taking the number of actions having a clear error and dividing by
the total number of actions credited to the examiner during the
trial period.

For those examiners on the temporary Partial Signatory Authority
Program, the error rate for Action Taking is calculated by taking
the number of actions having a clear error and dividing by the
total number of actions for which the examiner had the authority
to independently sign and had received credit during the trial
period. For Patent Examining Functions, the error rate will be
calculated by taking the number of actions having a clear error
and dividing by the total number of actions credited to the
examiner during the trial period.

Any examiner under the grant of temporary Signatory Authority
must perform, unless waived by Management (see "Waiver" Section
below), at least 700 hours of actual examining time in paid
status during the trial period. Failure to perform the minimum
700 hours of actual examining time in paid status during the
trial period, unless waived by Management, will result in a
denial of a permanent grant of Signatory Authority. Waivers are
granted to take into account matters beyond the examiner's
control.

Actual examining time in paid status for the purpose of meeting
the 700 minimum hour requirement in any trial period under the
Signatory Authority Program will consist of hours worked in the
following activities and subproject codes reported and approved
by the immediate Supervisor on the examiner's bi-weekly time
worksheet, form PTO 690E:

| Activity | Subproject Code |
|---|---|
| Examining Time | 112012/112030 |
| (including paid overtime) | |
| Reexam Time | 119051/119052 |
| PCT Time | 119024/119025 |
| Restriction Time | 112054 |
| APS First Action Search | 119084 |
| Protest and Inequitable | 119006 |
| Conduct Programs | |
| Appeal Conferences | 112041 |
| Public Use Proceedings | 112053 |

```
Other examining duties which        112036/any future
    produce work product            subproject codes
    subject to review,              confirming to
    e.g. amendment crossing          this criteria
    in mail, time spent
    examining transferred;
    amended application, etc.
Quality Review Cases                 119045
Markush                              112025
Extra Time for Examiner's            112050
    Answer
SIR Processing                       112065
Tri-Lateral Search Exchange          119040
```

<u>Decision</u>

The grant of temporary Signatory Authority shall terminate at the end of the trial period. Within two pay periods after the end of the trial period, the Office will either grant the permanent authority or provide the examiner with written reasons why the permanent grant is being denied. If any potential clear errors found during the evaluation could lead to an adverse decision, the examiner will be given an opportunity to respond prior to the final decision. Up to a total of eight hours of non-examining time shall be authorized, with appropriate supervisory approval, for the time needed for preparation of the examiner's response. The notice of potential clear errors will be communicated to the examiner no later than ten (10) calendar days before the final decision to grant or deny permanent Signatory Authority is due. The examiner's comments to the Director will be communicated within seven (7) calendar days thereafter. The examiner's comments may be communicated orally or in writing.

If the final decision is a denial of the permanent grant, a written explanation for the denial will be given to the examiner. The written explanation for a denial of signatory authority based upon the quality elements of the examiner's Performance Appraisal Plan shall include the following information:

1.  Specific identification of the nature of the error in a specific action of a patent application that has been identified by serial number;

2.  Specific identification of the Element of the examiner's Performance Appraisal Plan with respect to which the examiner's action is deficient;

3.  In the case of allegations of Patentability Determination errors, specific identification of the claims involved and a full statement of any rejection properly applicable to those claims; and/or

–7–

4.    In the case of allegations of errors in Action Taking or in the Performance of Patent Examining Functions, a full statement of the deficiency in the action(s) taken by the examiner.

<u>Waiver</u>

All examiners participating in a Signatory Authority trial period are expected to meet the 700 hours of actual examining time in paid status. However, if an examiner fails to meet this requirement for reasons beyond the examiner's control, the Office will consider, on a case-by-case basis, a request that the requirement be waived. Such a request must be submitted in writing to the examiner's immediate Supervisor during the ten (10) calendar days after the end of the trial period and should include an explanation of the reasons for failing to meet the requirement. Waivers may be requested by examiners working either a full-time or part-time schedule. A decision on the waiver request will be made in writing to the examiner with a copy being provided to POPA within two (2) pay periods after the end of the trial period.

<u>Retention</u>

For an examiner having a permanent grant of Signatory Authority, achievement above the Unsatisfactory level in Patent Examining and Workflow Management under the applicable Performance Appraisal Plan, shall be deemed an acceptable level of performance for retaining the permanent grant of Signatory Authority. There shall be no minimum number of examining hours required for retention of permanent signatory authority., That is, failure to spend time examining patent applications shall not be a basis for removal of permanent signatory authority.

# Exhibit 3

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| MUELLER, KURT A | | | 9/17/2007 |

| **FIRST ACTION** | | | | | **SECOND ACTION** | | | |
|---|---|---|---|---|---|---|---|---|
| 5-A. Code <br> 170 | 5-B. Nature of Action <br> EXC APPT | | | | 6-A. Code | 6-B. Nature of Action | | |
| 5-C. Code <br> YCM | 5-D. Legal Authority <br> SCH B 213.3202(O) | | | | 6-C. Code | 6-D. Legal Authority | | |
| 5-E. Code | 5-F. Legal Authority | | | | 6-E. Code | 6-F. Legal Authority | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number <br> PATENT EXAMINER COMPUTER SCIENCE <br> 20018648  400235 |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 1224 | 07 | 10 | 61,893.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | 41,262.00 | 20,631.00 | 61,893.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization <br> PATENT AND TRADEMARK OFFICE <br> COMMISSIONER FOR PATENTS <br> TECHNOLOGY CENTER SUMMARY <br> TRAINING A.U. 2109 <br><br> CM 569520109000000000   PP 19 2007 |
|---|---|

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1 – None <br> 2 – 5-Point | 3 – 10-Point/Disability <br> 4 – 10-Point/Compensable | 5 – 10-Point/Other <br> 6 – 10-Point/Compensable/30% | 2 | 0 – None <br> 1 – Permanent | 2 – Conditional <br> 3 – Indefinite | | YES   X   NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   BASIC | 9   NOT APPLICABLE | 5 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per |
|---|---|---|---|
| K   FERS AND FICA | 9/17/2007 | F   FULL TIME | Biweekly <br> Pay Period |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 | 1 – Competitive Service   3 – SES General <br> 2 – Excepted Service   4 – SES Career Reserved | N | E – Exempt <br> N – Nonexempt | | 1180 |

| 38. Duty Station Code <br> 51-0040-510 | 39. Duty Station (City – County – State or Overseas Location) <br> ALEXANDRIA  ALEXANDRIA  VA |
|---|---|

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks

APPOINTMENT AFFIDAVIT EXECUTED 09/17/07.
FROZEN SERVICE: 00 YRS. 00 MOS.
CREDITABLE MILITARY SERVICE: 00 YRS. 00 MOS.
PREVIOUS RETIREMENT COVERAGE: NEVER COVERED.
EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.
SPECIAL RATE UNDER 5 USC 5305.
SERVICE COUNTING TOWARDS PERMANENT TENURE FROM  09/17/07 .
JUSTIFICATION FOR USE OF SPECIAL NEED OF THE AGENCY AUTHORITY FOR PATENT
EXAMINER HIRING.  SELECTED FROM CERTIFICATE OF ELIGIBILITY
#J06-1408 DATED 12/13/06.  FULL PERFORMANCE IS GS-13.
UPON SUCCESSFUL COMPLETION OF A 2-YEAR TRIAL PERIOD, YOU WILL BE
NONCOMPETITIVELY CONVERTED TO A CAREER CONDITIONAL OR CAREER
APPOINTMENT IN THE COMPETITIVE SERVICE.
* REMARKS TO BE CONTINUED ON NEXT FORM *

| 46. Employing Department or Agency <br> DEPARTMENT OF COMMERCE | 50. Signature/Authentication and Title of Approving Official <br> KENT E. BAUM <br> DIRECTOR, HUMAN CAPITAL MANAGEMEN |
|---|---|

| 47. Agency Code <br> CM 56 | 48. Personnel Office ID <br> 2794 | 49. Approval Date <br> 9/19/2007 | |
|---|---|---|---|

| 5–Part 50–316 | OPF Copy - Long Term Record -- DO NOT DESTROY | Editions Prior to 7/91 Are Not Usable After <br> 6/30/93 <br> 7540-01-333-6238 |
|---|---|---|

This is an 'official' document generated from the EHRI eOPF system.

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| MUELLER, KURT A | | | 9/17/2007 |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 170 | EXC APPT | | |

| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
|---|---|---|---|
| YCM | SCH B 213.3202(O) | | |

| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
|---|---|---|---|
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | PATENT EXAMINER COMPUTER SCIENCE |
| | 20018648  400235 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 1224 | 07 | 10 | 61,893.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | 41,262.00 | 20,631.00 | 61,893.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | PATENT AND TRADEMARK OFFICE |
| | COMMISSIONER FOR PATENTS |
| | TECHNOLOGY CENTER SUMMARY |
| | TRAINING A.U. 2109 |
| | CM 569520109000000000  PP 19 2007 |

## EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| 1 | 1 = None    3 = 10-Point/Disability    5 = 10-Point/Other | 2 = 5-Point    4 = 10-Point/Compensable    6=10-Point/Compensable/30% | 2 | 0 = None    2 = Conditional | | YES    X    NO |
| | | | | 1 = Permanent    3 = Indefinite | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0    BASIC | 9    NOT APPLICABLE | 5 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K    FERS AND FICA | 9/17/2007 | F    FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2    1 = Competitive Service   3 = SES General    2 = Excepted Service   4 = SES Career Reserved | N    E - Exempt    N - Nonexempt | | 1180 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 51-0040-510 | ALEXANDRIA  ALEXANDRIA  VA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

\* CONTINUATION OF REMARKS \*
APPOINTMENT IS SUBJECT TO COMPLETION OF ONE YEAR INITIAL PROBATIONARY
PERIOD BEGINNING  09/17/07 .
SERVICE COUNTING TOWARDS PERMANENT TENURE FROM  09/17/07 .

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF COMMERCE | KENT E. BAUM |
| | DIRECTOR, HUMAN CAPITAL MANAGEMEN |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| CM 56 | 2794 | 9/19/2007 |

5-Part 50-316  OPF Copy - Long Term Record -- DO NOT DESTROY  Editions Prior to 7/91 Are Not Usable After 6/30/93  7540-01-333-6238

# Exhibit 4



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. Box 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

October 18, 2013

TO:        Kurt Mueller
           Art Unit 2157

FROM:      Wendy Garber
           Director, Technology Center 2100

SUBJECT:   **Notice of Denial of Permanent Partial Signatory Authority**

The purpose of this memorandum is to inform you of clear errors set forth below that have been identified in your cases that have been reviewed and that have led to an adverse decision on granting you permanent partial signatory authority.

On March 24, 2013, you were granted Temporary Partial Signatory Authority for a trial period of 13 pay periods, which period ended September 21, 2013. An evaluation of your performance under the trial period has been undertaken. The evaluation entailed a detailed review of the file record in at least 17 applications that you acted on and which you turned in for credit during the trial period. These applications contain an action that you have been delegated the authority to independently sign. Each application was independently reviewed by at least two Supervisory Patent Examiners or managers in Technology Center 2100, and reviewed by your Supervisor Patent Examiner and the Group Director.

During the trial period, you were credited with **36** non-final Office Actions that you had the authority to sign and that were eligible for review. As per the Temporary Grant of Partial Signatory Authority letter you received on March 25, 2013, in order to pass the trial period for Partial Signatory Authority, your performance in Category 2 (CAT2) errors cannot exceed **6.49%** when the denominator is taken as the number of non-final rejections (including those rejections on the First Action Interview Pilot) plus the number of requirements for restriction/election which have been submitted for credit during the period of consideration. Therefore, the maximum number of CAT2 errors permitted for the time period of your Temporary Grant of Partial Signatory Authority is **two (2)** errors in CAT2.

In addition to the maximum number of errors noted above for CAT2, grant of permanent partial signatory authority is dependent on a Fully Successful level of productivity and Docket

Management for the period of the temporary grant. In addition to the above, a minimum of 700 examining hours are required during the period of the temporary grant.

During the trial period, your total examining hours were **875**, your production at the Partial Signatory level was **111.52%**, and you were at least Fully Successful in Docket Management.

As will be discussed in more detail below, **eight (8)** of the applications reviewed contain at least one clear error under Category 2 Quality Major Activities according to the Performance Appraisal Plan (PAP) of FY12. The failure to achieve at least Fully Successful performance in CAT2 Quality Major Activities may result in your being considered less than Fully Successful under the PAP that would lead to an adverse decision on whether to grant you permanent partial signatory authority.

You have **eight (8)** applications that contain CAT2 errors. **This is an error rate in CAT2 of 22% which does not meet the Fully Successful level.** Clear error in an action taken (or not taken) is considered as having occurred where a reasonable Supervisory Patent Examiner could not have permitted the action (or inaction) at the time and under the circumstances that the action (or inaction) was taken (or not taken).

The following is a list of and description of the CAT2 errors that were found during the review process.

1.   <u>Serial Number: 13288525</u>

<u>Making proper rejections under 35 USC 102 and 103 with supporting rationale or determining how claim(s) distinguish over the prior art (Cat2. #6).</u>

In the Office action mailed June 5, 2013, claims 1 and 2 were rejected under 35 USC 102(b) using the NPL "SimPaD: A Word-Similarity Sentence-Based Plagiarism Detection Tool on Web Documents". However, SimPaD fails to disclose the claimed limitations, particularly, "calculating a checksum value associated with [each] line of text [in the text data]". Examiner interprets that a sentence is a line of text. Given this interpretation, SimPaD still does not teach that a checksum is generated for a line because a checksum of a sentence is not a comparison between two sentences. The reference also does not anticipate "recursively identifying the longest common block of lines of text between the text data and the reference text data based on the calculated checksum values". Examiner indicated that this limitation was taught by calculation of a number that equals the number of sentences in one document that were likely taken from another document, but this is not calculation of a longest common block of [sentences]. Examiner also indicated that this limitation was taught by a section of the reference which teaches detecting split sentences. This again is not a longest common block of lines.

2.      **Serial Number: 11/704,010**

**Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)**

In the Office action mailed 6/28/13, claims 1-5 were rejected under 35 USC 103 as rendered obvious over Alur and Naik. However, neither Alur nor Naik disclose the backup statistics include data on a historical success or failure rate of one or more previously executed backup tasks as recited in claim1. The examiner attempts to interpret "monitoring of policies to meet time constraints based on historical statistical calculations" as being the recited backup statistics. However, using this interpretation, the resource allocation for a task is based on statistical time to completion not the rate of success or failure of previously executed backup tasks. The additional details of claims 2-5 are also not disclosed in the cited references.

3.      **Serial Number: 11685095**

**Making proper rejections under 35 USC 102 and 103 with supporting rationale or determining how claim(s) distinguish over the prior art (Cat2, #6).**

In the Office action mailed June 14, 2013, claims 33, 37-39 were rejected under 35 USC 103(a) using the NPL "Evaluating Retrieval Performance using Clickthrough Data" (ERP), in view of "Methods for Comparing Rankings for Search Engine Results" (CRSER), and in further view of "Query Chains: Learning to Rank for Implicit Feedback" (QR). However, the combination fails to teach "training a model using the obtained information, wherein the model is trained to predict a click through rate based on input comprising one or more presentation bias features and one or more relevancy features". Examiner states that CRSER teaches this, but CRSER discloses the comparing of rankings of past search results and therefore is not creating a model to predict future click through rates. Examiner also refers QC as teaching this limitation. While QC does teach an algorithm that learns to rank partially based on user selection of results, the QR model does not predict a click through rate. The combination of references also fails to teach using "the ratios of predictive outputs of [a model using obtained presentation bias features] and [a model using the obtained relevancy features] to adjust the respective ranking scores of the given search results. Examiner refers to sections of all three documents as disclosing ratios. While these sections may disclose ratios, they do not teach using ratios of the predictive outputs of the two claimed models.

4.      **Serial Number: 11543759**

**Making proper rejections under 35 USC 102 and 103 with supporting rationale or determining how claim(s) distinguish over the prior art (Cat2, #6).**

In the Office action mailed May 20, 2013, claims 64 and 69 were rejected under 35 USC 103(a) as being unpatentable over Kennedy in view of Griffin. However, neither Kennedy nor Griffin teaches "present the custom form on the display, at least some of the plurality of fields of the custom form being automatically pre-filled with information obtained from the analyzed web

page, the pre-filled fields including the determined category, a title, a rating, a description, and a representative image form the web page". Examiner interprets that the analysis is of a form displayed to determine form fields that the computer can retrieve from previously filled in common form fields that are stored in a user profile. Claim 64 requires "at least some of the plurality of fields of the custom form being automatically pre-filled with information obtained from the analyzed web page". Given the examiner's interpretation, the form fields are filled from previously stored data based on an analysis of the web page field names. This is not the same as filling in the form fields with information obtained from the analyzed web page.

5.    **Serial Number:  12036536**

Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)

In the Office action mailed 8/9/13, claims 1 and 2 were rejected under 35 USC 103 as rendered obvious over Read, Bionda, and Chao. However, none of the prior art references, Read, Bionda, and Chao, disclose "supporting a plurality of interfaces to allow utilization of a plurality of customized vertical search forms associated with a plurality of service providers, respectively and causing a one of the customized vertical search forms associated with a respective one of the service providers to be retrieved". The examiner refers to Chau and Bionda to teach the claim limitations. Chau describes a client via user interface submitting a query to a search engine manager. The search engine manager then builds a query from the information received and passes the standard query to one or more search engine wrappers which translate the received query into the native format for of its respective search engine. Since the search engine manager is able to forward the search to respective search engines, the client only requires one search form at the client to communicate with the each of the service providers. The claimed invention requires "utilization of a plurality of customized search forms associated with a plurality of service providers", which is not taught in Chau. Further, Bionda discloses a rendered form as a search template to identify forms matching search criteria and fails to disclose neither "utilization of a plurality of customized search forms associated with a plurality of service providers", nor "causing a one of the customized vertical search forms associated with a respective one of the service providers to be retrieved". The additional details set forth in claim 2 are also not disclosed by the references.

6.    **Serial Number:  11685871**

Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)

In the Office action mailed 7/30/13, claim 1 was rejected under 35 USC 103 as rendered obvious over Kawamura and Ohsaki. However, neither Kawamura nor Ohsaki disclose "deferring issuance of a disk write operation for an updated database page in memory until a log record is written to the transaction log corresponding to a most recent page update for the updated database page in the database and said log record is located at a point in the transaction log past the waypoint". The examiner refers to Ohsaki to teach the claim limitation. Ohsaki

discloses storing write back commands/requests in an extra disk drive when the number of write back commands is greater than a predetermined value in the primary disk drive and when the number of write back commands in the primary write back commands becomes smaller than a predetermined threshold, then write back commands are written back to the disk drive. Ohsaki does not teach flushing the disk writes when the request number in the queue passes a threshold number and even if Ohsaki did, Ohsaki still does not teach deferring issuance of a disk write operation "at a point in the transaction log past the waypoint".

7.   **Serial Number: 13/371,634**

Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)

In the Office action mailed 9/6/13, claim 5 was rejected under 35 USC 103 as rendered obvious over Burrows and Hsieh.  However, neither Burrows or Hsieh disclose accessing a row in a second database table with the row comprising a third column and a fourth column, determining whether a second value in the second column matches a third value in the third column and determining whether the user has access to the database object based on a fourth value in the fourth column.  The examiner has concluded that the first and second columns disclosed in the prior art could be repeated indefinitely for any arbitrary number of columns.  However, this conclusion doesn't meet the recited third and fourth columns being in a row accessed in a second database table nor determining whether the second value matches a third value and access to the database object being based on a fourth value as required by claim 5.

8.   **Serial Number:  12/330,371**

Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)

In the Office action, claims 2 and 3 were rejected using a combination of Harrison and Lasser.  However, neither of these references, taken either alone or together, disclose the details of receiving a message indicating an asset has been modified, determining the on-disk location of the modified asset, determining a second OS link between the name of the modified asset and the on-disk location and storing the second OS link in a second file in a second file externally from the asset management system as claimed in claim 2.  Also, claim 3 requires that the second OS link replaces the first OS link in the reference file, which is not found in the references.

Since each of these applications include improper rejections, they each qualify as Category 2 errors under the PAP.

In view of the fact that the quality of your work during the trial period did not reach the expected level, I believe that it is reasonable to conclude that you are not yet ready to assume the responsibility, which accompanies a grant of Permanent Partial Signatory Authority.  The premature granting of this authority is certainly not in the best interest of either yourself or the

Office.  I have asked your supervisor to review with you in detail each of the cases that were reviewed and offer suggestions as to ways in which your performance might be improved so that you can, hopefully, learn from this process.  I am certain that your supervisor will assist you in any manner possible in order for you to again become eligible for a grant to Temporary Partial Signatory Authority.

You should be aware that the denial, at this time, of Permanent Partial Signatory Authority does not mean that you will not be eligible to participate in the Signatory Program.  The minimum period after which you may receive another temporary grant is ten (10) pay periods from October 21, 2013.  Of course, in order to be eligible for another temporary grant, your performance during this period must have been satisfactory in all respects, including production, quality of work, and workflow at the GS-13 level.

# Exhibit 5

**Lewis, Velton**

| | |
|---|---|
| **From:** | Myers, Randy |
| **Sent:** | Saturday, October 26, 2013 7:06 PM |
| **To:** | Garber, Wendy |
| **Cc:** | Turner, Fred; Lewis, Velton; Bhatia, Ajay; Hillery, Nathan (AU3715) |
| **Subject:** | NOTIFICATION OF GRIEVANCE FILING - KURT MUELLER |

Dear Director Garber,

Please be advised that POPA is filing a grievance on behalf of Kurt Mueller of your Tech Center regarding your Decision of Denial of Permanent Partial Signatory Authority to him dated October 18, 2013.

Please consider today as the first date of contact.

The grievance docket number has been assigned as follows: 10-13-KM-35.

Normally, the next step in the grievance procedure is for myself and another POPA representative to meet with you to discuss the grievance.

As Mr. Mueller's deciding official, the grievance has been directed to you in accordance with the parties' Collective Bargaining Agreement. In the event that you do not have the authority to resolve the matter, please promptly refer the grievance to the official who does have such authority and notify the grievant and the Association.

Thank You,

Randy Myers
POPA Grievance Director
Ext. 2-7526

# Exhibit 6

## Butler, Leia D.

| | |
|---|---|
| **From:** | Butler, Leia D. |
| **Sent:** | Wednesday, April 23, 2014 9:58 AM |
| **To:** | Kyle, Tamara |
| **Cc:** | Hillery, Nathan (AU3715); Kakalec, Kimberly |
| **Subject:** | RE: POPA Grievance/K. Mueller/Denial of Perm Full Sig Auth |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | Kyle, Tamara | Delivered: 4/23/2014 9:58 AM | |
| | Hillery, Nathan (AU3715) | Delivered: 4/23/2014 9:58 AM | |
| | Kakalec, Kimberly | Delivered: 4/23/2014 9:58 AM | Read: 4/23/2014 11:07 AM |

Got it.

You have a great day too!

---

**From:** Kyle, Tamara
**Sent:** Wednesday, April 23, 2014 8:43 AM
**To:** Butler, Leia D.
**Cc:** Hillery, Nathan (AU3715); Kakalec, Kimberly
**Subject:** RE: POPA Grievance/K. Mueller/Denial of Perm Full Sig Auth

Leia,

Kurt will be representing himself in today's presentation with the full support of POPA. As such, his outstanding grievance is to be considered pro se from this point on. Although I am unable to join you for today's presentation I believe that both Kim and Nathan will be present in support.

Thank you and have a nice day,

Tamara Kyle

-----Original Appointment-----
**From:** Butler, Leia D.
**Sent:** Thursday, April 10, 2014 3:36 PM
**To:** Butler, Leia D.; Garber, Wendy; Hillery, Nathan (AU3715); Kakalec, Kimberly
**Cc:** Kyle, Tamara; Mueller, Kurt A.
**Subject:** POPA Grievance/K. Mueller/Denial of Perm Full Sig Auth
**When:** Wednesday, April 23, 2014 3:00 PM-4:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** RND 4C09 (Wendy's Office)

1

# Exhibit 7



## UNITED STATES PATENT AND TRADEMARK OFFICE

DATE:     October 7, 2014

TO:        Kurt Mueller
             Patent Examiner, Art Unit 2157

FROM:    Wendy Garber
             Group Director, Technology Center 2100

SUBJECT:  Informal Decision
             Denial of Permanent Partial Signatory Authority (PPSA)

On October 26, 2013, POPA filed an informal grievance (Informal Grievance) on your behalf regarding a notice of denial of PPSA dated October 18, 2013 (Notice). On April 23, 2014, Tamara Kyle, POPA Representative notified Leia Butler, Labor Relations Specialist that you would represent yourself in this grievance process, rather than being represented by POPA. As a result, this is a *Pro Se* grievance. A grievance meeting was held. In attendance were Nathan Hillery and Kimberly Kakalec, POPA Representatives; Leia Butler, Labor Relations Specialist; and me. During this grievance meeting, you rebutted the findings of clear errors in the cases identified by the following serial numbers: 13288525, 11074010, 11685095, 11543759, 12036536, 11685871, 13371634 and 12330371 (collectively referred to as Cases).

The following remedies were requested:

1. Withdraw the findings of CAT2 errors in the Cases because the references which you relied upon justified your actions taken on these Cases.
2. Expunge and destroy all papers and records relative to the Notice from all Office files (including, but not limited to, the Official Personnel Files; the Office of Human Resources files; and Technology Center 2100 files); and
3. Retroactively grant PPSA as of September 21, 2013.

On March 24, 2013, you were granted PPSA for a trial period of 13 pay periods ending September 21, 2013 (Trial Period). An evaluation of your performance during the Trial Period was completed by management. The evaluation entailed a detailed review of 17 cases which you signed during the Trial Period. To be granted PPSA, your work must be rated at least Fully Successful for all of the elements on your performance appraisal plan (PAP), including Quality, Productivity and Docket Management. After careful consideration of your performance during the Trial Period, management determined that it could not grant you PPSA because of the 17 applications that were reviewed, eight (8) contained CAT2 errors. Your CAT2 error rate under the Quality Major Activities element on your PAP is 22%, which exceeds the 6.49% maximum rate necessary for Fully Successful performance. The Notice was sent to inform you of management's decision to not grant you PPSA. With this grievance, you are seeking to overcome eight (8) of the CAT2 errors, and be retroactively granted with PPSA.

Each of your rebuttals to the eight (8) cases determined to contain CAT2 errors are addressed as follows:

1. 13288525

Claims 1 and 2 were originally rejected using the NPL "SimPaD". However, SimPaD does not anticipate the claims, even after taking the examiner's interpretation that a claimed "line" of text is a "sentence". Under MPEP §2111.01, words in a claim are to be given the "ordinary and customary" meaning unless that meaning is inconsistent with the specification. The plain and ordinary meaning of a "line" of text is just that – a line. Not only is this plain and ordinary meaning not inconsistent with the specification, it comports exactly with the meaning of the specification (note the top paragraph of page 4, that states "multi-line" files are loaded into memory "line-by-line". Note also paragraph 21 which discusses the different concepts of "individual lines" and "blocks of lines"). Initially, presuming that it is reasonable to interpret "line" as "sentence", SimPaD does not calculate checksums at all, nor does it do so with a line/sentence in the current text and the reference text (claim 2). Importantly, SimPaD does not recursively identify the longest block of lines between the text and reference text using the checksum values. At most, SimPaD finds the sentence in the text that is most similar to a sentence in the reference text. Consistent with the interpretation taken by the examiner the "line" = "sentence", SimPaD does not recursively find the longest common block of "sentences". Thus, this error is maintained.

2. 11074010

Claims 1-5 were rejected under 35 USC §103 using Alur in view of Naik. While both of the references are relevant to during periodic data backup tasks, neither of them – either alone or together – disclose the claim limitations of establishing a quantitative control limit for backup tasks based on "a historical success or failure rate of one or more previously executed backup tasks". Under MPEP §2111.01, words in a claim are to be given the "ordinary and customary" meaning unless that meaning is inconsistent with the specification. The plain and ordinary meaning of "success/failure rate" is the # of successes/failures out of the total # of times the backup task had been attempted. This is consistent with the specification as seen in paragraph 24. Alur does not disclosure this at all and Naik looks at historical time-to-completion to assist with optimizing backup scheduling. To interpret "historical success or failure rate" as QoS (Quality of Service) as argued in the rebuttal is inconsistent with the ordinary and customary meaning and the specification. Similarly, claims 2-5 are not met by Alur and Naik. Thus, this error is maintained.

3. 11685095

Claims 33 and 37-39 were rejected under 35 USC §103 using publications named by the examiner as ERP in view of CRSER and further in view of QC. The first two references primarily deal with comparing search results returned by multiple search engines in response to a query. QC, on the other hand, deals with using query chains to improve ranking of results. However, none of the references looking at search results that each includes a bias feature and a relevancy feature that are

both used to train a model that <u>predicts a click-through-rate</u> wherein the model is used to <u>reduce presentation bias</u> in the display of search results. While various of these concepts can be word-matched to the various references, none of them work together or are used in the same context of the claimed invention. Claims 37-39 provide further details about the predictive models that are not disclosed by the references. Thus, this error is maintained.

4. 11543759

Claims 64 and 69 were rejected under 35 USC §103 using Kennedy in view of Griffin. However, these two references – taken either alone or together – do not disclose presenting a custom form to a user that has at least some of the fields being automatically pre-filled with information gleaned from a JavaScript program analyzing a web page, wherein the pre-filled information includes the JavaScript-determined category, title, rating, description and representative image. During the informal grievance, the examiner attempted to define "automatically pre-filled with information obtained from the analyzed web page" as the empty content fields of the form. However, this phrase should be given its plain and ordinary meaning unless it is inconsistent with the specification. The customary and ordinary definition of this phrase would be that information gleaned from the underlying website would be used to auto-populate some of the fields. This plain and ordinary meaning is consistent with the specification (see, for example, the last paragraph in page 15 and the second full paragraph on page 55). To interpret "with information obtained from the analyzed webpage" as empty data fields is inconsistent with both the ordinary and customary meaning and the specification. The additional information obtained from the website that is claimed in claim 69 is also not met by the references. Thus, this error is maintained.

5. 12036536

Claims 1 and 2 were rejected under 35 USC §103 using Read, Bionda and Chao. Read discloses vertical search forms within a single service provider. Bionda discloses a form (such as an expense request form) that has a version that can be used to search the repository of previous filled-out forms by simply filling in some of the fields with data for which you want to search. Bionda does not disclose anything about vertical search forms or service providers. The last reference, Chua, is a system that is able to run a single query against several search engines by using "search engine wrappers" to convert the query into the format of the respective search engine. None of these references – taken alone or together - disclose a <u>plurality</u> of <u>customized vertical search forms</u> associated with a <u>plurality of service providers</u>, respectively. Additionally, the references do not disclose that, of the plurality of vertical search forms, <u>one</u> of the forms associated with <u>one</u> of the service providers is retrieved. Claim 2 requires that the system has a form registry that stores the basic vertical search form which is then customized by causing customizations to be retrieved from a registry and combined with the search form. None of the references disclose these features. Thus, this error is maintained.

6.  11685871

Claim 1 was rejected under 35 USC §103 using Kawamura in view of Ohsaki. The examiner has specified that the "synch point" in Kawamura is being mapped to the claim "way point". The "synch point" in Kawamura is defined as that point in time when the contents of the database are synchronized with the system execution state. Taking this interpretation, neither Kawamura nor Ohsaki disclose "Deferring issuance of a disk write operation for an updated database page....until a log record is written to the transaction log....and the log record is located at a point in the transaction log past the waypoint". This is the opposite of the synch point in Kawamura. All of the disk write operations must be complete in order for the database to have reached a synchronization point. Ohsaki does not cure this deficiency, as it is not related to writing updated database pages at all, nor does it disclose deferring the write operation until a log record is located past a waypoint. Thus the second limitation is not met by the references in a way consistent with the examiner's interpretation that the "synch point" in Kawamura is the claimed "waypoint". Thus, this error is maintained.

7.  13371634

In the Office action, claim 5 was rejected by Burrows in view of Hsieh. Primarily, MPEP §2144 was relied upon as a way to "extend the teaching of Burrows" to cover claim 5, specifically §2144.04(VI)(B) related to duplication of parts. However, it should be noted that §2144 also specifies that (in the first paragraph of the section) rationales such as "duplication of parts" should not be treated as per se rules and should be explained as to how it is applicable to the application at-hand. Even more importantly, claim 5 requires more than a mere duplication of columns of data. There are functional requirements in the claims regarding the interrelationships of the columns. Claim 5 adds to the "determining whether the user is authorized to access the database object based on the second column" limitation of claim 1 by adding that this step further includes accessing a row in a second database table to determine a match from the second column (of claim 1) to the value in the third column and determining access based on a fourth column in the second database. Thus, this error is maintained.

8.  12330371

In the Office action, claims 2 and 3 were rejected under 35 USC §103 using Harrison in view of Lasser. Harrison does disclose storing assets that includes determining the directory path of the asset creates a "local symbolic link" that a client can use to retrieve the asset. The link is stored on the client. Harrison also discloses that stored assets can be modified – but the modified version is generally stored in the place of the original asset, thus no link is created. In this case, there would be no message that an asset has been modified, no determination of a second operating link, and no storage of the second operating link in a second reference file, as claimed in claim 2. With respect to claim 3, Harrison does disclose that there are instances when one may want to store various version of the asset, but the versions are stored in the same storage system resource (thus, no new on-disk location, no second operating system link, and no replacing the first operating

system link with the second operating system link as claimed in claim 3).  The secondary reference does not cure these deficiencies.  Thus, this error will be maintained.

I carefully considered the information you presented during the grievance meeting to rebut the findings of CAT2 clear errors in the Cases.  However, I was not persuaded to withdraw any of these CAT2 clear errors.  Accordingly, your CAT2 error rate under the Quality Major Activities element on your PAP is 22%, which exceeds the 6.49% maximum rate necessary for Fully Successful performance.  Therefore, my decision to deny you PPSA remains unchanged and your requested remedies are hereby denied.

# Exhibit 8



## UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents

Date:        October 31, 2014

To:          ADC Valencia Martin-Wallace

             Director, TC 2100

From:        Kurt Mueller, Examiner, Art Unit 2157

Subject:     Formal Grievance resulting from the denial of Partial Signatory Authority

### Table Of Contents

I.      Written Formal Grievance (21 pages)

II.     September 30 3013 memo, "Questions of Concern" ( 7 pages)

III.    October 7 2013 examiner's reply memo, "Questions of Concern" (62 pages)

IV.     October 18 2013 memo, "Notice of Denial of Partial Signatory Authority" (6 pages)

V.      October 7 2104 memo, "Informal Decision: Denial of Permanent Partial Signatory Authority (PPSA)

VI.     Letter Granting Filing Extension for this Formal Grievance (1 page)



### UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents

Date:       October 31, 2014

To:         ADC Valencia Martin-Wallace

            Director, TC 2100

From:       Kurt Mueller, Examiner, Art Unit 2157

Subject:    Formal Grievance resulting from the denial of Partial Signatory Authority

## INTRODUCTION

The examiner hereby invokes Article 11, Sections 7 & 8, of the Collective Bargaining Agreement of 1986.

The examiner appeals the decision of TC Director Wendy Garber of October 7, 2014 in response to the examiner's informal grievance, said informal grievance relating to the denial to the examiner of partial signatory authority. The examiner requested and received an extension of time to file this appeal until the end of the day on October 31, 2014. Therefore, this appeal is timely.

The decision of the TC Director resulting from the informal grievance process must and should be reversed both on procedural grounds and substantive grounds.

## ARGUMENT

I.   **THE DECISION OF TC DIRECTOR WENDY GARBER RESULTING FROM THE INFORMAL GRIEVENCE PROCESS CANNOT BE SUSTAINED ON PROCEDURAL GROUNDS AND MUST BE REVERSED GROUNDS IN ORDER TO COMPORT WITH DUE PROCESS**

The USPTO is bound by the procedural processes agreed to in the <u>Agreement Between U.S Department of Commerce / Patent and Trademark Office and The Patent Office Professional Association</u> from 1986 (the "Collective Bargaining Agreement" or CBA). The TC Director's handling of this matter is a massive and material violation of this agreement, and this violation has worked to irrepealably and materially damage the ability of the examiner to advocate for his case. A collective bargaining agreement, such as the one in effect here, is a contract and the terms contained therein are to be viewed in contract terms. This prejudice to the examiner is thus not only a contractual breech between the examiner as a member of the POPA and the Office, but the breech is of such degree that it violates the examiner's substantive and procedural due process rights that compels the Office to rule for the examiner on the basis of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and its progeny.

The Collective Bargaining Agreement, Article 11, section 6, clause D, provides:

> The official receiving the informal grievance **shall inform** the grievant, and/or the Association, as appropriate, of his/her decision **within 20 calendar days** after receipt of the grievance. If the decision does not resolve the grievance, the official **shall immediately** issue a written memorandum to the grievant stating that the parties were unable to resolve the matter informally. Copies of the memorandum shall be provided to the Association, as appropriate.

(emphasis added). The language of the collective bargaining agreement is both unambiguous and mandatory; the official **shall**. The USPTO has clearly and unmistakably bound itself to a mandatory procedure that was not followed. Even worse, the violation here is not a mere technical or trivial violation. The delay in time has obscured the examiner's mental recall of the facts relevant to the case, thus prejudicing the examiner's ability to meaningfully forward his interests.

The examiner is bound by the terms of the CBA. As the Supreme Court stated in NLRB v, Allis-Chalmers Manufacturing Co, a collective bargaining agreement "extinguishes the individual employee's' power to order his own relations with his employer and creates a power vested in the chosen representatives to act in the interest of all employees", whether or not the employee agrees with the union's policies or actions.

As noted in the October 7, 2014 letter written by the TC Director responding to the informal grievance noted, the underling grievance was filed on October 26, 2013. That means that a reply was not issued for **346 calendar days** from the date the informal grievance was made. Even under a more charitable interpretation of the rules, the same October 7, 2014 letter notes that the grievance meeting was held on April 24, 2014. That means that a reply that was contractually required to be issued with 20 calendar days was in fact not issued for **166 calendar days**. This is simply absurd by any plausible definition.

As also noted by the October 7. 2014 letter, this grievance was designated as *pro se* by POPA (without the permission of the examiner, and POPA abandoned the examiner as the examiner's representative only as of the date of the oral presentation relating to the informal grievance, thus prejudicing the examiner). The TC Director's letter is clear that she was well aware of the fact that the examiner was representing himself; therefore, the examiner had no agent or representative who was empowered to agree to any extension of time and the TC Director was aware that there no such agent.

Nevertheless, the examiner received **NO REQUEST** for **ANY** extension of time, nor did the examiner ever receive any notice from **ANY PERSON** that an extension had been asked of by a third party or that an extension had been granted by a third party. Assuming arguendo that the TC Director asked for and received an extension, the examiner was not notified and if he had been, the examiner would have strenuously objected at the waiver of his contractual rights on his behalf.

Even if the Office wanted to argue that certain circumstances necessitated or made reasonable an extension *sua sponte*, the examiner would first argue that the Office is without power to make such unilateral extension because it is bound by a contractual

agreement that, as a pro se party who is a party to the contract, only the examiner was empowered to waive, and second, even if the office did have such power, if the contractual language limiting the office's response time to **20 calendar days** is to have **any meaning whatsoever**, the Office's residual power cannot be so large that the Office can unilaterally extend its own period for response by a **factor of eight.**

The time periods provided for in the Collective Bargaining Agreement are not present merely to make the lives of the parties to a dispute less convenient. Instead, these time periods exists to make sure that the facts relevant to a dispute as clear in the minds of the participants as possible.  The grant of temporary partial signatory authority (PPSA) started on **March 23, 2013**; some of the office actions at the root of this issue are now **more than a year and a half old**. The examiner has a BD of 5.2; accordingly, in the many weeks that have followed the originally filing of this dispute, the examiner has touched on dozens, if not hundreds, of distinct matters. The office actions that form the basis of this case are now, at best, a distant, blurry memory. To now expect the examiner to be able to meaningfully respond, given the elapsed time, the number of issues present, and the condensed time frame for response, denies the examiner any meaningful due process.

II.     **THE DECISION OF TC DIRECTOR WENDY GARBER RESULTING FROM THE INFORMAL GRIEVENCE PROCESS CANNOT BE SUSTAINED ON SUBSTANTIVE GROUNDS**

All of the alleged errors raised by the partial signatory process raised out of alleged "clear errors" under 35 USC 102 / 103. The Office has promulgated a specific and binding definition of "clear error". According to the Patent Examiner Performance Appraisal Plan (PAP) Guidelines dated 10/09/2013, a clear error is manifest only when:

> Clear error under this element will be deemed to have occurred where the examiner's office action or office communication:
>
> 1. does not reasonably comply with the major activities set forth in this element, and

2. could not have been permitted at the time and under the circumstances that the action was taken, and

3. is not an honest and legitimate difference of opinion as to what action should have been taken. If the action taken by the examiner is reasonable and the action preferred by the SPE is reasonable, this constitutes an honest and legitimate difference of opinion and the action taken by the examiner is free of clear error.

The examiner concludes that none of the "errors" that are presently in dispute constitute a "clear error" as that term has been defined by the Office. Certainly, to the extent that the TC Director, had she herself examined the cases, she would have not applied the art as the examiner did, this does not constitute a clear error. The TC Director's views with respect to the art are legitimate, but that does not make the examiner's views by necessity illegitimate; there is room enough for reasonable people to reasonably disagree.

The TC Director has changed her views on where the clear errors in the actions lie. The examiner believes that this is proof enough that if there are errors (which the examiner does not concede), they are not **clear** errors. A clear error by the office's own standard must be so manifest that it can be clearly and reliably pinpointed without any change in the underlying analysis by the reviewer.

The examiner takes notice of the examiner's response dated October 7, 2013 to the TC Directors' Questions of Concern. The examiner hereby incorporates the entirety of that document as part of this reply, and is providing a copy of the document along with this reply. In order to avoid undue repetition of arguments already made, the examiner requests reference to the examiner's reply dated October 7, 2013, where the examiner has already address some of these issues in further detail.

The examiner also argues that the TC director has failed to address the three point standard for any of the alleged clear errors of the examiner. The remarks by the TC Director are entirely conclusory, and do not offer substantive support for each of the three required elements to establish a clear error as that term has been defined by the office. The TC Director has therefore failed to make a prima facia case for any of the outstanding errors, and the decision of the TC Director must and should be reversed on that basis alone.

Each of the alleged clear errors will now be addressed in turn with additional specificity.

## II(1): Alleged Clear Error with Respect to Case 13/288525

In the memorandum dated 10/7/2014, TC Director Wendy Garber writes:

1. 13288525

Claims 1 and 2 were originally rejected using the NPL "SimPaD". However, SimPaD does not anticipate the claims, even after taking the examiner's interpretation that a claimed "line" of text is a "sentence". Under MPEP §2111.01, words in a claim are to be given the "ordinary and customary" meaning unless that meaning is inconsistent with the specification. The plain and ordinary meaning of a "line" of text is just that – a line. Not only is this plain and ordinary meaning not inconsistent with the specification, it comports exactly with the meaning of the specification (note the top paragraph of page 4, that states "multi-line" files are loaded into memory "line-by-line". Note also paragraph 21 which discusses the different concepts of "individual lines" and "blocks of lines"). Initially, presuming that it is reasonable to interpret "line" as "sentence", SimPaD does not calculate checksums at all, nor does it do so with a line/sentence in the current text and the reference text (claim 2). Importantly, SimPaD does not recursively identify the longest block of lines between the text and reference text using the checksum values. At most, SimPaD finds the sentence in the text that is most similar to a sentence in the reference text. Consistent with the interpretation taken by the examiner the "line" = "sentence", SimPaD does not recursively find the longest common block of "sentences". Thus, this error is maintained.

MPEP 2111.01(III) provides that "In the absence of an express intent to impart a novel meaning to the claim terms, the words are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art."). It is the use of the words in the context of the written description and customarily by those skilled in the relevant art that accurately reflects both the "ordinary" and the "customary" meaning of the terms in the claims. Ferguson Beauregard/Logic Controls v. Mega Systems, 350 F.3d 1327, 1338, 69 USPQ2d 1001, 1009 (Fed. Cir. 2003)."

The idea that a "line" is cannot be properly interpreted as a sentence is facially incorrect. If an actor asks for his next "line", he means to be provided his next sentence; he does not mean the next several words based on how they sit on the page (which could vary substantially, depending on the medium the text was printed in). In computer programing, a line is a sentence, namely a complete programming statement. While a

line can plausibly be understood as referring to a single written series of words from beginning to end as it physically lies on a page, this is not the only such understanding, particularly in modern computing where the entire concept of "physical" presentation is somewhat outmoded.

The references to the specification are not persuasive. The noted portions of the specification merely reuse the term "line", but do nothing to provide the term any additional clarity, and the reference certainly do not provide any type of express definition. There is nothing in the cited sections that even hints as to a proper understanding of the term line, or that the term line is to be as narrowly construed as suggested by the TC Director.

As to the element of finding the longest block of lines, as explained by the examiner in the initial response to the questions power, the examiner provided detail analysis of several teaching from section 2.3 – 2.3.3 of the SimPaD NPL prior art, which disclosed several methods of finding blocks of text that were more than a particular line, such as the disclosing of matching across split sentences, which using either the understanding of line as provided by the examiner or as provided by the TC director would be multi-lines, and therefore would comprise a "block" under the broadest reasonable understanding.

## II(2): Alleged Clear Error with Respect to Case 13/288525

## 2. 11074010

Claims 1-5 were rejected under 35 USC §103 using Alur in view of Naik. While both of the references are relevant to during periodic data backup tasks, neither of them – either alone or together – disclose the claim limitations of establishing a quantitative control limit for backup tasks based on "a historical success or failure rate of one or more previously executed backup tasks". Under MPEP §2111.01, words in a claim are to be given the "ordinary and customary" meaning unless that meaning is inconsistent with the specification. The plain and ordinary meaning of "success/failure rate" is the # of successes/failures out of the total # of times the backup task had been attempted. This is consistent with the specification as seen in paragraph 24. Alur does not disclosure this at all and Naik looks at historical time-to-completion to assist with optimizing backup scheduling. To interpret "historical success or failure rate" as QoS (Quality of Service) as argued in the rebuttal is inconsistent with the ordinary and customary meaning and the specification. Similarly, claims 2-5 are not met by Alur and Naik. Thus, this error is maintained.

The TC Director unduly narrows the claims by arguing the "plain and ordinary meaning of 'success/failure rate' is the # of successes/failures out of the total # of times the backup task has been attempted.

While this is a plausible interpretation in light of the specification, it is not the <u>only</u> definition that fits within the scope of the claim language.

The MPEP is clear that the examiner is compelled to give the claims the broadest reasonable interpretation. Quoting MPEP 2111: " Because applicant has the opportunity to amend the claims during prosecution, giving a claim its broadest reasonable interpretation will reduce the possibility that the claim, once issued, will be interpreted more broadly than is justified."

The MPEP is also clear that the examiner is not to read definitions or language from the specification into the claims absent situations where the applicant has unambiguously been his own lexicographer. Quoting MPEP 2111.01 (II): "Though understanding the claim language may be aided by explanations contained in the written description, it is important not to import into a claim limitations that are not part of the claim."

Further, quality of service, as applied by the examiner, is wholly consistent with the claim language as informed by the examiner. On the Internet and in other networks, QoS (Quality of Service) is the idea that transmission rates, error rates, and other

characteristics can be measured, improved, and, to some extent, guaranteed in advance. Quality of Service is therefore defined by the very same ratios that the TC Director alleges is missing from the examiner's analysis.

## II(3): Alleged Clear Error with Respect to Case 11/685095

3.  11685095

Claims 33 and 37-39 were rejected under 35 USC §103 using publications named by the examiner as ERP in view of CRSER and further in view of QC. The first two references primarily deal with comparing search results returned by multiple search engines in response to a query. QC, on the other hand, deals with using query chains to improve ranking of results. However, none of the references looking at search results that each includes a bias feature and a relevancy feature that are

P.O. Box 1450, Alexandria, Virginia 22313-1450 – www.uspto.gov

both used to train a model that predicts a click-through-rate wherein the model is used to reduce presentation bias in the display of search results. While various of these concepts can be word-matched to the various references, none of them work together or are used in the same context of the claimed invention. Claims 37-39 provide further details about the predictive models that are not disclosed by the references. Thus, this error is maintained.

First, the examiner highlights how this argument is entirely conclusory. There is no analysis of the sections of the prior art that the examiner originally cited, no analysis of the remarks provided by the examiner's reply dated October 7, 2013, and the TC Director has no provided any individualized or detailed analysis of any of the alleged issues present.

The examiner directs you to pages 13 – 21 of the examiner's reply dated October 7, 2013, wherein the examiner directed eight pages of detailed and comprehensive analysis responding to these issues. As the TC Director has not provided any substantive analysis responding to the detailed analysis originally provided by the examiner, the examiner does not know which, if any, portions of the analysis the TC Director found unpersuasive or defective, and does not know why those arguments were found to be unpersuasive or defective. Since the response from the TC Director is summary, the examiner has been denied a meaningful opportunity to respond.

## II(4): Alleged Clear Error with Respect to Case 11/543759

4.  11543759
Claims 64 and 69 were rejected under 35 USC §103 using Kennedy in view of Griffin. However, these two references – taken either alone or together – do not disclose presenting a custom form to a user that has at least some of the fields being automatically pre-filled with information gleaned from a JavaScript program analyzing a web page, wherein the pre-filled information includes the JavaScript-determined category, title, rating, description and representative image. During the informal grievance, the examiner attempted to define "automatically pre-filled with information obtained from the analyzed web page" as the empty content fields of the form. However, this phrase should be given its plain and ordinary meaning unless it is inconsistent with the specification. The customary and ordinary definition of this phrase would be that information gleaned from the underlying website would be used to auto-populate some of the fields. This plain and ordinary meaning is consistent with the specification (see, for example, the last paragraph in page 15 and the second full paragraph on page 55). To interpret "with information obtained from the analyzed webpage" as empty data fields is inconsistent with both the ordinary and customary meaning and the specification. The additional information obtained from the website that is claimed in claim 69 is also not met by the references. Thus, this error is maintained.

The TC Director says that during the informal grievance the examiner attempted to define "'automatically pre-filled with information obtained from the analyzed web page' as the empty content fields of the form". The examiner provided no written remarks during the informal grievance itself, and the examiner did not make the noted argument; the examiner believes there was a misunderstanding. Had the examiner made such a

representation, it would be clearly erroneous; such an argument, had it been made by the examiner, would be absurd.

Rather, the examiner argued that empty content fields were the search keys for which matching content was to be located.

In a web form, a person might have provided similar information in the past to other web forms. Thus, the prior art looks at a newly provided web form, which would be entirely blank, and then looks to its archives for the information the user has provided previously for other web forms in the past, and determines if there is a match. If there is, the system provides the information to the blank web form, so that the user does not have to type it again. Many web forms ask for similar information (e.g., the user's address, for shipping), so the prior art saves the user time by automatically filling in the blank form elements using the matching form element labels or matching form element descriptions.

Since most websites requesting form data have some elements that are uncommon to web forms considered as a whole, it is also likely that the blank web form provided does not match entirely to previously provided information. Under such circumstances, the prior art detects this new information provided by the user in response to this new form's request, and the prior art then stores the information in its database, so that the next time yet another new form comes along that requests that information, this new information will be stored from the current use, thus saving time for the user in the future.

More detail regarding the mapping of the prior art to the claims using this explanation may be found in the examiner's reply dated October 7, 2013 pages 27-32 with pages 30-31 discussing the specific limitation that is at issue here.

It should be noted that the alleged clear error as explained in the TC Director's memo dated  October 7. 2014 is not at all similar to the alleged clear error as explained in the TC' Director's Questions of Concern to which the examiner replied on October 7, 2013. A clear error is supposed to be <u>clear</u>. As the TC Director's rationale has completely

changed and as the TC Director's conclusion is based on a misunderstanding of the examiner's position, the TC's decision should be withdrawn.

## II(5): Alleged Clear Error with Respect to Case 12/036536

5. 12036536
Claims 1 and 2 were rejected under 35 USC §103 using Read, Bionda and Chao. Read discloses vertical search forms within a single service provider. Bionda discloses a form (such as an expense request form) that has a version that can be used to search the repository of previous filled-out forms by simply filling in some of the fields with data for which you want to search. Bionda does not disclose anything about vertical search forms or service providers. The last reference, Chua, is a system that is able to run a single query against several search engines by using "search engine wrappers" to convert the query into the format of the respective search engine. None of these references – taken alone or together - disclose a plurality of customized vertical search forms associated with a plurality of service providers, respectively. Additionally, the references do not disclose that, of the plurality of vertical search forms, one of the forms associated with one of the service providers is retrieved. Claim 2 requires that the system has a form registry that stores the basic vertical search form which is then customized by causing customizations to be retrieved from a registry and combined with the search form. None of the references disclose these features. Thus, this error is maintained.

As noted by MPPE 707. "One cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. See In re Keller, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); In re Merck & Co., 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986)." The arguments about what certain items of art does not teach is therefore manifestly misplaced, as the examiner did not use the noted items of art for those propositions, but instead used the other items of art as noted in the original office action.

The TC Director concedes that Read discloses a vertical search form with a single provide. A search form, by its nature, and as disclosed by the Read prior art, is customized when the user provides the search elements that are desirable accordingly to the user's needs and wishes. In order to reach the scope of the claim therefore, the examiner was merely required to show that this singular process of Read could be

extended multiple times, which would reach the claim scope of a plurality of vertical search forms associated with a plurality of search provides.

MPEP 2144.04 (V)(B) noted that the "mere duplication of parts has no patentable significance unless a new and unexpected result is produced." Here, the examiner could have merely duplicated the process of Read without more, as Read discloses one search form associated with one search provides, so the duplication of Read with itself leads to the teaching of multiple vertical search forms associated with multiple search providers. The examiner was therefore not required to cite to additional references, and the citation to additional references merely shows explicitly this feature that can be inferred according to MPEP 2144.04 (V)(B) from Read.

Further detail explaining how the various teaching of the references were combined to reach the scope of the noted claims can be found in the examiner's response dated October 7, 2013, pages 38-39, where the examiner in some detail addressed the teaching of each element of the art and how they could be reasonably combined.

The TC Director in her remarks does not provide any individualized analysis of the specific arguments raised by the examiner in the examiner's response dated October 7, 2013, nor has the TC Director performed the required three part analysis of the clear error test in individualized detail. Therefore, the clear error charge was in error, and the TC Director has therefore failed to make a prima facia case, and the decision of the TC Director must and should be reversed on that basis alone.

## II(6): Alleged Clear Error with Respect to Case 11/685871

6.  11685871

Claim 1 was rejected under 35 USC §103 using Kawamura in view of Ohsaki. The examiner has specified that the "synch point" in Kawamura is being mapped to the claim "way point". The "synch point" in Kawamura is defined as that point in time when the contents of the database are synchronized with the system execution state. Taking this interpretation, neither Kawamura nor Ohsaki disclose "Deferring issuance of a disk write operation for an updated database page....until a log record is written to the transaction log....and the log record is located at a point in the transaction log past the waypoint". This is the opposite of the synch point in Kawamura. All of the disk write operations must be complete in order for the database to have reached a synchronization point. Ohsaki does not cure this deficiency, as it is not related to writing updated database pages at all, nor does it disclose deferring the write operation until a log record is located past a waypoint. Thus the second limitation is not met by the references in a way consistent with the examiner's interpretation that the "synch point" in Kawamura is the claimed "waypoint". Thus, this error is maintained.

The TC Director misunderstands the examiner's combination of the references. The Kawamura art addresses the establishment of sync points, which is the same as the claim language's waypoint. However, the Kawamura art does not teach the delaying of disk writes "until a  log record is written to the transaction log ... and the log record is located at a point in the transaction log part the waypoint.". For this aspect, the examiner brings on the Ohaski art, which does address the delaying of disk writes based on a "predetermined values" (Ohaki: paragraph 11). The Ohaski art in paragraph 11 also discloses that this can be a threshold value, which is a dynamic consideration, which is consistent with the language of the claims of the application, particularly claims 10 & 11, which likewise discuss altering the checkpoint based on dynamically determined threshold calculations.

Therefore, the combination of the arts has a motivation to combine, and the arts when combined reach the scope of the claims. Ohsaki discloses the checkpoint, and Kawamura discloses the deferral of disk writes until some predetermined value is reached. There is no obvious reason why the predetermined value could not be a checkpoint, particularly in light of the claim language of the application which teaches the creation or alteration of the checkpoint based on dynamically determined considerations.

The separate references teach the noted claim limitations, and the combination of references was reasonable based of MPEP 2141(III), based on the "Combining prior art elements according to known methods to yield predictable results" and there being "Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.". Therefore, the examiner made a viable prima facia case, and the clear error charge was erroneous.

## II(7): Alleged Clear Error with Respect to Case 13/371634

7. 13371634
In the Office action, claim 5 was rejected by Burrows in view of Hsieh. Primarily, MPEP §2144 was relied upon as a way to "extend the teaching of Burrows" to cover claim 5, specifically §2144.04(VI)(B) related to duplication of parts. However, it should be noted that §2144 also specifies that (in the first paragraph of the section) rationales such as "duplication of parts" should not be treated as *per* se rules and should be explained as to how it is applicable to the application at-hand. Even more importantly, claim 5 requires more than a mere duplication of columns of data. There are functional requirements in the claims regarding the interrelationships of the columns. Claim 5 adds to the "determining whether the user is authorized to access the database object based on the second column" limitation of claim 1 by adding that this step further includes accessing a row in a <u>second</u> database table to <u>determine a match</u> from the second column (of claim 1) to the value in the third column and determining access based on a fourth column in the second database. Thus, this error is maintained.

The TC Director's comment that "rationales such as 'duplication of parts' should not be treated as per se rules and should be explanted as to how it is applicable to the application at-hand" is a new comment that is being presented for the first time as part of the TC Director's response to the informal grievance. Additionally, the admonition against the application of "per se" rules is written with respect to all 103 rejections, rather than with respect to the application of 2144.04(VI)(B) specifically, as the TC Director's phrasing implies. Finally, the examiner did not apply the rule in a per se fashion; rather the examiner supplied supporting rationales and arguments which are not addressed here.

The examiner agrees that the claims "require more than a mere duplication of columns of data". However, the examiner did not use duplication of parts for merely this effect as is implied; rather, the examiner used the <u>duplication</u> of parts for a repetition of the prior art's <u>underlying process</u>. As explained by the examiner in pages 49-50 of the to the examiner's reply dated October 7, 2013:

> The first limitation of claim 5 recites "accessing a row in a second database table, the row comprising a third column and a fourth column".
>
> While the prior art only discusses two non-overlapping columns, the examiner concluded that the first and second non-overlapping columns could be repeated indefinitely for any arbitrary N number of columns. The examiner has cited as support MPEP 2144 to reach this conclusion that the art can be modified. Paragraph 47 of Burrows explicitly recites a table having 5 columns, P-T, but split into two groups. Since Burrows explicitly discloses that access control can be split into 2 non-overlapping parts, splitting it into N non-overlapping parts would accomplish the same purpose. No unexpected results appear to flow from this choice.
>
> The second limitation of claim 5 recites "determining whether a second value in the second column matches a third value in the third column".
>
> While the prior art only discusses that each column is checked independently, the examiner concluded that any number of columns could be checked. The examiner has cited as support MPEP 2144 to reach this conclusion that the art can be modified. Paragraph 47 of Burrows allows in some embodiments for the columns to be non-overlapping, but the columns can nevertheless contain identical data. Paragraph 35 discloses a case where ordinary users have read rights, but admins have read and write permissions. But these access permissions could be identical (both could be read-write). Therefore, rather than merely accessing one column because the user is in one group, the system can be readily modified to access two or more columns using the same process, and only grant access if the values are the same when compared to the access permission requirements (if the check is for read permissions, then a read-write permission would be a "match" for this requirement). No unexpected results appear to flow from this choice.
>
> The third limitation of claim 5 recites "determining whether the user has access to the database object based on a fourth value in the fourth column".
>
> While the prior art only discusses that a first and second column is checked independently, the examiner concluded that any number of columns could be checked. The examiner has cited as support MPEP 2144 to reach this conclusion that the art can be modified. Paragraph 47 of Burrows explicitly recites a table having 5 columns, P-T, but split into two groups. Since Burrows

explicitly discloses that access control can be split into 2 non-overlapping parts, splitting it into N non-overlapping parts would accomplish the same purpose. Splitting the columns into four parts, as is required here, and checking the fourth column would be done using the same process which checks the first column. No unexpected results appear to flow from this choice.

The TC Director's remark that the examiner merely argued that the prior art could be repeated because all the claims required was "a mere duplication of columns of data" is simply not supported by the text of the examiner's office action, nor the text of the examiner's thorough explanation as quoted above providing exactly what the claims required, exactly what the prior art provided, and how using the teachings of the prior art the process of the prior art could be repeated to reach the scope of the claims requirements.

The TC Director's comments do not, in any meaningful sense, response to the detailed and through analysis of the examiner. Additionally, the clear error charge is invalid on its face for failing to address the three point standard of what constitutes a "clear error" in any individualized or particularized manner. The clear error charge therefore cannot be sustained.

## II(8): Alleged Clear Error with Respect to Case 12/330371

8.   12330371

In the Office action, claims 2 and 3 were rejected under 35 USC §103 using Harrison in view of Lasser.  Harrison does disclose storing assets that includes determining the directory path of the asset creates a "local symbolic link" that a client can use to retrieve the asset.  The link is stored on the client.  Harrison also discloses that stored assets can be modified – but the modified version is generally stored in the place of the original asset, thus no link is created.  In this case, there would be no <u>message</u> that an asset has been modified, no determination of a second operating link, and no storage of the second operating link in a <u>second</u> reference file, as claimed in claim 2.  With respect to claim 3, Harrison does disclose that there are instances when one may want to store various version of the asset, but the versions are stored in the same storage system resource (thus, no new on-disk location, no second operating system link, and no replacing the first operating

P.O. Box 1450, Alexandria, Virginia 22313-1450 – WWW.USPTO.GOV

system link with the second operating system link as claimed in claim 3).  The secondary reference does not cure these deficiencies.  Thus, this error will be maintained.

The alleged clear errors presented here are materially different from those presented previously. In the originally question to the examiner, the TC Director inquired about alleged deficits from claim 1, which are now completely absent. Although the clear error charge mentioned the message required by the claims, it did not do so with any detail. The examiner, not being made aware of the particulars of the alleged clear error, was denied a meaningful opportunity for reply.

The creation of links between files between the client and the external storage is described in Harrison, paragraph 66. Paragraph 94 illustrates the particular case when the initial link is a temporary asset versus a permanent asset, and the updating the links based on this distinction. This mapping satisfies the requirements of the claims as drafted by applicant.

If an asset is modified, its link would remain constant. That applicant chose to cancel all of their pending claims in light of the examiner's explanation and mapping is at least suggestive that applicant did not find the examiner's interpretations so absurd as to comprise a "clear error".

## Conclusion and Prayer for Action

The examiner believes the breach of the contract of the Collective Bargaining Agreement with respect to the agreed upon time periods for response is a material breach of the contract, has denied the examiner procedural due process, and has prejudiced the examiner's substantive due process by improperly delaying resolution of this issue and by clouding the relevant factual basis in play by the unwarranted passage of time. The examiner therefore believes the Office has breached its contract, and that a decision in favor of the examiner is the only equitable remedy.

The examiner believes that the Office has failed to show in any of the alleged clear errors at issue any individualized or particularized anaylsis of the three part clear error standard, as that standard has been promulgated by the office. Failing to show each of the three parts, the Office has failed to make a prima facia case for any clear errors, and thus the decision of the Office cannot be sustained.

The examiner believes that none of the questions presented in the memorandum dated September 30, 2013 or as detailed in the October 7, 2014 letter written by TC Director Garber formally responding to the informal grievance represent a clear error within the meaning of that term as it has been defined by the USPTO. The examiner believes that the conclusions of the examiner as expressed in the office actions referred to the memorandum's questions are a legitimate and reasonable interpretation of the claims in broadest reasonable view of the specification as would be understood by a person of skill in the art, and the art is a legitimate mapping to the claims as best understood. Therefore, the examiner believes that he has made a prima facie case that the prior art discloses the claim limitations as recited, and therefore, the questions should be withdrawn as not representing clear errors.

The examiner therefore prays to be granted partial signatory authority without further delay.

Most Respectfully Submitted,

Kurt Mueller

Examiner, AU 2157

# Exhibit 9



## UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents

Date:         February 27, 2015

To:           Peggy Focarino, Commissioner of Patents

From:         Kurt Mueller, Examiner, Art Unit 2157

Subject:      Exceptions resulting from the denial of Partial Signatory Authority
              Grievance 10-13-KM-35

### INTRODUCTION

The examiner hereby invokes Article 11, Sections 7 & 8, of the Collective Bargaining Agreement of 1986. This matter is being handled *pro se*. The examiner requests an in-person meeting with you at your earliest possible convenience to discuss this issue, and to explore if a mutually satisfactory agreement can be reached under the provisions of the CBA, Article 11, Section 8, Clauses D & E.

The examiner appeals the decision of TC Director Wendy Garber of October 7, 2014 in response to the examiner's informal grievance, said informal grievance relating to the denial to the examiner of partial signatory authority. The examiner timely appealed to ADC Valencia Martin-Wallace, but as of the date of this filing, no reply from the ADC has been received. On February 20, 2015, Leia Butler of the labor relations division of human resources granted permission to the examiner to proceed with the filing of exceptions notwithstanding the failure of the ADC to timely respond.

The examiner reserves the right to file revised or amended exceptions if the ADC substantively responds to the formal grievance filed with her office. The examiner does not waive the right to respond on the substantive merits.

The decision of the TC Director resulting from the informal grievance process must and should be reversed both on procedural grounds and substantive grounds. As the ADC decision is pending, the examiner elects to respond to the only issue which is presently ripe at this time,

namely the procedural issues that comprise a fatal defect in the Office's handling of this matter. Should the substantive issues become ripe at some later time by the ADC finally acting in this matter, the examiner reserves the right to address any substantive issues at that time.

## ARGUMENT

### THE DECISION OF TC DIRECTOR WENDY GARBER RESULTING FROM THE INFORMAL GRIEVENCE PROCESS CANNOT BE SUSTAINED ON PROCEDURAL GROUNDS AND MUST BE REVERSED IN ORDER TO COMPORT WITH DUE PROCESS

The USPTO is bound by the procedural processes agreed to in the <u>Agreement Between U.S Department of Commerce / Patent and Trademark Office and The Patent Office Professional Association</u> from 1986 (the "Collective Bargaining Agreement" or CBA). Both the TC Director's and the ADC's handling of this matter is a massive and material violation of this agreement, and this violation has worked to irrepealably and materially damage the ability of the examiner to advocate for his case. A collective bargaining agreement, such as the one in effect here, is a contract and the terms contained therein are to be viewed in contract terms. This prejudice to the examiner is thus not only a contractual breach between the examiner and the Office, but the breech is of such degree that it violates the examiner's substantive and procedural due process rights, which compels the Office to rule for the examiner.

The Collective Bargaining Agreement, Article 11, section 6, clause D, provides:

> The official receiving the informal grievance **shall inform** the grievant, and/or the Association, as appropriate, of his/her decision **within 20 calendar days** after receipt of the grievance. If the decision does not resolve the grievance, the official **shall immediately** issue a written memorandum to the grievant stating that the parties were unable to resolve the matter informally. Copies of the memorandum shall be provided to the Association, as appropriate.

(emphasis added). The language of the collective bargaining agreement is both unambiguous and mandatory; the official **shall**. The USPTO has clearly and unmistakably bound itself to a mandatory procedure that was not followed. Even worse, the violation here is not a mere technical or trivial violation. The delay in time has obscured the examiner's mental recall of the

facts relevant to the case, thus prejudicing the examiner's ability to meaningfully forward his interests.

As noted in the October 7, 2014 letter written by the TC Director responding to the informal grievance noted, the underling grievance was filed on October 26, 2013. That means that a reply was not issued for **346 calendar days** from the date the informal grievance was made. Even under a more charitable interpretation of the rules, the same October 7, 2014 letter notes that the grievance meeting was held on April 24, 2014. That means that a reply that was **contractually required** to be issued within 20 calendar days was in fact not issued for at least **166 calendar days**. This is simply absurd by any plausible definition.

> The Collective Bargaining Agreement, Article 11, section 8, clause A, provides:
>
> [In a formal grievance proceeding] The official **shall** answer the merits of the grievance, provide any pertinent information relevant to the grievance, and present any allegations of procedural deficiencies **within ten (10) calendar days** of filing the formal grievance. The official's answer **shall** clearly indicate the reason(s) for his/her position and **shall** address the points raised by the grievant in the formal grievance.

As with the CBA's provisions with respect to the process in informal grievances, the language in the CBA which address the formal grievance proceeding is both unambiguous and mandatory; the office **shall.**

Although the formal grievance was timely filed with the ADC, as of the date of the filing it has been **119 calendar days** since the filing of the formal grievance papers without any reply from the ADC. The examiner had requested an oral presentation to help assist the ADC in understanding any portion of the written remarks which may have been unclear. Although a meeting had been scheduled for December 3, 2014, the meeting did not occur because the ADC **failed to appear** at the agreed upon time and place. Neither a reason nor an apology for the ADC's failure to appear was ever provided to the examiner. The examiner takes note that even though the meeting did not in fact take place, December 3, 2014 was **86 calendar days** ago.

The USPTO's repeated failure to obey its own agreed upon rules for the processing of grievances, especially in view of the degree and scope of the failure, is both shocking and

inexcusable. The length of the delay by the office, without cause or agreement to extend, of delays of this scope and length, can only justly result in procedural default on the part of the USPTO.

As also noted by the October 7, 2014 letter by TC Director Garber, this grievance was designated as *pro se* by POPA (without the permission of the examiner, and POPA abandoned the examiner as the examiner's representative only as of the date of the oral presentation relating to the informal grievance, thus prejudicing the examiner). The TC Director's letter is clear that she was well aware of the fact that the examiner was representing himself; therefore, the examiner had no agent or representative who was empowered to agree to any extension of time and the TC Director was aware that there no such agent.

Nevertheless, the examiner received **NO REQUEST** for **ANY** extension of time, nor did the examiner ever receive any notice from **ANY PERSON** that an extension had been asked of by a third party or that an extension had been granted by a third party. Assuming arguendo that the TC Director asked for and received an extension by some third party, the examiner was not notified and if he had been the examiner would have strenuously objected at the waiver of his contractual rights on his behalf. Likewise, the examiner did not receive a request for an extension of time with respect to the formal grievance process pending before the ADC until February 13, 2015, at which time the formal grievance had already been pending **for at least 72 calendar days** even under the most charitable interpretation of the rules. The examiner denied the request because as shown above the time period for the office to respond provided by the CBA had long since lapsed, and therefore the request was not even remotely close to timely.

Even if the Office wanted to argue that certain circumstances necessitated or made reasonable an extension *sua sponte*, the examiner would first argue that the Office is without power to make such unilateral extension because it is bound by a contractual agreement that, as a *pro se* party who is a party to the contract, only the examiner was empowered to waive, and second, even if the office did have such power, if the contractual language limiting the office's response time to **20 calendar days** is to have **any meaning whatsoever**, the Office's residual power cannot be so large that the Office can unilaterally extend its own period for response to the informal grievance by a **factor of eight.** Likewise, the contractual language limiting the period of response for a formal response limiting the office's limiting the office's response time to **10 calendar days** is to have **any meaning whatsoever**, the Office's residual power cannot be so large that the Office can unilaterally extend its own period for response by a **factor of eight.**

That the office has now violated its own agreed upon time frames for response **TWICE**, on both occasions by **at least** a factor of **EIGHT**, would be a laughable farce by the sheer scope of its absurdity if this matter were not serious.

The time periods provided for in the Collective Bargaining Agreement are not present merely to make the lives of the parties to a dispute less convenient. Instead, these time periods exists to make sure that the facts relevant to a dispute as clear in the minds of the participants as possible, as well as to ensure the prompt resolution of any dispute.  The grant of temporary partial signatory authority (PPSA) started on **March 23, 2013**; some of the office actions at the root of this issue are now **almost two years old.** The examiner has a BD of 29.98; accordingly, in the many dozens of weeks that have followed the originally filing of this dispute, the examiner has touched on hundreds of distinct matters. The office actions that form the basis of this case are now, at best, a distant, blurry memory. To now expect the examiner to be able to meaningfully respond, given the elapsed time, the number of issues present, and the condensed time frame for response to which the Office holds the examiner to even as it provides itself apparent unilateral authority to extend its own contractual deadlines as it sees fit without any apparent limits, denies the examiner any meaningful due process.

A default judgment in favor of the examiner must be entered in the interest of equity and fundamental fairness. The examiner additionally request such other remedies as may be needed avoid prejudice to the examiner by the Office's failure to act timely.

Sincerely,

Kurt Mueller

# Exhibit 10

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle)<br>FOCARINO, MARGARET ANN | 2. Social Security Number | 3. Date of Birth | 4. Effective Date<br>06/30/15 |
|---|---|---|---|

| FIRST ACTION | SECOND ACTION |
|---|---|

| 5–A. Code<br>302 | 5–B. Nature of Action<br>RETIREMENT VOLUNTARY | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| 5–C. Code<br>SQM | 5–D. Legal Authority<br>5 U.S.C. 8336 | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number<br>COMMISSIONER FOR PATENTS<br>15214047 OT9185 | 15. TO: Position Title and Number |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AD | 1220 | 00 | 00 | 183,300.00 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 183,300.00 | .00 | 183,300.00 | .00 | | .00 | | .00 |

| 14. Name and Location of Position's Organization<br>PATENT AND TRADEMARK OFFICE<br>PATENTS<br>OFC OF COMM FOR PATENTS | 22. Name and Location of Position's Organization<br><br>5A<br>CM 561500100000000000  PP 13 2015 |
|---|---|

## EMPLOYEE DATA

| 23. Veterans Preference<br>1<br>1 – None   3 – 10–Point/Disability   5 – 10–Point/Other<br>2 – 5–Point   4 – 10–Point/Compensable   6 – 10–Point/Compensable/30% | 24. Tenure<br>0<br>0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF<br>YES   X   NO |
|---|---|---|---|

| 27. FEGLI<br>C0   BASIC | 28. Annuitant Indicator<br>9   NOT APPLICABLE | 29. Pay Rate Determinant<br>0   NOT APPLICABLE |
|---|---|---|

| 30. Retirement Plan<br>1   CS | 31. Service Comp. Date (Leave)<br>04/07/77 | 32. Work Schedule<br>F   FULL TIME | 33. Part–Time Hours Per<br>Biweekly<br>Pay Period |
|---|---|---|---|

## POSITION DATA

| 34. Position Occupied<br>2<br>1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | 35. FLSA Category<br>E<br>E – Exempt<br>N – Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status<br>8888 |
|---|---|---|---|

| 38. Duty Station Code<br>51-0040-510 | 39. Duty Station (City – County – State or Overseas Location)<br>ALEXANDRIA  ALEXANDRIA  VA |
|---|---|

| 40. Agency Data | 41. | 42. | 43.<br>NA | 44.<br>NP |
|---|---|---|---|---|

**45. Remarks**
TRANSFER FEHB ENROLLMENT TO OPM.
BASIC LIFE INSURANCE: ELECTED  75% REDUCTION.
FORWARDING ADDRESS=10714 FOURNIER DR. FAIRFAX STATION VA 22039
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.
REASON FOR RETIREMENT: TO OBTAIN RETIREMENT BENEFITS

| 46. Employing Department or Agency<br>DEPARTMENT OF COMMERCE | 50. Signature/Authentication and Title of Approving Official<br>E/S BY: KAREN KARLINCHAK |
|---|---|
| 47. Agency Code<br>CM 56 | 48. Personnel Office ID<br>2794 | 49. Approval Date<br>06/29/15 | DIRECTOR, HUMAN CAPITAL MGMT. |

5–Part 50–316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

# Exhibit 11

## UNITED STATES PATENT AND TRADEMARK OFFICE

August 13, 2015

TO:         Kurt Mueller
                Art Unit 2157

FROM:      Remy Yucel
                Assistant Deputy Commissioner for Patent Operations
                Technology Center 2100

SUBJECT:  Formal Grievance Response
                Denial of Partial Signatory Authority

The purpose of this memorandum is to respond to the Formal Grievance on Denial of Partial Signatory Authority filed 31 October, 2014 (Formal Grievance).

I incorporate into this response the information contained in the Informal Grievance Response to the extent that it is not inconsistent with the remainder of my decision which follows.

The grievance advances a procedural argument which posits that because the Office did not adhere to timeframes set forth in the Collective Bargaining Agreement Article 11, section 6, clause D, the decision on the informal grievance is unsustainable because the examiner's right to due process was denied.

In response, let me start by apologizing for the Agency's delay in getting you a response to this grievance.  We have had multiple staff changes that have not allowed us to move more quickly.  However, your procedural rights pursuant to the Collective Bargaining Agreement have not been violated. Your grievance has been processed and your allegations considered. The process, as agreed to in the Collective Bargaining Agreement,, does not allow for the remedy you requested.  You have not been harmed by the delay in the response and you cannot get through a procedural issue what you are not entitled to on the merits.  In this instance, the delay does not justify a grant of partial signatory authority allowing you to send certain office actions to applicants without supervisory review when it has been determined that the quality of your work does not support that grant of authority.

In addition, you argue that the informal grievance decision cannot be sustained on substantive grounds and alleges that the TC director has not met the burden of presenting "clear errors", has provided only conclusory remarks and has changed views on where the clear errors lie (pg. 5 of the Formal Grievance).

At the outset I note that based on the number of actions signed during the Partial Signatory Authority trial period (36) and the largest permissible error rate (<6.49%),  the maximum number of CAT 2 errors for the examiner was two (2) errors.  There are eight

(8) applications discussed in the Formal Grievance document under the substantive grounds section.  This is four (4) less than the letter of concern, indicating that the Examiner rebuttal process was used and was persuasive for the four applicatoins that were subsequently dropped.  Therefore the Formal Grievance is based on eight (8) alleged errors which is four (4) times the number of permissible CAT 2 errors.  While there is no lower limit for the filing of a grievance, this situation does not appear on its face, to be a "close call."

A discussion of each of the errors follows below.

**1.      Serial Number: 13288525**

<u>Making proper rejections under 35 USC 102 and 103 with supporting rationale or determining how claim(s) distinguish over the prior art (Cat 2. #6).</u>

As Director Garber noted in the Informal Grievance Response:

> Claims 1 and 2 were originally rejected using the NPL "SimPaD".  However, SimPaD does not anticipate the claims, even after taking the examiner's interpretation that a claimed "line" of text is a "sentence".   Under MPEP §2111.01, words in a claim are to be given the "ordinary and customary" meaning unless that meaning is inconsistent with the specification.  The plain and ordinary meaning of a "line" of text is just that – a line.  Not only is this plain and ordinary meaning not inconsistent with the specification, it comports exactly with the meaning of the specification (note the top paragraph of page 4, that states "multi-line" files are loaded into memory "line-by-line".  Note also paragraph 21 which discusses the different concepts of "individual lines" and "blocks of lines").  Initially, presuming that it is reasonable to interpret "line" as "sentence",  SimPaD does not calculate checksums at all, nor does it do so with a line/sentence in the current text and the reference text (claim 2).  Importantly, SimPaD does not recursively identify the <u>longest block of lines</u> between the text and reference text using the checksum values.  At most, SimPaD finds the sentence in the text that is most similar to a sentence in the reference text.  Consistent with the interpretation taken by the examiner the "line" = "sentence", SimPaD does not recursively find the longest common <u>block</u> of "sentences".  Thus, this error is maintained.

The examiner's rebuttal solely focuses on the construction of the "line" limitation found in claim 1 (pg. 6-7 of Formal Grievance) and argues for a broader (reasonable) interpretation than the TC director's interpretation.  However, the TC director's allegation of error is based on more than just the definition of the term "line."  The examiner does not rebut the TC director's finding that the cited reference does not meet the limitation of calculating a "checksum value" also found in claim 1.

The anticipatory reference used by the examiner, SimPaD, describes a system for detecting plagiarism by comparing sentences in a document to a set of reference documents. Given two documents, SimPaD conducts a sentence-to-sentence comparison to determine the degree of resemblance between them using pre-computed word-correlation factors. Equation (3) shows the use of the pre-computed scaled word correlation factors to compute a numerical value that reflects the similarity between sentences. P. 5 col. 1.   Although SimPaD does teach the calculation of a value associated with a sentence, the function used is not a checksum function.  In contrast, a

checksum (or hash sum) value is calculated based on a set of mathematical functions (algorithm)—not  pre-computed word correlations.

Although the SImPaD reference does discuss the use of hashing functions to determine similarity between documents, p. 12 col. 1, the discussion is in the section of the reference describing prior systems—indicating that the word correlation approach used by the authors is different from the checksum (hash sum) approach.

Lastly, the examiner also does not rebut the TC director's observation that the anticipatory reference also does not meet the limitation of recursively identifying the longest block of lines using checksum values.

The examiner's rebuttal only addressed the definition of a "line" and did not address the remaining limitations of the claim(s) at question.  The examiner's rebuttal does not explain how the cited SimPaD reference anticipates the additional limitations of the claims.  Therefore, the TC director did not err in maintaining this error.

### 2.     Serial Number: 11/704,010

<u>Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)</u>

As Director Garber noted in the Informal Grievance Response:

> Claims 1-5 were rejected under 35 USC §103 using Alur in view of Naik.  While both of the references are relevant to during periodic data backup tasks, neither of them – either alone or together – disclose the claim limitations of establishing a quantitative control limit for backup tasks based on "a historical success or failure rate of one or more previously executed backup tasks".  Under MPEP §2111.01, words in a claim are to be given the "ordinary and customary" meaning unless that meaning is inconsistent with the specification.  The plain and ordinary meaning of "success/failure rate" is the # of successes/failures out of the total # of times the backup task had been attempted.  This is consistent with the specification as seen in paragraph 24.  Alur does not disclosure this at all and Naik looks at historical time-to-completion to assist with optimizing backup scheduling.  To interpret "historical success or failure rate" as QoS (Quality of Service) as argued in the rebuttal is inconsistent with the ordinary and customary meaning and the specification.  Similarly, claims 2-5 are not met by Alur and Naik. Thus, this error is maintained

The examiner's rebuttal is based on the premise that the TC director's construction of the claims is not the only plausible definition that fits the scope of the claim language.  The examiner also cites MPEP section 2111 which urges broadest reasonable interpretation and not to import definitions from the specification into the claims.  Finally, the examiner argues that the "quality of service" concept applied by the examiner supplies the alleged missing elements (see pg. 8-9, Formal Grievance).

The rebuttal fails to explain how the references teach the limitation at issue. The examiner cites to paragraphs 0035 and 0075 of Alur as teaching specifically a method of evaluating  a backup policy based on a set of backup statistics wherein the backup statistics include data on a historical success or failure rate of one or more previously

executed backup tasks (see pg. 9, OA mailed 6-28-2013).  The cited portions of Alur refer generally to how QoS (quality of service) can be tailored based on general metrics.  Alur does mention task failures but does not specifically teach or suggest a "historical success or failure rate of one or more previously executed tasks."

The examiner's rebuttal also does not explain how Naik remedies the deficiency of Alur.  The examiner indicates that Naik makes mention of the "calculation of an expected run time of a task based on a statistical analysis of similar tasks run in the past" (OA  mailed 6-28-2013).  However, a general teaching regarding the use of statistical analysis does not teach the use of the specific statistic of a historical success or failure rate of a previously executed task. Assuming that this the mere use of the term QoS in a reference discloses the genus of all error rates, there is no evidence that disclosure of the genus teaches all species within the genus.

Finally, the examiner's rebuttal does not explain how the references either alone or in combination teach the limitations of claims 2-5.  Therefore the TC director did not err in maintaining this error.

### 3.      Serial Number: 11685095

<u>Making proper rejections under 35 USC 102 and 103 with supporting rationale or determining how claim(s) distinguish over the prior art (Cat2. #6).</u>

As Director Garber noted in the Informal Grievance Response:

> Claims 33 and 37-39 were rejected under 35 USC §103 using publications named by the examiner as ERP in view of CRSER and further in view of QC. The first two references primarily deal with comparing search results returned by multiple search engines in response to a query.  QC, on the other hand, deals with using query chains to improve ranking of results.  However, none of the references looking at search results that each includes a <u>bias feature</u> and a <u>relevancy feature</u> that are both used to train a model that <u>predicts a click-through-rate</u> wherein the model is used to <u>reduce presentation bias</u> in the display of search results.  While various of these concepts can be word-matched to the various references, none of them work together or are used in the same context of the claimed invention.  Claims 37-39 provide further details about the predictive models that are not disclosed by the references.  Thus, this error is maintained.

The examiner contends that the statement of error made by the TC director is conclusory and lacks analysis of the sections of the prior art cited and of the examiner's remarks of 7 October 2013 (pgs. 13-21).  In summary, the examiner contends that the lack of analysis by the director has resulted in the examiner not knowing which parts of the rebuttal if any the TC director found unpersuasive (pg. 9-10, Formal Grievance).

While the response to the Informal Grievance is succinct, it sets forth the deficiencies of the references with regard to the limitations of the claims being rejected.  It is also noted that the signatory denial letter, which is part of the record for this grievance, also provides a sufficient level of analysis for the examiner to rebut any of the contentions made with regard to the references used in the rejection (see pg. 3, Signatory Denial letter).  The response to the informal grievance made by the examiner does not present any analysis of the three NPL references, how they would be combined to meet the

limitation of the claims that were rejected.   The examiner's previous response to the letter of concern is also bereft of explanation of how the combination of references meets all of the limitations of the rejected claims—it merely reiterates the original rejection.

The predictive models being claimed here are predicated upon using both presentation bias information and to relevancy information.  The ERP reference teaches using clickthrough data rather than traditional methods for evaluating retrieval functions. Because it refers to automatic learning as future work, ERP does not teach training a model using both presentation bias information and relevancy information.  Similarly, CRSER merely discloses comparing rankings of past search results and therefore is not creating a model to predict future clickthrough rates (see pg. 3 , Signatory Denial letter). Finally, the examiner relies upon the QC reference to teach the step of obtaining information regarding selections of search results provided in response to a plurality of search queries (see pg. 6-7, OA mailed 6-14-2013 and pg. 20, response to letter of concern).  The examiner, by his own admission, did not recognize that of the three references cited, QC was the only reference that taught a learning function.  In addition, none of the examiner's responses indicate where in the cited references were the limitations of training model based on both presentation bias information and relevancy information taught.  Therefore, the TC director did not err in maintaining this error.

**4.    Serial Number: 11543759**

<u>Making proper rejections under 35 USC 102 and 103 with supporting rationale or determining how claim(s) distinguish over the prior art (Cat2. #6).</u>

As Director Garber noted in the Informal Grievance Response:

> Claims 64 and 69 were rejected under 35 USC §103 using Kennedy in view of Griffin.  However, these two references – taken either alone or together – do not disclose presenting a custom form to a user that has at least some of the fields being automatically pre-filled with information gleaned from a JavaScript program analyzing a web page, wherein the pre-filled information includes the JavaScript-determined category, title, rating, description and representative image.  During the informal grievance, the examiner attempted to define "automatically pre-filled with information obtained from the analyzed web page" as the empty content fields of the form.  However, this phrase should be given its plain and ordinary meaning unless it is inconsistent with the specification.  The customary and ordinary definition of this phrase would be that information gleaned from the underlying website would be used to auto-populate some of the fields.  This plain and ordinary meaning is consistent with the specification (see, for example, the last paragraph in page 15 and the second full paragraph on page 55).  To interpret "with information obtained from the analyzed webpage" as empty data fields is inconsistent with both the ordinary and customary meaning and the specification.  The additional information obtained from the website that is claimed in claim 69 is also not met by the references.  Thus, this error is maintained.

The examiner contends that the TC director alleged different errors on October 7, 2013 and October 7, 2014 and that the shift in the TC director's rationale is based on a misunderstanding of the examiner's position of the meaning of "empty content fields." The statement of error discusses the interpretation of this recitation, but also states that

rejection of record does not explain how the references alone or in combination teach all of the limitations of claims 64 and 69.

In particular, new claim 64, which was added in the amendment filed on April 15, 2012, requires the system to:

> *Present a selectable element on the display*… wherein *in response to selection of the selectable element* the programming instructions further cause the processor to:
>> Insert a JavaScript program into the web page, the JavaScript program being configured to analyze the web page…. the *step of analyzing comprising analyzing the web page for a URL, a title, a meta-description, one or more embedded images, and one or more keywords*;
>> Present the custom form on the display, at least some of the plurality of fields of the custom form being *automatically pre-filled with information obtained from the analyzed web page, the prefilled fields including the determined category, a title, a rating, a description, and a representative image for the web page*.

Claim 69 further adds the limitation "wherein analyzing the web page further comprises determining a date or time for an event, and further wherein the custom form includes the corresponding date or time."

These claims require that the web page be analyzed for a combination of numerous items.  Specifically, a URL, a title, a meta-description, one or more embedded images, and one or more keywords (claim 64) and date/time information (claim 69) are to be identified.

The Kennedy reference teaches that JavaScript can be used to find labels for a form and to insert information into a form.  However, Kennedy does not teach or suggest that the script analyzes a web page for a URL, a title, a meta-description, one or more embedded images, and one or more keywords.   The Griffin reference teaches analysis of a URL using Perl script, but does not teach or suggest analyzing for the other items enumerated in claims 64 and 69.

Therefore the TC director did not err in maintaining this error.

**5.     Serial Number:  12036536**

<u>Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)</u>

As Director Garber noted in the Informal Grievance Response:

> Claims 1 and 2 were rejected under 35 USC §103 using Read, Bionda and Chao.  Read discloses vertical search forms within a single service provider.  Bionda discloses a form (such as an expense request form) that has a version that can be used to search the repository of previous filled-out forms by simply filling in some of the fields with data for which you want to search.  Bionda does not disclose anything about vertical search forms or service providers.  The last reference, Chua, is a system that is able to run a single query against several search engines by using "search engine wrappers" to convert the query into the format of the respective search engine.  None of these references – taken alone

or together - disclose a plurality of customized vertical search forms associated with a plurality of service providers, respectively. Additionally, the references do not disclose that, of the plurality of vertical search forms, one of the forms associated with one of the service providers is retrieved.  Claim 2 requires that the system has a form registry that stores the basic vertical search form which is then customized by causing customizations to be retrieved from a registry and combined with the search form.  None of the references disclose these features.

The examiner contends that the TC director failed to make a prima facie case for clear error based on an alleged lack of "individualized analysis of specific arguments raised by the examiner in the response dated October 7, 2013.

I note that the examiner's response from October 7, 2013 contains several instances of new text (not found in the rejection that was reviewed for the Partial Signatory Authority program).  See for example, pg. 34 , portions of second and third full paragraphs; pg. 35, first full paragraph.  Not commenting on statements that were not part of the original rejection does not diminish the TC director's allegation of error.

Further, the examiner has presented an entirely different rationale in the Formal Grievance document  based upon the TC director's admission that Read discloses a vertical search form from the reasons advanced in the Rebuttal to Questions of Concern, dated October 7, 2013 and the OA mailed 8-9-2013.  The Examiner relies upon the admission and legal precedent to argue that Reed's singular process could be extended multiple times based on the legal precedent that mere duplication of parts has no patentable significance unless a new and unexpected result is produced, (pg. 12-13, Formal Grievance).

A rejection is improper when it fails to address a claim limitation where it was probable at the time the rejection was made that either patentability would be predicated on the claim limitation [check this sentence, meaning is not clear to me]. PAP Guidelines p. 19. Although the Office action does mention the limitation at issue because you copied and pasted claim language into the action, the Office action fails to present the analysis from the Rebuttal nor anything that could reasonably be construed as the application of legal precedent. See Office Action pp. 3-17. Given the Applicant's argument that the feature at issue distinguishes the claims over the prior art, Remarks p. 12, the failure of the Office action to include the rationale makes the rejection improper. Therefore, the TC director did not err in maintaining this error.

## 6.    Serial Number:  11685871

Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)

As Director Garber noted in the Informal Grievance Response:

Claim 1 was rejected under 35 USC §103 using Kawamura in view of Ohsaki. The examiner has specified that the "synch point" in Kawamura is being mapped to the claim "way point".  The "synch point" in Kawamura is defined as that point in time when the contents of the database are synchronized with the system execution state.  Taking this interpretation, neither Kawamura nor Ohsaki disclose "Deferring issuance of a disk write operation for an updated database page….until a log record is written to the transaction log….and the log record is

located at a point in the transaction log past the waypoint".  This is the opposite of the synch point in Kawamura.  All of the disk write operations must be complete in order for the database to have reached a synchronization point.  Ohsaki does not cure this deficiency, as it is not related to writing updated database pages at all, nor does it disclose deferring the write operation until a log record is located past a waypoint.  Thus the second limitation is not met by the references in a way consistent with the examiner's interpretation that the "synch point" in Kawamura is the claimed "waypoint".

The examiner contends that the TC director has misunderstood the examiner's combination of references.  The examiner reiterates the rationale of the rejection and concludes that there is a motivation to combine.   See pg. 14-15, Formal Grievance.

The examiner's error, as the TC director notes above, is in equating Kawamura's "synch point" with the claim's "waypoint."  In summary, Kawamura teaches that syncpoint is a synonym for checkpoint. Col. 1:13-17. In the portions of Kawamura that discuss syncpoints, Kawamura uses the term syncpoint in the same manner as Applicants use checkpoints. Given that claim 1 refers to both a waypoint and a checkpoint and the different uses of the terms in Applicant's specification (pars. 0008, 0014, 0028), it was unreasonable for the examiner to point to Kawamura's checkpoint to teach the waypoint of claim 1. There is nothing in Kawamura that reasonably teaches or suggests a waypoint. Nor does Ohsaki teach or suggest a waypoint for the reasons given in the informal grievance decision.  See pg. 4.  Since neither reference teaches or suggests a waypoint, the rejection of claim 1 was a clear error because the limitations of the rejected claim were not fully met by the references used in the rejection.  Therefore, the TC director did not err in the maintaining of this error.

## 7.    Serial Number: 13/371,634

<u>Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)</u>

As Director Garber noted in the Informal Grievance Response:

> In the Office action, claim 5 was rejected by Burrows in view of Hsieh.  Primarily, MPEP §2144 was relied upon as a way to "extend the teaching of Burrows" to cover claim 5, specifically §2144.04(VI)(B) related to duplication of parts.  However, it should be noted that §2144 also specifies that (in the first paragraph of the section) rationales such as "duplication of parts" should not be treated as *per* se rules and should be explained as to how it is applicable to the application at-hand.  Even more importantly, claim 5 requires more than a mere duplication of columns of data.  There are functional requirements in the claims regarding the interrelationships of the columns.  Claim 5 adds to the "determining whether the user is authorized to access the database object based on the second column" limitation of claim 1 by adding that this step further includes accessing a row in a <u>second</u> database table to <u>determine a match</u> from the second column (of claim 1) to the value in the third column and determining access based on a fourth column in the second database.

The examiner contends that MPEP section 2144 was not applied in a per se manner, that the examiner used the duplication of the parts for a repetition of the prior art's

underlying process and that the TC director did not set forth a clear error.  The examiner reproduces pg. 49-50 of the October 7, 2013 reply.  See pg. 15-17, Formal Grievance.

I have reviewed the examiner's comments in the documents submitted as well as the Office action which is the subject of this section of the grievance (mailed 9-6-2013).  The statement of rejection for claim 5 is confusing at best.  It does not follow the Graham v. Deere format in terms of setting forth what the base reference teaches, what it lacks and the specific teachings of the secondary reference relied upon to cure the deficiencies of the base reference.  Regardless of format; however, the office action lacks any analysis/explanation of how to combine the teachings of Burrows with specific teachings of Hsieh to arrive at the complete invention of claim 5.  No nexus is set forth between the teachings of Burrows (which teaches a plurality of columns) and that of Hsieh (which teaches a plurality of tables)—or how such a combination would be made such that different columns from different tables could be used.  As the TC director points out above, claim 5 requires more than a mere duplication of columns of data.  It would appear that the claim actually refers to more than one table/database/tenant.  Hsieh starts with this premise by building relationships (trust hierarchies) between multiple tenants.  That the Office action does not discuss relevant teachings of the Hsieh reference renders the rejection incomplete as to the full limitations of the claim being rejected.  Therefore, the TC director did not err in maintaining this error.

8.   **Serial Number:  12/330,371**

Making proper rejections under 35 USC 102 and 103 with supporting rationale, or determining how claim(s) distinguish over the prior art (Cat2, #6)

As Director Garber noted in the Informal Grievance Response:

> In the Office action, claims 2 and 3 were rejected under 35 USC §103 using Harrison in view of Lasser.  Harrison does disclose storing assets that includes determining the directory path of the asset creates a "local symbolic link" that a client can use to retrieve the asset.  The link is stored on the client.  Harrison also discloses that stored assets can be modified – but the modified version is generally stored in the place of the original asset, thus no link is created.  In this case, there would be no under message that an asset has been modified, no determination of a second operating link, and no storage of the second operating link in a second reference file, as claimed in claim 2.  With respect to claim 3, Harrison does disclose that there are instances when one may want to store various version of the asset, but the versions are stored in the same storage system resource (thus, no new on-disk location, no second operating system link, and no replacing the first operating system link with the second operating system link as claimed in claim 3).  The secondary reference does not cure these deficiencies.

The examiner contends that there was no meaningful opportunity for reply because the TC director presented materially different errors.  The examiner further contends that Harrison teaches the creation of links between files between the client and the external storage (see for example, pg. 18 of Formal Grievance, pg. 53-54, Response to Letter of Concern).

I note that both the denial of Partial Signatory Authority letter and the response to the informal grievance set forth the concern that the step of "storing the second operating system link in a second reference file stored externally from the asset management system" is missing from the teachings of Harrison and Lasser.  Additionally, both documents refer to the rejection of claims 2 and 3.

The examiner's comments in the documents submitted and the Office action which is the subject of this section of the grievance have been fully considered.  As noted previously, the examiner's statement of rejection with regard to a given claim is confusing.  While the Office action states that claims 2 and 3 are rejected over the combination, it is not clear what teachings from which reference are relied upon for the different limitations.

When considering the portions of Harrison relied upon by the examiner, it is not evident how Harrison teaches storing a second operating system link *in a second reference file* that is stored externally from the asset management system.  Harrison describes how temporary and final versions of a "Doobie_character" file are mapped to different partitions on the asset management system. Pars. 0093-94. Based on the fact that the temporary and final versions of the file would have different names, they would have different logical links. See par. 0066.  However, just because Harrison shows that the files would have different links does not mean that these links are stored in different reference files.  Claim 2 requires the second operating system links to be stored in a second reference file that is different from the reference file in which the first operating system link is stored. See final step of claim 1 and last step of claim 2. In a portion of Harrison not relied upon by the examiner, Harrison describes how in one embodiment the access program determines whether a logical link exists at the operating system level. Par. 0069. This general discussion of the use of the operating system does not teach or suggest storing the second operating system link in a second reference file. In the same paragraph, Harrison describes how the access program may search through a textual list stored on the client system. Par. 0069. However, nothing in Harrison teaches or suggests that more than one textual list for indicating which animation asset identifiers have associated paths.

It is not evident how Lasser teaches this limitation either. Lasser teaches a parallel virtual file system for parallel processing systems. Col. 1: 6-9.  Therefore, the TC director did not err in maintaining this rejection.

Based on the reasons presented above, your requested remedy to be granted partial signatory authority as stated in the Formal Grievance is hereby denied.